## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BYUNG-GOOK HAN, Derivatively on Behalf of PURECYCLE TECHNOLOGIES, INC., | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| MICHAEL OTWORTH, RICHARD BRENNER, TANYA BURNELL, JEFFREY FIELER, TIM GLOCKNER, FERNANDO MUSA, JOHN SCOTT, DAVID BRENNER, MICHAEL E. DEE, TASMIN ETTEFAGH, and BYRON ROTH, | ) Case No. ) ) ) ) ) ) ) ) |
| Individual Defendants, -and- | ) ) ) |
| PURECYCLE TECHNOLOGIES, INC., a Delaware corporation, | ) ) ) |
| Nominal Defendant. | ) ) |

## <u>VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff Byung-Gook Han ("Plaintiff"), by his attorneys, submits this Verified Stockholder Derivative Complaint for Violations of Securities Laws, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Plaintiff alleges the following upon information and belief, except as to the allegations specifically pertaining to Plaintiff, which are based on personal knowledge. This complaint is also based on the investigation of Plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## <u>NATURE AND SUMMARY OF THE ACTION</u>

1. This is a stockholder derivative action brought by Plaintiff on behalf of Nominal

Defendant PureCycle Technologies, Inc. ("PureCycle" or the "Company"), formerly known as Roth CH Acquisition I Co. ("Roth Acquisition"), against members of the Company's board of directors (the "Board") and members of upper management. The wrongdoing alleged herein has caused substantial damage to PureCycle's reputation, goodwill, and standing in the business community and has exposed PureCycle to substantial potential liability for violations of federal securities laws and the costs associated with defending itself. The violations of the law outlined herein have damaged PureCycle in the form of, among other things, millions of dollars in losses to the Company's market capitalization.

2.      This action seeks to remedy wrongdoing committed by PureCycle's directors and officers from November 16, 2020 through the present (the "Relevant Period").

3.      PureCycle produces recycled polypropylene ("Polypropylene" or "PP"). Polypropylene is one of the most used thermoplastics in the world. Polypropylene's uses range from plastic packaging, plastic parts for machinery and equipment, and fibers and textiles. The Company holds a license for restoring waste PP into virgin-like resin. Its proprietary process removes color, odor, and other contaminants from recycled feedstock to produce recycled PP.

4.      Until November 2020, PureCycle's predecessor, Roth Acquisition, was a publicly traded special purpose acquisition company ("SPAC")[1] created for the sole purpose of effecting a merger, stock exchange, acquisition, reorganization, or similar business combination with one or more businesses. Roth Acquisition was incorporated in Delaware on February 13, 2019 but, as a SPAC in search of a business to acquire, it had no ongoing business operations.

---

[1] A SPAC is essentially a shell company set up by investors with the sole purpose of raising money through an IPO to eventually buy another company. A SPAC has no commercial operations, makes no products, and does not sell anything. In fact, a SPAC's only assets are typically the money raised in its own IPO. A company might choose to go public through a SPAC versus a traditional IPO because the process is quicker, with lower associated costs and fewer extensive financial disclosure requirements.

5.      In October 2020, shortly before the beginning of the Relevant Period, PureCycle completed a $250 million bond raise that it announced would help finance the Company's first commercial plant in Ironton, Ohio. The Company has stated that production will commence in the Ironton plant in 2022, with 2023 listed as the full capacity date. The Company has also said that it plans to have five plants operational by 2023.

6.      The Relevant Period begins on November 16, 2020 when PureCycle said it would list its common stock on the NASDAQ via a reverse merger with Roth Acquisition, which was then trading on the NASDAQ under the ticker symbol "ROCH". At that time, the Company claimed that PureCycle was forecasting for its revenues to reach $8 million in 2022 as its first plant in Ironton launched. It further stated that revenues would then increase to $224 million in 2023 with the first five plants coming into fruition. By 2024, PureCycle stated it was forecasting to reach $800 million in revenues, with EBITDA margins of over 50%.

7.      The price of PureCycle common stock (then still trading as ROCH), increased as the Company continued to tout the prospects of the combined business and the merger, which its shareholders approved at a special meeting held virtually on March 16, 2021. Shares of PureCycle also began trading on NASDAQ under the ticker symbol PCT on March 18, 2021. On that date, Roth Acquisition/PCT stock reached an all-time high of $35.75 per share.

8.      While the Company does not have any current production and has not had any revenue since it began, it has a current market valuation of $3.1 billion, and an enterprise value of ~$2.8 billion, owing to the $308 million in cash it raised through its SPAC and private investment in public entity ("PIPE") rounds.

9.      During the Relevant Period, the Company made materially false or misleading statements, which included premature financial projections in relation to the commercial viability

of its key product, Polypropylene, that were not backed up by any reliable or tangible data or peer reviewed studies. The Individual Defendants' statements understated or omitted the Company's competition in the plastics industry and overstated the Company's business performance, financial and operational metrics, financial prospects, and commercial scale.

10.     Moreover, the Company did not disclose that the management team bringing PureCycle public had no specific experience in the Polypropylene industry and had previously taken six companies public with disastrous results. Of those six companies, two went bankrupt, three were delisted, and one was acquired following a ~95% decline. Over $760 million in public shareholder capital was incinerated in the process.

11.     Thus, unbeknownst to the investing public, the primary motivation of the management team bringing PureCycle public was to complete any transaction, good or bad, in order to obtain tens of millions of dollars in cash and tradable shares. This background would have been highly material to investors when choosing to invest in a new Company like PureCycle, which was reliant solely (as with the other six failed business brought public by this management team) on one key product.

12.     The Individual Defendants breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact. The Individual Defendants also willfully or recklessly caused the Company to fail to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

13.     As detailed herein, and as alleged in the ongoing federal securities class action in the Middle District of Florida styled *Theodore v. Purecycle Technologies, Inc. et al.*, Case No. 6:21-cv-809, (the "Federal Securities Class Action"), PureCycle's officers and directors

substantially damaged the Company by filing false and misleading statements that omitted material adverse facts.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1). This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that would not otherwise have such jurisdiction.

16.     Venue is proper in this District because PureCycle is incorporated in this District and the Defendants' activities have had an effect in this District.

## THE PARTIES

### Plaintiff

17.     Plaintiff Byung-Gook Han is and has continuously been a stockholder of PureCycle during the wrongdoing complained of herein.

### Nominal Defendant

18.     Defendant PureCycle is a Delaware corporation, founded in 2015, which has principal executive offices at 5950 Hazeltine National Drive, Suite 650, Orlando, Florida, 32822. PureCycle's shares trade on the NASDAQ under the ticker symbol "PCT." Until the March 17, 2021, completion of the merger with Roth Acquisition ("the Merger"), the common stock of Roth Acquisition traded on the NASDAQ under the ticker symbol "ROCH."

### Individual Defendants

*Director Defendants*

19.     Defendant Michael Otworth ("Otworth") is, and at all relevant times has been, the

Chief Executive Officer ("CEO") of PureCycle and has served as the Chairman of the Board since completion of the Merger. In addition to his sizeable salary, he received $5,000,000 solely due to the successful consummation of the SPAC transaction.

20.     Defendant Richard Brenner ("Rick Brenner") at all relevant times has been a director of PureCycle.

21.     Defendant Tanya Burnell ("Burnell") at all relevant times has been a director of PureCycle.

22.     Defendant Jeffrey Fieler, ("Fieler") at all relevant times has been a director of PureCycle.

23.     Defendant Tim Glockner ("Glockner") at all relevant times has been a director of PureCycle.

24.     Defendant Fernando Musa ("Musa") at all relevant times has been a director of PureCycle.

25.     Defendant John Scott ("Scott") at all relevant times has been a director of PureCycle. He is a Founder and Principal of the Company and has served as the Company's Chief Science Officer and as a member of the Company's board of directors since October 2015. Additionally, he has served as a senior scientific advisor to the Company's management team since 2015.

26.     Together, Defendants Otworth, Rick Brenner, Burnell, Fieler, Glockner, Musa, and Scott may be referred to herein as the "Director Defendants."

***Officer Defendants***

27.     Defendant David Brenner ("David Brenner") is, and at all relevant times has been, the Chief Commercial Officer ("CCO") of PureCycle.

6

28.    Defendant Michael E. Dee ("Dee") is, and at all relevant times has been, the Chief Financial Officer ("CFO") of PureCycle. In addition to his sizeable salary, he received $2,000,000 solely due to the successful consummation of the SPAC transaction.

29.    Defendant Tasmin Ettefagh ("Ettefagh") is, and at all relevant times has been, Chief Sustainability Officer of PureCycle.

30.    Defendant Byron Roth ("Roth") was, prior to the Merger, the Chairman and CEO of Roth Acquisition. Defendant Roth is the CEO and Chairman of Roth Capital Partners, LLC ("Roth Capital"), an investment banking firm that focuses on the small-cap public market. Roth Capital, along with Craig-Hallum Capital Group LLC ("Craig-Hallum"), were the underwriters of the Company's deal with Roth Acquisition and received almost 2 million shares in the Company for just over a penny per share through their sponsorship of the SPAC deal.

31.    Collectively, Defendants Otworth, Rick Brenner, Burnell, Fieler, Glockner, Musa, Scott, David Brenner, Dee, Ettefagh, and Roth are referred to herein as the "Individual Defendants."

32.    The Individual Defendants, because of their positions with PureCycle, possessed the power and authority to control the contents of PureCycle's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance, and each had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and/or

misleading.

## SUBSTANTIVE ALLEGATIONS

### Background

33.     PureCycle's technology is based on a license it received from the Procter & Gamble Company ("P&G") in October 2015. P&G created the technology underlying PureCycle's entire business because Polypropylene was the largest plastic type used by P&G, and it has historically been difficult to recycle. However, P&G did not choose to develop the technology internally to grow its business from this technology or license the technology to a company with any relevant background in plastics or polycarbon. Instead, P&G licensed the technology to PureCycle in October 2015, around the time the Company was founded.

34.     The management team of PureCycle, however, did not have any substantive experience in Polypropylene recycling. This lack of experience in the Polypropylene recycling industry is evident from the broad and unspecialized goals stated by the Company prior to going public.

35.     Prior to PureCycle announcing it was going public through the Merger in November 2020, it was owned and controlled by Innventure LLC ("Innventure"), a Florida-based startup which describes its goal as working with multinational companies to "identify, grow and commercialize their proprietary IP while strategically partnering for success."

36.     Innventure was founded by Defendants Otworth, Rick Brenner, and Scott. Defendants Otworth and Rick Brenner currently serve on Innventure's board of directors and Defendant Scott serves as Innventure's Chief Science Officer and a member of its Investment Committee.

37.     Innventure's management boasts about allegedly successful IPOs for which they were responsible. While the Company made positive representations about these IPOs, it failed

8

to disclose to investors of Roth Acquisition or PureCycle, during the Relevant Period, that these prior allegedly successful IPOs resulted in significant investor losses. For example:

- *ChromaVision Medical Systems* made imaging systems to detect cellular diseases. Defendant Scott served as Chairman of ChromaVision. ChromaVision amassed a $64.2 million accumulated deficit by end of year 2001 and received a notice of delisting in October 2004.

- *eMerge Interactive, Inc.* was an online cattle auctioneer. Defendant Scott served as Chairman at eMerge, beginning in September 1994, before resigning in November 2001. eMerge amassed a $212.4 million accumulated deficit by the end of 2005. eMerge filed for Chapter 11 bankruptcy and wasdelisted in 2007.

- *AgCert International, Ltd.* focused on reducing emissions from pig dung. Bill Haskell, CEO of Innventure, acted as "representative" for his group'sinvestment in AgCert and also served as the company's interim CEO in 2005 through at least 2007. AgCert amassed a €141.1 million accumulated deficit by mid-2007. The company delisted after "misjudging its carbon credit portfolio" in 2008 and filed for insolvency in 2012.

- *TyraTech, Inc.* was focused on developing insectcontrol products. Defendant Rick Brenner served as founding CEO at TyraTech until 2009. TyraTech went public during his tenure and amasseda $55.5 million accumulated deficit by his departure. TyraTech was acquired in 2018 for just $2.15 million after declining approximately 95% from its highs.

- *PetroAlgae* claimed to have found a way to economically turn algae into fuel. Defendant Scott served as CEO of PetroAlgaehe. The zero-revenue company filed to go public in 2010.PetroAlgae amassed a $73.8 million accumulated deficit by2010, and the company was delisted onto the OTC pink sheets by 2011. Scott resigned as Chairman in February 2012. The company changed its name in 2012 and ultimately had its securities registration revoked in 2017.

- *XL TechGroup, Inc.* was a venturecapital/incubator company that preceded Innventure. Defendant Scott served as Co-Founder and CEO of XL TechGroup and Otworth held a C-level role at XL TechGroup. Bill Haskell, CEO of Innventure, served as Co-Founder and President of XL TechGroup. The company went public in 2004, amassed a $189.6 million accumulated deficit, and

its stock was delisted and cancelled in August 2008.

**Materially False and Misleading Statements**

38.     The Relevant Period begins on November 16, 2020, when PureCycle announced

via a press release (the "November 2020 Press Release") that it would become a publicly traded

company via an agreement and plan of merger with Roth Acquisition. In this press release,

PureCycle touted that it had "a revolutionary and proprietary cost-effective method to recycle

waste polypropylene to virgin-like resin" that was "built on patented technology invented by

Procter & Gamble, to be globally commercialized by PureCycle."

39.     The November 16, 2020 Press Release stated:

PureCycle Technologies LLC holds a global license to commercialize the only
patented solvent-based purification recycling technology for restoring waste
polypropylene into virgin-like resin. This process, developed by The Procter &
Gamble Company ("P&G"), and commercialized by PureCycle, is both more cost-
efficient and environmentally sustainable than the traditional manufacturing
process of producing virgin polypropylene, utilizing approximately 75% less
energy.[1] PureCycle's Ultra-Pure Recycled Polypropylene ("UPRP") has nearly
identical properties and applicability for reuse as virgin polypropylene. PureCycle
intends to obtain a Letter of No Objection from the U.S. Food and Drug
Administration for its UPRP to be used in food grade applications.

Strong interest and broad global awareness of PureCycle has resulted in strategic
investments and highly-attractive offtake agreements with notable groups
including Aptar, BMW i Ventures, Closed Loop Partners, Wasson Enterprise,
Glockner Enterprises, L'Oréal, Milliken & Company, P&G, Ravago, and Total.
As a result of this strong demand, PureCycle has contracted pricing for its UPRP
that is both de-linked from commodity pricing and at a premium to virgin
polypropylene resin. Combined with abundant polypropylene waste feedstock,
PureCycle expects to achieve EBITDA margins in excess of 50% from the
Company's first seven plants in 2024.

The Company is building its first commercial-scale plant in Ironton, Ohio, which
is expected to have nameplate capacity of approximately 107 million pounds per
year when fully operational. Production is expected to commence in late 2022 with
full capacity expected to be achieved in 2023. PureCycle raised approximately
$250 million in a tax-exempt municipal bond offering in October 2020 to fund the
construction of the Ironton facility. The Company has long term contracts for
feedstock to supply the Ironton plant production and has entered into long term

offtake agreements with leading global customers and Fortune 500 partners for all of the production of its UPRP from the Ironton facility.

PureCycle intends to build new recycling production facilities globally, with the goal of having 30 commercial lines operational by 2030 and 50 by 2035. In addition to PureCycle's first plant in Ironton, Ohio, the Company expects to announce its next location in Europe and to commence production in 2023 with a nameplate capacity of approximately 107 million pounds when fully operational. Additional expansion in the United States is expected to include five scaled up commercial lines capable of producing over 165 million pounds each of its UPRP. Pre-engineering for the design and installation of five commercial lines in a single "cluster" site is currently underway and will result in a combined capacity of over 825 million pounds annually in one location. Production from the Ironton, Europe, and cluster sites are expected to bring over 1.2 billion pounds of annual recycled polypropylene to the market in the next five years.

"This transaction represents a key milestone in PureCycle's mission to transform polypropylene into a recyclable and sustainable product," said Mike Otworth, CEO of PureCycle. "Our recycling process produces virgin-like resin that we believe is suitable for high-value, food-grade consumer products, and we believe we are well-positioned to meet the consumer demand for recycled content as well as global sustainability mandates.[2] The proceeds of this transaction are intended to provide us with the balance sheet strength to accelerate the global rollout of our proven technology addressing the immense global problem associated with polypropylene waste. The current global challenges surrounding polypropylene waste are significant. Of the approximately 170 billion pounds of polypropylene waste produced annually, less than 1% is recycled today; the remainder largely ends up in landfills and the ocean, creating a massive environmental problem. We look forward to partnering with the Roth CH team on an efficient, accelerated path for a successful public listing."

_____

[1] According to Company internal estimates; an independent Life Cycle Analysis (LCA) is planned to occur in 2021
[2] A No Objection Letter from the FDA is required to claim resin is suitable for food grade use

40.     The November 16, 2020 Press Release quoted Defendant Roth, Chairman and CEO

of Roth Acquisition, as stating:

> ***We searched for a business combination that would not only be a compelling growth company but could also benefit from the relationships and experience of our two growth investment banks. We believe PureCycle's technology will be transformative in plastic recycling and help companies meet their sustainability goals.*** We look forward to sharing additional details on this exciting transaction

in the coming months. We appreciate all of our shareholders and investors that have participated in the IPO and PIPE transactions. We look forward to a successful future together.

(Emphasis added).

41. Further, the November 16, 2020 Press Release boasted about the experience of PureCycle's management team. Notably, it failed to mention any substantive experience in polypropylene recycling:

> PureCycle is retaining its experienced management team, including CEO Mike Otworth, CCO David Brenner, and CFO Michael Dee. Mr. Otworth has over 23 years of experience **leading and scaling early-stage companies**. Mr. Brenner was PureCycle's first hire and has led PureCycle's commercial expansion over the last four years. Mr. Dee spent nearly three decades in public markets, corporate finance, private equity and M&A in senior roles at Morgan Stanley, Temasek Holdings and the Asian Infrastructure Investment Bank.

(Emphasis added).

42. The November 16, 2020 Press Release also contained links to a webinar during which Roth Acquisition and PureCycle management discussed the proposed transaction (the "November 2020 Webinar"), along with an accompanying investor presentation (the "November 2020 Investor Presentation"). During the November 2020 Webinar, Individual Defendants Otworth, Dee, and David Brenner presented information regarding the benefits of PureCycle's business metrics and financial prospects. A transcript of the November 2020 Webinar on Schedule 14A was filed with the SEC by Roth Acquisition on November 16, 2020.[2]

43. The transcript of the November 2020 Webinar, as filed with the SEC, was considered soliciting material pursuant to §240.14a-12. Therein, Defendant Otworth stated, in part:

> [Demand for polypropylene] continues to grow, yet recycling rates aren't growing. So what's really needed is a game changing, transformational technology that will drive higher utilization of recycled polypropylene and ***that's our mission and that's what we will succeed in doing going forward***.

---

[2] Roth CH Acquisition I Co., Proxy Statement (Schedule 14A) (Nov. 16, 2020).

***

The slide demonstrates a bit of the difference between what mechanically recycled polypropylene is typically used for today and ***what our customers will be able to use our resin for***. So you see, the black pellets, that's what and that's what recycled polypropylene often looks like today. You have all different colors that are ground up. And so, as we know, when you mix every color of the rainbow, you end up with black. And, you know, this type of dark colored resin is used for things like trash cans and battery casings. But it can't be used for applications where you need bright brand colors, where you need food-contact grade resin, and where you the typical types of products and packaging that represent premium products are rather inconsistent with so, you know, what you can make out of mechanically recycled plastic today. ***We're changing that in a very dramatic way. And so, as I said, customers can use our resin, they can use it interchangeably with virgin resin, and they can make, you know, the same brand colors with the same appearance in the same degree of hygiene that that they expect from virgin resin today.***

(Emphasis added).

44.     Also on November 16, 2020, Roth Acquisition filed a copy of the November 2020 Investor Presentation as Exhibit 99.2 to a Form 8-K. Among other things, the November 2020 Investor Presentation emphasized PureCycle's allegedly experienced management team. Defendants Otworth, Dee, and David Brenner, who are listed as the presenters, highlighted the purported value of the Company's technology and intellectual property rights, noting PureCycle's "Significant Progress and Achievements" on the following slide in the November 2020 Investor Presentation:



45.     After detailing the construction and rollout of new factors, the November 2020 Investor Presentation also provided strong financial guidance, with charts forecasting the growth of the Company's plants into the future.

46.     On November 20, 2020, Roth Acquisition filed a Registration Statement on Form S-4 with the SEC, signed by Defendant Roth and several non-parties. This Registration Statement noted, in relevant part:

**Proprietary and Proven Technology Developed by Procter & Gamble**

PCT utilizes a proprietary purification process that converts waste polypropylene feedstock into UPRP pellets with similar characteristics to virgin polypropylene. The Technology was developed by P&G, and PCT has a global license from P&G. PCT's process utilizes a broad range of feedstocks including waste carpet, stadium cups and supersacks and produces virgin-quality UPRP pellets that are clear, odorless and contaminant-free, making it suitable for use in almost all polypropylene applications including high-value, food grade consumer products.

This patented process was developed by P&G over the course of eight years and has been refined by PCT over the past five years with more than 350 laboratory tests and with over 1,000 pounds of UPRP produced at the Feedstock Evaluation Unit (also called the "FEU" or "Phase I Facility") since its commissioning in July 2019. In addition, PCT's purification process and UPRP quality have been validated by independent technical consultants and many of PCT's strategic partners and initial customers.

47.    On February 12, 2021, Roth Acquisition filed a proxy statement with the SEC on Schedule 14A (the "Proxy"), to schedule a virtual special meeting of shareholders on March 16, 2021. Like the November 16, 2020 press release, the Proxy touted the strength of the Company's business, technology, management, and intellectual property rights, stating, in pertinent part:

> **PCT's ground-breaking patented recycling process**, developed by Procter & Gamble and licensed to PCT, separates color, odor and contaminants from plastic waste feedstock **to transform it into ultra-pure recycled polypropylene. PCT's recycling service converts waste plastic into near-virgin plastic, fully closing the loop on the reuse of recycled plastics while making recycled polypropylene more accessible at scale to companies desiring to use a sustainable, recycled resin.**[3]

48.    Describing the Roth Acquisition board's reasons for approval of the business combination, the Proxy stated:

> In particular, ROCH's Board considered the following positive factors, although not weighted or in any order of significance:
>
> - **Strong Technology Representing Significant Innovation**: PCT's unique, patented process separates colors, odors and contaminants through a physical purification process (not involving chemical reactions), allowing for a broader range of feedstock than traditional recycling. This purification process and resulting product quality have been tested and validated by P&G, prospective customers and third party engineering specialists.
> - **PCT Secured Significant Investment by Lenders and Satisfied Bond Investor Due Diligence**: PCT's Construction Indebtedness involve three levels of technology requirements:
>   - Public report regarding independent evaluation of technology;
>   - Scaling risk quantification; and
>   - Infrastructure evaluation.

---

[3] Roth CH Acquisition I Co., Proxy Statement (Schedule 14A) (Feb. 12, 2021).

As well as meeting the following commercial requirements:

- o Proof of scale up;
- o 20+ year feedstock agreements; and
- o 20+ year offtake agreements.[4]

49.     Like the Company's November 2020 Press Release, the Proxy also boasted about the apparent strength of PureCycle's management team, stating:

> - **Strong Management Team: The PCT management team has broad experience across plastics manufacturing, plant development, technology, R&D,** sales, marketing, accounting and finance. PCT Chief Executive Officer Mike Otworth has over 23 years' experience **leading and scaling early stage companies**, holding multiple senior management positions with a **proven track** record of founding and capitalizing startups. Chief Financial Officer Michael Dee was a senior executive at Morgan Stanley and has over 30 years of public markets, corporate finance, and M&A experience. Chief Science Officer John Scott holds a dual Ph.D. in Physics and Astrophysics, authored over 60 academic papers, and was the CEO of the XL TechGroup, the precursor company of Innventure. Chief Commercial Officer David Brenner brings over 15 years' **experience leading transformational projects in a range of industries** and was a Senior Manager at Deloitte prior to joining PCT. Director of Technology Jason Vititoe holds two product patents in polystyrene and decades of engineering leadership experience working for Americas Styrenics and Dow Chemical Company. Senior Director of Operations Chris Talarek has over 20 years of operations leadership at BP Oil, P&G, and Timbertech. Combined, the PCT executive team has over 100 years' experience leading operations and over 70 years operating equipment.[5]

50.     The Proxy also described PureCycle "as a leader in polypropylene recycling and polymers sustainability" and repeated representations from previous filings regarding the efficacy of the technology it licensed from P&G to restore waste polypropylene into resin with near-virgin characteristics.

51.     On March 16, 2021, shareholders approved the Merger and related governance and financing terms by a large margin.

---

[4] *See id*. at 70.

[5] *Id*.

16

52.     On March 18, 2021, PureCycle issued a press release (the "March 18 Press Release") announcing that its business combination with Roth Acquisition was approved by Roth Acquisition's shareholders at a special meeting held on March 16, 2021, and that PureCycle's shares would begin trading under the ticker symbol PCT beginning the same day.

53.     In the March 18 Press Release announcing approval of the Merger, Defendant Otworth stated that "[t]he consummation of this transaction represents yet another major milestone for PureCycle, demonstrating broad market validation of our value proposition...Most importantly, we now have the increased capital market access to support the accelerated scaling required to revolutionize the transformation of waste propylene into sustainable products."

54.     Otworth further stated that: "[o]ver the last three months, PureCycle has further developed its financial and manufacturing capabilities...This is now an execution game for PureCycle. It's incumbent on us to pull forward the best most knowledgeable leaders to ensure that we realize the full potential of this technology."

55.     Also, in its March 18 Press Release, PureCycle stated that it "uses proprietary technology licensed from Procter & Gamble to recycle waste polypropylene (PP) into virgin-like recycled PP for myriad applications. The company is at the intersection of an enabling technology meeting a compelling global need." The press release also included a quote from Byron Roth, Chairman and CEO of Roth Acquisition: "PureCycle's revolutionary and proprietary technology recycle waste polypropylene into virgin-like resin is not only transformative, but also beneficial to our planet. We are confident that PureCycle has the resources to deliver substantial value for all stakeholders."

56.     On April 21, 2021, PureCycle issued a press release entitled "PureCycle's Tasmin Ettefagh facilitates plastics industry dialogue about polypropylene recycling solutions in light of

U.S. Plastics Pact: Ultra-pure recycle polypropylene manufacturer CSO drives narrative." In this release, PureCycle announced that Defendant Ettefagh had participated in two conferences leading up to Earth Day and had "moderated a panel discussion about advanced recycling technologies and how these may impact commitments made by the U.S. Plastics Pact." In this press release, Defendant Ettefagh stated "PureCycle is uniquely positioned to reduce the use of non-renewable virgin plastics and minimize negative environmental impacts." She added that "PureCycle's proprietary recycling technology was developed by [P&G], and it's this type of top-down investment that's driving the circular economy."

57.    This April 21, 2021 press release continued:

PureCycle uses proprietary technology licensed from The Procter & Gamble Company (P&G) to recycle waste PP into virgin-like recycled PP for a myriad of applications. The company is the intersection of an enabling technology meeting a compelling global need: only approximately 1% of the 170 billion pounds of PP consumed last year was recycled as compared to almost 20% for polyethylene terephthalate (PET), according to the American Chemistry Council.

58.    The statements referenced above in ¶¶ 38-57 were materially false and misleading when made because they failed to disclose the following adverse facts, which were known to Individual Defendants or recklessly disregarded by them as follows:

(a)    that the management team bringing PureCycle public had previously brought six other businesses public, all of which failed thereafter;

(b)    that the management team bringing PureCycle public had characterized rank speculation as financial projections to investors in the past;

(c)    that the primary motivation of the management team bringing PureCycle public was to complete any transaction, good or bad, in order to obtain tens of millions of dollars in cash and tradable shares;

(d)    that PureCycle faces higher competition for high quality feedstock than it has led investors to believe, materially undermining the management team's financial projections;

18

(e)    that PureCycle's patent is nowhere near as cogent or valuable as it has led
investors to believe, and the technology underlying its business operations
is unproven and presents serious issues even at lab scale;

(f)    that the Company's flammable pressurized process is not yet functional,
especially at scale, and is dangerous;

(g)    that the Company purports to be advancing to commercial production
scale despite still having operational issues at a lab scale; and

(h)    that as a result of the foregoing, Individual Defendants' positive
statements during the Relevant Period about the Company's business
performance, financial and operational metrics, and financial prospects
were false and misleading and/or lacked a reasonable basis.

## THE TRUTH EMERGES

59.    Early on May 6, 2021, analyst Hindenburg Research published a revealing report
on PureCycle entitled "PureCycle: The Latest Zero-Revenue ESG SPAC Charade, Sponsored by
the Worst of Wall Street" (the "Report").

60.    The Report disclosed, among other things, that:

(1)    multiple former employees of Defendant Otworth and other PureCycle
executives told Hindenburg that "PureCycle's executives based their
financial projections on 'wild ass guessing', brought companies public far
too early, and [] deceived investors;"

(2)    unlike most "leading plastics companies [that] publish peer reviewed
studies that detail their advancements in the field," Hindenburg was "unable
to find a single peer reviewed study in any scholarly journal citing or
reviewing PureCycle's licensed process;"

(3)    "multiple competitors and industry experts . . . explained that PureCycle
faces steep competition for high quality feedstock, and called the
company's financial projections into question;"

(4)    "a 30-year expert on polymers, with a background in advanced plastics recycling . . . told [Hindenburg] the company's patent is 'indirect,' 'vague,' and a 'regurgitation' of prior art;"

(5)    the same expert "referred to the company's flammable pressurized process as a 'bomb' and warned about the company forging ahead to commercial scale despite having issues at a lab scale;" and

(6)    "PureCycle represents the worst qualities of the SPAC boom; another quintessential example of how executives and SPAC sponsors enrich themselves while hoisting unproven technology and ridiculous financial projections onto the public markets, leaving retail investors to face the ultimate consequences."

61.    The Report also noted that, although PureCycle previously announced that it aimed to generate revenue from its "commercial scale production facility in late 2020," in its latest company presentation, PureCycle "revised that target to late 2022, at the earliest, when it hopes to finish most of the commercial 'Phase II' portion of its plan and generate $8 million in revenue. From there, the company boldly projects $224 million of net revenue in FY2023, *which it then plans to grow nearly ten-fold* – to $2.3 billion by 2027." (Emphasis in original). Hindenburg wrote that PureCycle "put its aggressive projections through a bit of a torture session in order to justify its valuation. Indeed, the Report highlighted that the numbers projected "would put PureCycle's margins on par with some of the world's most profitable tech companies."

62.    Hindenburg further wrote that "the only two investment banks whose 'research' divisions cover PureCycle are Roth and Craig Hallum, the two sponsors of the deal. Both have put 'Buy' ratings on the company, with price targets ranging from $45-48." Hindenburg also noted

that "Craig Hallum issued its 'Buy' rating and a $48 price target on March 18th, the very day PureCycle went public." (Emphasis omitted). Hindenburg revealed, however, that two partners within Craig-Hallum's research division received shares of PureCycle in the Merger, which became eligible for sale on April 16th due to the elevated stock price. Then five days after Roth Acquisition's shares were unlocked for sale, the research department at Roth issued a "Buy" rating on PureCycle, assigning a $45 price target. As Hindenburg noted, "[t]he rest of Roth and Craig Hallum's founder's shares will become freely tradeable in September 2021, well before any revenue is generated by [PureCycle]. Both firms stand to gain considerably regardless of how the company's plans work out."

63.    Hindenburg also outlined how Defendant Otworth and three other senior PureCycle executives, Bill Haskell, Defendant Rick Brenner, and Defendant Scott, had taken at least six companies public and "[a]ll have failed." Hindenburg further noted: "Of the 6 companies taken public by PureCycle Senior Executives, 2 went bankrupt, 3 were delisted, and 1 was acquired following a ~95% decline. Over $760 million in public shareholder capital was incinerated in the process."

64.    The Report mentioned that it had received comment from former employees of several of the failed public companies led by PureCycle's executive team during their tenure at Innventure. A former senior employee of one of these companies, PetroAlgae, said:

> *I think they did con . . . that's a strong word but I think it's accurate.*
>
> ***
>
> *I think because of the biofuel boom especially in algae they were forced into the same hype as all the other algae biofuels just to get funding.*
>
> ***
>
> *I think it was **deceiving to the investors** and I couldn't have done that personally.*

21

*But a lot of salespeople have that mentality where they overpromise and think they can make it happen. It just didn't at that time.*

65.     Hindenburg also received comments from a former employee of AgCert, another company the PureCycle senior executives had taken public, who said that the company was "too aggressive" with forward sales projections. Indeed, he  noted that "[t]here was a lot of wild ass guessing going on there, and as a warning to investors: this is speculative you could lose all your money so jump in if you want."

66.     Hindenburg also spoke with a former employee of Tyratech, another company that the PureCycle executives took public, who said that "the dossier that Tyratech went to market with was really not, I know now, it was not credible."

67.     With regard to the Merger, the Report outlined that, on top of lucrative base salaries, PureCycle's executives received $7 million in cash bonuses simply for closing the SPAC deal with Roth Acquisition, and are set to receive approximately $40 million in compensation before PureCycle generates any revenue. Defendant Otworth himself, according to Hindenburg, collected a $5 million bonus after the deal with Roth Acquisition closed.

68.     The Report also called into question the technology that PureCycle has licensed from Procter and Gamble and has repeatedly lauded:

One might wonder: if the technology was a major breakthrough, as described in the company's presentation . . . why P&G didn't license it to a chemical company like Dow or well-established plastics or polycarbon companies rather than a team with a history of repeated failures and no specific polycarbon expertise? Or, why not develop the technology internally as a new income stream?

69.     The Report cited a written Q&A session with a P&G employee who was asked the question above. That employee explained:

[A] Global Business Development Director at P&G had a personal relationship with the team at PureCycle's patent company, Innventure, and made the connection. . . The P&G employee that bridged the deal appears to have later taken a senior position at PureCycle, now serving as VP of Commercial and Business

Development.

70.    Hindenburg further noted that an analysis led it to believe that "P&G likely had a 'technology' that it saw no economic sense in commercializing itself, so it spun it off, providing a steady stream of positive PR for the plastic producing giant, showcasing its efforts to promote recycling."

71.    The Report also noted that "[o]ne of the key challenges (and likely future bottlenecks) of PureCycle's proposed process is in securing enough quality feedstock to make the process economical." Indeed, in a November 2020 interview, the inventor of P&G's technology was asked about this potential bottleneck. He said: "I think the fact that you have to ensure you have feedstock coming in and I think that'll be a bottleneck is ensuring the feedstock is of the right quality, at the right quantity, to keep the larger plants running."

72.    Hindenburg also received insight from Scott Saunders, General Manager of KW Plastics and Chairman of the Association of Plastics Recyclers, on PureCycle's role in the market. Mr. Saunders commented:

> The problem I see with chemical recycling – and I'm not an expert in this process but I am an expert in PP raw materials – t**here is not enough non-contaminated PP scrap to support these processes. So you're going to get a wide range of materials that have varying degrees of other resin contamination.**
>
> ***
>
> **And what's stated publicly by PureCycle themselves is that the facility works well up to 5 percent contamination. I've been buying PP scrap for 30 years and I'm not aware of any PP scrap in volume that has any less than 5% contamination in the world.**

(Emphasis added).

73.    The Report further quoted Richard Minges, a 10-year executive for Custom Polymers, who detailed how PureCycle was overstating its potential sales. Indeed, based on his experience in the industry, he noted that "it's more about the raw materials that can be secured."

23

He opined that:

> **stating that they're going to sell their resin for as much as $2 a pound, which is a huge premium. And the people that we have that are paying premium right now is because they only need a small amount and it's a marketing ploy and they want it secured. And if I go back to these same people and tell them I have a 10x as much and the price is going up to $2 then I don't know a single one who would pay.**

(Emphasis added).

74.     Hindenburg also wrote that it was "unable to find a single peer reviewed study in any scholarly journal citing PureCycle's licensed process," and that "PureCycle's licensed patents seem to rely heavily on prior discoveries that never ended up reaching commercial scale."

75.     Further, Hindenburg wrote that it spoke with a "30 year expert in polymers," who said "[t]here is no mention of the needed actual testing of the final product. It is indirect and vague. The hazards are clearly minimized, which is typical when serious hazards are expected and read by someone without any prior knowledge or experience."

76.     The same expert stated, according to the Report, that "[w]hile the n-butane & propane blends for solvent, heated and pressurized may extract a slightly higher concentration of PP per cycle pass than carbon dioxide and n-butane, it is still apparently very low. PureCycle doesn't disclose what these values are in the scaled-up testing." He concluded:

> The permitting, engineering, and equipment would be very expensive and a challenge full scale. The plastic recovered may or may not be accepted or usable. **I don't think the process could ever be cost efficient.** The process is expensive, the test requirements and documentation is extensive, and the value of the product just isn't high enough.

77.     Hindenburg further described how PureCycle's licensed technology presented issues a "lab scale," rendering larger scale development even more problematic.

78.     Following the scathing revelations in the Report, PureCycle's stock price fell from its May 5, 2021 closing price of $24.59 per share to a May 6, 2021 closing price of $14.83. This

24

was a one-day drop of almost 40% on unusually heavy trading volume.

79.     PureCycle's May 6, 2021 press release, issued in response to the Report, did not disprove or negate any of the Report's specific underlying factual allegations, merely making a vague response that "[w]e remain confident in our people, our technology, and our long term growth strategy" and "[w]e believe PureCycle is well-positioned to continue executing on its strategy to drive long term growth and enhanced value for shareholders."

**FIDUCIARY DUTIES**

80.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and continues to owe PureCycle and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care and was/is required to use his/her utmost ability to control and manage PureCycle in a fair, just, honest, and equitable manner. The Individual Defendants were/are required to act in furtherance of the best interests of PureCycle and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

81.     Each Individual Defendant owed and continues to owe PureCycle, and its stockholders, the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

82.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of PureCycle, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their executive and/or directorial positions with PureCycle, each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's business practices, operations, financials, financial

prospects, compliance policies, and internal controls so that the market price of the Company's stock would be based on truthful and accurate information.

83.   To discharge their duties, the Individual Defendants were/are required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. The Individual Defendants were required to, among other things:

    (a)    ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in insider trading and other deceptive conduct;

    (b)    conduct the affairs of the Company in compliance with all applicable laws, rules, and regulations to make it possible to provide the highest quality performance of its business, avoid wasting the Company's assets, and maximize the value of the Company's stock;

    (c)    remain informed as to how PureCycle conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make a reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

    (d)    truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

**Duties Pursuant to the Company's Code of Conduct**

84.   The Individual Defendants, as officers and/or directors of PureCycle, were bound by the Company's Code of Business Conduct and Ethics[6] (the "Code of Conduct"), which required the following:

to act in accordance with these standards, which are designed to deter wrongdoing and promote:
• honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;
• full, fair, accurate, timely and understandable disclosure in reports and documents

---

[6] *See* PureCycle, Code of Business Conduct and Ethics (Mar. 17, 2021), https://d1io3yog0oux5.cloudfront.net/_dd5a71390d7497bc0706f9b0922396e9/purecycletech/db/1097/9697/file/Code_of_Business+Conduct+and+Ethics+Policy+%28FINAL+03.14.21%29.pdf.

that PureCycle files with, or submits to, the United States Securities and Exchange Commission ("SEC") or any other governmental agency and in other public communications;
• compliance with applicable governmental laws, rules and regulations;
• the prompt internal reporting of violations of this Code to the persons identified herein; and
• accountability for adherence to this Code.

***

**Fair Dealing. All Employees and Directors must deal honestly and fairly with the Company's customers, suppliers, competitors, stockholders and other stakeholders and must not take unfair advantage of others through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or other unfair dealing practices.**

***

**Accounting Standards and Documentation**. It is the Company's policy to comply with all applicable financial reporting and accounting regulations. Accounts and records must be documented in a manner that clearly describes and identifies the true nature of business transactions, assets, liabilities or equity, and properly and timely classifies and records entries on the books of account in conformity with generally accepted accounting principles. No record, entry or document may be false, distorted, misleading, misdirected, deliberately incomplete or suppressed.

***

The Company has established internal control standards and procedures to ensure that assets are protected and properly used and that financial reports are accurate and reliable. Employees and Directors share the responsibility for maintaining and complying with required internal controls.

***

Fraud Prevention

In addition, it is the Company's policy to prevent fraud and maintain certain deterrents against the initiation of fraud, including theft, impairment or misrepresentation of an asset value, misrepresentation or concealment of liabilities, manipulation or misrepresentation of revenues or expenses, bribery, and violation of any state or federal law or regulation regarding theft, corruption, fraudulent claims, diversion or embezzlement. Fraud may include acts of concealment, such as omissions of entries and manipulation of documents (including forgery) or could involve collusion among individuals inside or outside of the Company. To deter such actions, the Company maintains the right "tone at the top" with a view that

improper or fraudulent activity will not be tolerated. The Company will take the appropriate actions against any individual that commits or is in any way involved in an improper activity. The Company will maintain the proper segregation of duties pertaining to its internal control environment, and risk assessment procedures will include discussions surrounding opportunities for fraud. Internal reviews may be performed in various areas that have a greater propensity for fraud.

\*\*\*

**Corporate Opportunities**. All Employees and Directors owe a duty to the Company to advance the Company's legitimate interests when the opportunity to do so arises. Employees and Directors must not: (A) receive or seek to receive a benefit from opportunities that are discovered or developed through his or her involvement or employment with the Company (including, without limitation, his or her use of the Company's property or information, or his or her position); (B) use corporate property or information, or his or her position for personal gain; or (C) compete with the Company, directly or indirectly, for business opportunities.

**Compliance and Reporting**. Employees and Directors are expected to comply with this Code and its underlying policies and procedures to protect the Company and its Employees and Directors from criticism, litigation or embarrassment that might result from alleged, perceived or real conflicts of interest or unethical practices. Violations of this Code are grounds for disciplinary action up to and including discharge and possible legal prosecution. Each report of apparent violations of this Code is treated in a confidential manner, to the extent permitted by applicable law. Confidentiality, to the extent permitted by applicable law, is important to avoid damaging the reputations of persons suspected, but subsequently found innocent, of wrongful conduct and to protect the Company from potential civil liability. Employees and Directors should not attempt to personally conduct investigations or interviews/interrogations related to any suspected illegal or unethical behavior or activity.

(Emphasis added).

**Duties Pursuant to the Company's Audit Charter**

85.    In addition to these duties, the Individual Defendants who served on the Audit Committee during the Relevant Period, Defendants Burnell, Fieler and Musa (the "Audit Committee Defendants"), owed specific duties to PureCycle under the Audit Committee Charter (the "Audit Charter").[7] Specifically the Audit Charter provided for the following responsibilities

---

[7] *See* PureCycle, Audit Committee Charter (Mar. 17, 2021), https://d1io3yog0oux5.cloudfront.net/_dd5a71390d7497bc0706f9b0922396e9/purecycletech/db/

of the Audit Committee Defendants:

> to assist the Board…of PureCycle…in fulfilling its responsibility to oversee:
> (A) the integrity of the Company's accounting and financial reporting process, including by (x) overseeing the preparation, presentation and integrity of the financial statements and other financial information provided by the Company to any governmental or regulatory body, the public or other users thereof and (y) assessing the appropriateness of the accounting and reporting policies that are used by the Company,
> (B) the Company's compliance with legal and regulatory requirements,
> (C) the independent auditors' qualifications and independence,
> (D) the performance of the Company's internal audit function, its independent auditors and its systems of internal accounting and financial controls,
> (E) the audits of the financial statements of the Company, and
> (F) the Company's Code of Business Conduct and Ethics as established by the Board.
>
> The Committee will also prepare all reports required to be included in the Company's proxy statement, pursuant to and in accordance with applicable rules and regulations of the Securities and Exchange Commission (the "SEC").

* * *

## IV. RESPONSIBILITIES

The Committee's primary responsibility is one of oversight and it recognizes that the Company's management is responsible for the preparation, presentation and integrity of the Company's financial statements and for the appropriateness of the accounting and reporting policies that are used by the Company. The independent auditors are responsible for auditing the Company's financial statements, reviewing the Company's interim financial statements and attesting to the effectiveness of the Company's internal controls in accordance with Section 404 of the Sarbanes-Oxley Act, as applicable. The Committee also recognizes that the Company's management, as well as the independent auditors, have more time, knowledge and more detailed information on the Company than do Committee members; consequently, in carrying out its oversight responsibilities, the Committee is not providing any expert or special assurance as to the Company's financial statements or any professional certification as to the independent auditor's work. The Committee shall also carry out any other responsibilities assigned to it by the Board from time to time.

The following responsibilities are set forth as a guide with the understanding that the Committee may diverge as appropriate given the circumstances, provided that

---

1097/8991/file/Audit+Committee+Charter+%28FINAL+031221%29.pdf.

at all times the Committee must undertake the responsibilities ascribed to it under the Sarbanes-Oxley Act, Rule 10A-3(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and the rules of the NASDAQ Stock Market or any other stock exchange on which the Company's shares are listed or traded. The Committee is authorized to carry out these and such other responsibilities assigned by the Board from time to time, and take any actions reasonably related to the mandate of this Charter. In fulfilling its responsibilities, the Committee shall:

***

Review and discuss quarterly with the independent auditors (i) all critical accounting policies and practices to be used; (ii) any significant changes in Company accounting policies; (iii) all alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor; (iv) any accounting and financial reporting proposals that may have a significant impact on the Company's financial reports; (v) other material written communications between the independent auditor and management, such as any management letter or schedule of unadjusted differences; and (vi) the reports of the results of such other examinations outside of the course of the independent auditors' normal audit procedures that the independent auditors may from time to time undertake. The foregoing is to include the reports required by Section 204 of the Sarbanes-Oxley Act.

***

<u>Financial Reporting Process</u>

Consider and review with the independent auditors and management: (i) the adequacy of the Company's disclosure controls and procedures and internal controls, including computerized information system disclosure controls and procedures and security; (ii) all changes in the Company's internal control over financial reporting which could materially affect the Company's ability to record, process, summarize and report financial data; (iii) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting; and (iv) the related findings and recommendations of the independent auditors together with management's responses. Without excluding other possibilities, the Committee may wish to review with the independent auditors (i) any accounting adjustments that were noted or proposed by the auditors but were "passed" (as immaterial or otherwise); (ii) any communications between the audit team and the audit firm's national office respecting auditing or accounting issues presented by the engagement; and (iii) any "management" or "internal control" letter issued, or proposed to be issued, by the independent auditors to the Company or any other material written communications between the accounting firm and management, such as any management letter or schedule of "unadjusted differences."

Review periodically the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company. Inquire as to independent auditor's view of the accounting treatment related to significant new transactions or other significant matters or events not in the ordinary course of business.

Review with management and the independent auditors significant financial risks or exposures to the Company's business and assess the steps management has taken to monitor and minimize such risks. Discuss with management and the independent auditors the Company's underlying policies and guidelines with respect to risk assessment and risk management, including with respect to data protection and business continuity.

### Review of Reports and Earnings Press Releases

Prior to public release, (A) review with management and the independent auditors the Company's annual audited and quarterly financial statements, including (i) the related footnotes, (ii) the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and (iii) the disclosures regarding internal controls and other matters required to be reported to the Committee by Section 302 of the Sarbanes-Oxley Act and any rules promulgated thereunder by the SEC and (B) discuss with the independent auditors the matters required to be discussed pursuant to applicable auditing standards.

With respect to the Company's annual financial statements, make a recommendation that such financial statements be included in the Company's Annual Report on Form 10-K and its annual report to shareholders. With respect to the Company's quarterly financial statements, make a recommendation that such financial statements be included in the Company's Quarterly Report on Form 10-Q. The Committee will also prepare all reports required to be included in the Company's proxy statement, pursuant to and in accordance with applicable rules and regulations of the SEC, and will review the matters described in such reports.

Review and discuss with management and the independent auditors the Company's earnings and other financial press releases (including any use of any "pro forma" or "non-GAAP" information), as well as financial information and earnings guidance provided to analysts and rating agencies.

## **Compliance**

Review the effectiveness of the system for monitoring compliance with laws and regulations.
Review the results of management's investigation and follow-up (including disciplinary action) of any serious instances of non-compliance.

Review any material issues that arise under the Company's Code of Business Conduct and Ethics. The Committee is to receive reports from Company management of evidence of any violation of securities laws or breaches of fiduciary duties or violation of the Code of Business Conduct and Ethics by (a) any officer or director of the Company or any material subsidiary of the Company or (b) any other employee whose violation or breach is significant, as determined by either Company management or the IA Executive.

Establish and maintain procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submissions by employees of concerns regarding questionable accounting or auditing matters as required by Section 301 of the Sarbanes-Oxley Act and Exchange Act Rule 10A3(b)(3).

Discuss with management and the independent auditors any material correspondence with regulators or governmental agencies and any significant complaints or concerns which are brought to its attention regarding the Company's financial statements or accounting policies.

Review and approve or disapprove any related party transactions in advance of such transaction. In those instances in which the Chief Financial Officer or General Counsel determines that it is not practicable or desirable for the Company to wait until the next Committee meeting, the related party transaction will be submitted to the Chair of the Committee, who will possess delegated authority to act between Committee meetings. The Committee or Chair of the Committee, as applicable, shall review the material facts of all related person transactions. In reviewing any related person transaction, the Committee or Chair of the Committee, as applicable, will take into account, among other factors that it deems appropriate, whether the related person transaction is on terms no less favorable to the Company than terms generally available in a transaction with an unaffiliated third-party under the same or similar circumstances and the extent of the related person's interest in the transaction.

## **BREACHES OF DUTIES**

86.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and/or directors of PureCycle, the absence of good faith on their part, and a reckless disregard for their duties to the Company.

87.     The Individual Defendants breached their duties of loyalty and good faith by utterly failing to implement a reasonable, relevant, meaningful, and well-constituted system of internal

controls, especially with respect to the dissemination of false or misleading statements to the investing public that failed to disclose that the Company made false or misleading statements, which included premature financial projections in relation to the commercial viability of its key product, Polypropylene, that were not backed up by any reliable or tangible data or peer reviewed studies. The Individual Defendants' statements understated or omitted the Company's competition in the plastics industry and overstated the Company's business performance, financial and operational metrics, financial prospects and commercial scale. The Individual Defendants also concealed or omitted information regarding the history and inexperience of the management team responsible for bringing PureCycle public, which would have been highly material to investors when choosing to invest in a new company like PureCycle.

88.     The Individual Defendants also breached their duties of loyalty and good faith by allowing the Company to cause, or by themselves causing, the Company to make improper statements to the public and the Company's stockholders. These unlawful practices wasted the Company's assets and caused PureCycle substantial damage.

89.     The Audit Committee Defendants had a duty to review the Company's earnings press releases and regulatory filings. The members of the Audit Committee breached their duties of loyalty and good faith by approving the omission of material information, making the improper statements detailed herein, and failing to properly oversee PureCycle's public statements and internal control function.

90.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of PureCycle, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. In addition, as a result of the

Individual Defendants' improper course of conduct, the Company is now the subject of the Federal Securities Class Action, which alleges violations of federal securities laws. As a result, PureCycle has expended, and will continue to expend, significant sums of money.

## DAMAGES TO PURECYCLE

91.     The deficient internal controls which led to the issuance of materially false and misleading statements, namely premature financial projections in relation to the commercial viability of its key product, Polypropylene, and statements that omitted the management team's history and inexperience in the plastics industry, have exposed the Company to reputational and financial damages, including but not limited to:

<blockquote>

(a)     Possible restatements and goodwill impairments;

(b)     Liability arising from the Federal Securities Class Action;

(c)     Potential increased director and officer insurance premiums;

(d)     The loss of credibility with customers, investors, and suppliers; and

(e)     Legal and accounting costs associated with litigation, investigations, and possible restatements.

</blockquote>

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

92.     Plaintiff brings this action derivatively and for the benefit of PureCycle to redress injuries suffered, and to be suffered, because of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of PureCycle, waste of corporate assets, unjust enrichment, and violations of Section 20(a) of the Exchange Act.

93.     PureCycle is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

94.     Plaintiff is, and has been, a stockholder of PureCycle during the wrongdoing complained of herein. Plaintiff will adequately and fairly represent the interests of PureCycle in

enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

95.     Plaintiff incorporates by reference and re-alleges each allegation stated above as if fully set forth herein.

96.     A pre-suit demand on the Board of PureCycle is futile and, therefore, excused. At the time of filing of this action, the Board consists of Defendants Otworth, Burnell, Rick Brenner, Scott, Fieler, Glockner and Musa (the "Director Defendants"). Plaintiff needs only to allege demand futility as to a majority (four) of the Director Defendants who are on the Board at the time this action is commenced.

97.     Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

98.     In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

99.     Demand on Defendant Otworth is futile because Defendant Otworth cannot disinterestedly and independently consider a demand. As acknowledged in PureCycle's public

filings, Otworth is not an independent director. Prior to the Company going public, Otworth served as CEO of the Company and as a member of PureCycle's Board since October 2015. Otworth is Chairman of the board of Innventure, which he co-founded with Director Defendants Scott and Rick Brenner, and currently serves on its board with Defendant Rick Brenner. Otworth also served as CEO of Innventure from October 2015 to January 2021. Through his role at Innventure, Defendant Otworth, together with Defendants Rick Brenner and Scott, has taken at least six companies public previously, all of which were failures. Nevertheless, Otworth failed to disclose these prior failures when taking PureCycle public. Moreover, Defendant Otworth did not need to prove that PureCycle's technology worked before cashing in. In addition to a sizeable salary, he received $5,000,000 solely due to the successful consummation of the SPAC transaction. Further, upon consummation of the Merger, Otworth received 3,997,165 shares of PureCycle common stock in exchange for 291,223 outstanding pre-closing PureCycle Class A Units and 112,500 outstanding pre-closing PureCycle Class C Units. Therefore, Otworth had a motive to conceal negative news concerning the Company's core product. Defendant Otworth personally made many of the false and misleading statements outlined herein, including in the November 16, 2020 Press Release, the November 2020 Webinar, the November 2020 Investor Presentation, and the March 18 Press Release.  Thus, Defendant Otworth cannot impartially consider a demand, because Defendant Otworth received a material personal benefit and faces a substantial likelihood of liability. Further, Defendant Otworth lacks independence from the directors with whom he founded Innventure, Defendants Scott and Rick Brenner, both of whom received a material personal benefit and face a substantial likelihood of liability as alleged herein.

100.    Demand on Defendant Burnell is futile because Defendant Burnell cannot disinterestedly and independently consider a demand. She is a member of the Audit Committee

and is responsible for overseeing, among other things, the integrity of the Company's financial statements, the Company's compliance with laws and regulations, and the Company's accounting and financial reporting practices and system of internal controls, as outlined herein. Therefore, Defendant Burnell faces a substantial likelihood of liability in connection with the claims outlined herein.

101.    Demand on Defendant Rick Brenner is futile because Defendant Rick Brenner cannot disinterestedly and independently consider a demand. Defendant Rick Brenner, together with Defendants Otworth and Scott, has previously taken at least six companies public, all of which were failures. Nevertheless, Rick Brenner failed to disclose these prior failures when taking PureCycle public. Further, upon consummation of the Merger, Rick Brenner received 3,516,754 shares of PureCycle common stock in exchange for 301,054 outstanding pre-closing PureCycle Class A Units and 37,500 outstanding pre-closing PureCycle Class C Units. Accordingly, Defendant Rick Brenner received a material personal benefit from the misconduct alleged herein. Therefore, Rick Brenner had a motive to conceal negative news concerning the Company's core products. He also lacks independence from his son, Defendant David Brenner, who faces a substantial likelihood of liability because he was named as a defendant in the Federal Securities Class Action. Further, Defendant Rick Brenner lacks independence from the directors with whom he founded Innventure, Defendants Scott and Otworth, both of whom received a material personal benefit from the conduct alleged herein. At the time PureCycle announced that it was going public, it was owned and controlled by Innventure, which was co-founded by Rick Brenner, along with Defendants Otworth and Scott. Defendants Otworth and Rick Brenner still serve together as board members of Innventure and Defendant Rick Brenner's primary employment is being the Chief Operating Officer of Innventure. As such, Rick Brenner is beholden to Defendant Otworth and

lacks independence from him.

102.    Demand on Defendant Scott is futile because Defendant Scott cannot disinterestedly and independently consider a demand. Defendant Scott, together with Defendant Rick Brenner and Defendant Otworth, has previously taken at least six companies public, all of which were failures. Nevertheless, Defendant Scott failed to disclose these prior failures when taking PureCycle public. Furthermore, upon consummation of the Merger, Scott received 2,724,945 shares of PureCycle common stock in exchange for 225,790 outstanding pre-closing PureCycle Class A Units and 37,500 outstanding pre-closing PureCycle Class C Units. Accordingly, Defendant Scott received a material personal benefit from the misconduct alleged herein. Defendant Scott also lacks independence from the directors with whom he founded Innventure, Rick Brenner and Otworth, both of whom received a material personal benefit as described herein. At the time PureCycle announced that it was going public in November 2020, it was owned and controlled by Innventure, which was founded by Defendants Otworth, Scott, and Rick Brenner. Otworth and Rick Brenner currently serve on Innventure's board, and Scott's primary employment is as the Chief Science Officer of Innventure. As such, Defendant Scott is beholden to Defendants Rick Brenner and Otworth, as members of the Innventure board of directors.

103.    Demand on Defendant Fieler is futile because Defendant Fieler cannot disinterestedly and independently consider a demand. Upon consummation of the Merger, Fieler was able to exchange 1,533,529 shares of common stock in Roth Acquisition's parent company for 1,139,640 shares of PureCycle common stock and 393,889 PureCycle warrants, exercisable on May 7, 2021. Accordingly, Defendant Fieler received a material personal benefit from the misconduct alleged herein. He is also a member of the Audit Committee and is responsible for

overseeing, among other things, the integrity of the Company's financial statements, the Company's compliance with laws and regulations, and the Company's accounting and financial reporting practices and system of internal controls, as outlined herein. Therefore, Defendant Fieler also faces a substantial likelihood of liability on the claims alleged herein.

104.    Demand on Defendant Glockner is futile because Defendant Glockner cannot disinterestedly and independently consider a demand. Upon consummation of the Merger, Glockner received 5,581,933 shares of PureCycle common stock in exchange for 107,486 outstanding pre-closing PureCycle Class A Units, 403,303 outstanding pre-closing PureCycle Class B Preferred Units, and 19,462 outstanding pre-closing PureCycle Class C Units. Accordingly, Defendant Glockner received a material personal benefit from the misconduct alleged herein.

105.    Demand on Defendant Musa is futile because Defendant Musa cannot disinterestedly and independently consider a demand. He is a member of the Audit Committee and is responsible for overseeing, among other things, the integrity of the Company's financial statements, the Company's compliance with laws and regulations, and the Company's accounting and financial reporting practices and system of internal controls, as outlined herein. Therefore, Defendant Musa faces a substantial likelihood of liability on the claims alleged herein.

106.    As trusted Company directors, the above Director Defendants conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded their duties to monitor the Company's controls over reporting and engagement in the scheme, and consciously disregarded their duties to protect corporate assets. For the above reasons, these Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile

and, therefore, excused.

107.    Pursuant to the Company's Audit Charter, the Audit Committee Defendants are responsible for overseeing, among other things, the integrity of the Company's financial statements, the Company's compliance with laws and regulations, and the Company's accounting and financial reporting practices and system of internal controls. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements and system of internal controls, as they are charged to do under the Audit Charter, and allowed the Company to issue false and misleading financial statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

108.    In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment. In further violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, protect and properly use corporate assets, and properly report violations of the Code of Conduct. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

109.    PureCycle has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for PureCycle any part of the damages PureCycle suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

110.     The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's various Charters (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

111.     The acts complained of herein constitute violations of fiduciary duties owed by PureCycle's officers and directors, and these acts are incapable of ratification.

## FIRST CLAIM

**Against the Individual Defendants**
*for Violations of Section 20(a) of the Exchange Act*

112.     Plaintiff repeats and re-alleges each and every allegation set forth above as though fully set forth herein.

113.     The Individual Defendants, by virtue of their positions with PureCycle and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of PureCycle and officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence, and exercised same, to cause PureCycle to engage in the illegal conduct and practices complained of herein.

114.     Plaintiff, on behalf of PureCycle, has no adequate remedy at law.

41

## SECOND CLAIM

### Against the Individual Defendants
*for Breach of Fiduciary Duties*

115.    Plaintiff repeats and re-alleges each and every allegation set forth above as though fully set forth herein.

116.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of PureCycle's business and affairs.

117.    Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

118.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of PureCycle.

119.    In breach of their fiduciary duties, the Individual Defendants caused the Company to engage in the misconduct described herein.

120.    In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure, controls, and procedures.

121.    Also, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements during the Relevant Period, including premature financial projections in relation to the commercial viability of its key product, Polypropylene, and omitted to disclose the management team's history and inexperience.

122.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and

omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

123.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

124.    Such improper conduct was committed knowingly or recklessly. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

125.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

126.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, PureCycle has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

127.    Plaintiff, on behalf of PureCycle, has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants
*for Unjust Enrichment*

128.    Plaintiff repeats and re-alleges each and every allegation set forth above as though fully set forth herein.

129.    By their wrongful acts, violations of law, false and misleading statements, and

omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of and to the detriment of PureCycle.

130.    The Individual Defendants either benefitted financially from the improper conduct, received unjust compensation tied to the materially false and misleading statements, received bonuses, stock options, or similar compensation from PureCycle tied to the performance or artificially inflated valuation of PureCycle, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

131.    Plaintiff, as a stockholder and a representative of PureCycle, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including benefits, performance-based, valuation-based, and other compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

132.    Plaintiff, on behalf of PureCycle, has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants
*for Waste of Corporate Assets*

133.    Plaintiff repeats and re-alleges each and every allegation set forth above as though fully set forth herein.

134.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions and engage in internal investigations, and PureCycle will lose financing from investors and business from future customers who no longer trust the Company and its products.

135.    Because of the waste of corporate assets, the Individual Defendants are each liable to the Company.

136.    Plaintiff, on behalf of PureCycle, has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

A.      Declaring that Plaintiff may maintain this action on behalf of PureCycle, and that Plaintiff is an adequate representative of the Company;

B.      Declaring that the Individual Defendants have breached their fiduciary duties to PureCycle;

C.      Determining and awarding to PureCycle the damages sustained by it because of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre- and post-judgment interest thereon;

D.      Directing PureCycle and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and protect PureCycle and its stockholders from a repeat of the damaging events described herein;

E.      Awarding PureCycle restitution from Individual Defendants;

F.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

G.      Granting such other and further relief as the Court may deem just and proper.

Dated: November 3, 2021                    **BIELLI & KLAUDER, LLC**

_/s/ Ryan M. Ernst_
Ryan M. Ernst (No. 4788)
1204 N. King Street
Wilmington, DE 19801
(302) 803-4600
rernst@bk-legal.com

**LEVI & KORSINSKY, LLP**
Correy A. Kamin
Ryan C. Messina
55 Broadway, 10th Floor
New York, NY 10006
Tel.: (212) 363-7500
Fax: (212) 363-7171
ckamin@zlk.com
rmessina@zlk.com

*Attorneys for Plaintiff Byung-Gook Han*