# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| IN RE: PURECYCLE TECHNOLOGIES, INC. DERIVATIVE LITIGATION | Lead Case No. 21-1569-RGA |

## STIPULATION AND AGREEMENT OF SETTLEMENT

This Stipulation and Agreement of Settlement (the "Stipulation") dated July 17, 2024 is entered into by and among the following Settling Parties (defined herein) through their respective counsel: (i) stockholder Patrick Ayers, plaintiff in the derivative action on behalf of PureCycle Technologies, Inc. ("PureCycle" or the "Company") styled *In re PureCycle Technologies, Inc. Derivative Litigation*, Lead Case No. 1:21-cv-01569-RGA (D. Del.) (the "Federal Action"), as consolidated; (ii) stockholder John Brunson, plaintiff in the derivative action on behalf of PureCycle styled *Brunson v. Otworth, et al.*, No. 2024-0326-NAC (Del. Ch.) (the "Delaware Chancery Action"), who also served a litigation demand on the Company's Board of Directors (the "Board") and a demand on the Company pursuant to 8 *Del. C.* § 220; (iii) stockholder Tyler Begley, who served a litigation demand on the Board and a demand on the Company pursuant to 8 *Del. C.* § 220; (iv) stockholder Thomas Workman (with Tyler Begley, the "Demanding Stockholders"), who served a demand on the Company pursuant to 8 *Del. C.* § 220 (the Federal Action, Delaware Chancery Action, and the Demanding Stockholders' demands are collectively referred to as the "Derivative Matters," and the plaintiffs in the Federal Action and Delaware Chancery Action and the Demanding Stockholders are collectively referred to as the "Settling Stockholders"); (v) Michael Otworth, Richard Brenner, Tanya Burnell, Jeffrey Fieler, Tim Glockner, Fernando Musa, John Scott, David Brenner, Michael E. Dee, James Donnally, Andy

Glockner, Byron Roth and Tasmin Ettefagh (collectively, the "Individual Defendants"); and (vi) PureCycle (together with the Individual Defendants, the "Settling Defendants") (Settling Stockholders and Settling Defendants are collectively referred to as the "Settling Parties"). This Stipulation is intended by the Settling Parties to fully, finally and forever resolve, discharge and settle the Released Claims[1], subject to the approval of the United States District Court for the District of Delaware (the "Court").

## I.    THE LITIGATION

### A.    Procedural History of the Litigation

#### 1.  The Federal Action

On November 3, 2021, the action *Han v. Otworth et al*, Civil Action No. 1:21-cv-01569-RGA (D. Del.) (the "*Han* Action") was filed in the United States District Court for the District of Delaware (the "Federal Court"), on behalf of the nominal defendant Company, against defendants Michael Otworth, David Brenner, Michael Dee, Tasmin Ettefagh, and Byron Roth, and nominal defendant PureCycle, alleging claims for violation of Section 20(a) of the Exchange Act, breach of fiduciary duty, unjust enrichment, and waste of corporate assets. Byron Roth was dismissed from the *Han* Action on December 15, 2021. On January 18, 2022, the Federal Court granted the parties' stipulation providing for a stay of the *Han* Action pending resolution of a motion to dismiss in the related securities class action styled *Theodore v. PureCycle Technologies, Inc., et al.*, Case No. 6:21-cv-809-PGB-RMN (M.D. Fla.) (the "Securities Action").

On January 27, 2022, a related derivative action was filed in the Federal Court, captioned *Ayers v. Otworth et al.*, Civil Action No. 1:22-cv-00110-RGA (D. Del.) (the "*Ayers* Action"). The *Ayers* Action brought suit against the Individual Defendants and alleged substantially similar

---

[1] Capitalized words or terms used herein, unless otherwise defined, shall have the meanings ascribed to them in Section I herein titled "Definitions."

claims to those alleged in the *Han* Action, including violation of Section 20(a) of the Exchange Act, breach of fiduciary duty, unjust enrichment, and aiding and abetting. The complaint in the *Ayers* Action also alleged claims for indemnification and contribution. On March 17, 2022, the Federal Court granted the parties' stipulation providing for a stay of the *Ayers* Action pending resolution of a motion to dismiss in the Securities Action.

On June 15, 2023, the motion to dismiss in the Securities Action was granted in part and denied in part. Thereafter, the remaining defendants in the Securities Action filed a motion for reconsideration of the court's order.

On July 27, 2023, the Federal Court entered an order consolidating the *Han* Action and the *Ayers* Action, under the caption *In re PureCycle Technologies, Inc. Derivative Litigation*, Lead Case No. 1:21-cv-01569-RGA (D. Del.), and appointing Weiss Law as lead counsel in the Federal Action.

On August 11, 2023, the Federal Action was further stayed pending resolution of defendants' motion for reconsideration of the denial, in part, of the motion to dismiss filed by the defendants in the Securities Action.

On February 23, 2024, a Consolidated Verified Amended Complaint was filed in the Federal Action against the Individual Defendants and alleging claims for violation of Sections 14(a) and 20(a) of the Exchange Act, breach of fiduciary duty, unjust enrichment, waste of corporate assets, aiding and abetting, gross mismanagement, and indemnification and contribution. As set forth below, the plaintiff in the Federal Action agrees to be bound by the terms of this Stipulation.

### 2. The Delaware Chancery Action

On February 3, 2023, plaintiff Brunson sent PureCycle a letter seeking production of books and records pursuant to 8 Del. C. § 220. Following negotiations and the execution of a

confidentiality agreement, the Company produced certain non-public books and records to Brunson on a rolling basis from October 2023 through February 2024 pertaining to the wrongdoing alleged in the Securities Action.

Following receipt and review of those books and records, on February 23, 2024, plaintiff Brunson sent a letter to the Board demanding, among other things, that it undertake an independent investigation into the Individual Defendants' alleged breaches of fiduciary duty and/or aiding and abetting of such breaches of fiduciary duty within thirty (30) days and that the Company enter into appropriate tolling agreements with the Individual Defendants to protect its derivative claims during the pendency of the Board's investigation.

On March 23, 2024, upon expiration of the deadline requested in plaintiff Brunson's litigation demand letter for the Board to begin an independent investigation and obtain tolling agreements, plaintiff Brunson filed the Delaware Chancery Action captioned *Brunson v. Otworth, et al.*, No. 2024-0326-NAC (Del. Ch.). The Delaware Chancery Action asserted claims for wrongful demand refusal, breach of fiduciary duty, failure to obtain tolling agreements, and other related claims under Delaware law against certain Individual Defendants, and all such claims are included as part of this Settlement. As set forth below, plaintiff Brunson agrees to be bound by the terms of this Stipulation, and further agrees to voluntarily dismiss the Delaware Chancery Action with prejudice within ten (10) days after the Final Judgment in the Court in the Federal Action approving the Settlement becomes final and non-appealable.

### 3. The Demanding Stockholders

On October 6, 2023, stockholder Workman sent PureCycle a letter demanding production of books and records pursuant to 8 Del. C. § 220. On October 27, 2023, stockholder Begley sent PureCycle a letter also demanding the right to inspect books and records pursuant to 8 Del. C. §

4

220. Thereafter, the Company produced certain non-public books and records to the Demanding Stockholders.

On February 5, 2024, stockholder Begley sent a letter to the Board demanding that the Company initiate legal action against its officers, directors, or members of senior management for their alleged breach of fiduciary duties and take remedial measures for damages from alleged unjust enrichment and corporate waste.

As set forth below, the Demanding Stockholders agree to be bound by the terms of this Stipulation.

### B. Mediation

The Settling Parties, by and through their undersigned attorneys, have engaged in good faith, arm's-length discussions with regard to the possible settlement of the Derivative Matters. To that end, the Settling Parties agreed to participate in mediation before Jed D. Melnick, Esq. (the "Mediator") of Judicial Arbitration and Mediation Services ("JAMS"), a nationally recognized mediator with extensive experience mediating complex shareholder disputes similar to the Derivative Matters who was also serving as mediator in the Securities Action. Mediation began at the end of February 2024 with the Settling Parties participating in a full day mediation session on March 5, 2024. The Parties did not reach an agreement resolving the derivative litigation during the March 5, 2024 mediation session, but agreed to continue their settlement discussions under the aegis of the Mediator.

Counsel for the Settling Parties participated in another, half-day mediation session before the Mediator on March 13, 2024, where they made significant progress. The negotiations continued for several weeks thereafter, including during an additional full-day mediation before

the Mediator on April 2, 2024, in which the Settling Parties reached an agreement in principle on the terms of the corporate governance reforms detailed herein.

At the mediation sessions, the Settling Parties engaged in frank discussions regarding the strengths and weaknesses of the claims and defenses at issue, both indirectly through the Mediator and directly in joint sessions attended by counsel for the Settling Parties, a representative of PureCycle, and the relevant insurers. During the joint sessions, and subject to the Confidential Mediation Agreement and all applicable mediation privileges, the Company provided information regarding the technical and practical considerations that drove its decision-making with respect to PureCycle's patented technology, its progress commercializing this technology, relevant disclosures and other related issues. The Settling Parties debated their competing views of the essential facts, legal claims and defenses, and the broad range of possible litigation outcomes. The Settling Parties also discussed a range of remedial options and were able to agree on a set of principles and target areas for corporate governance enhancements to be fleshed out through further negotiations, and sharpened the focus on monetary compensation for PureCycle as the driving factor in any potential settlement of the Derivative Matters.

After reaching agreement on the principal terms of the Settlement, the Settling Parties commenced negotiations facilitated by the Mediator regarding reasonable attorneys' fees and expenses to be paid to Settling Stockholders' Counsel, subject to Court approval, in consideration for the substantial benefits conferred upon PureCycle and its shareholders by the Settlement.

On May 2, 2024, the Settling Parties reached an agreement in principle on the remaining material terms for the Settlement, including the monetary component, and negotiated the terms of a written memorandum of understanding ("MOU") outlining the essential terms and conditions for the release of all claims asserted in the Derivative Matters in consideration for the Company's

6

agreement to cause their insurers to pay $3 million to PureCycle as the monetary component of this Settlement ("Monetary Component"), and to adopt, implement, and/or maintain in accordance with the corporate governance practices, policies and procedures, internal controls and board composition reforms as set forth below (the "Reforms"). On May 7, 2024, the Settling Parties signed the MOU outlining the material terms and conditions of the Settlement. The Settling Parties believe that the Settlement is in the best interests of PureCycle and Current PureCycle Stockholders (as defined in ¶ 1.2 herein).

C.    **Plaintiffs' Assessment of the Claims and Benefits of Settlement**

The Settling Stockholders asserted claims for breach of fiduciary duty and related stockholder causes of action against the Individual Defendants in connection with the Individual Defendants' alleged: (i) material misstatements and omissions about PureCycle's allegedly cost-effective and environmentally-friendly recycling process and the alleged interchangeability of its ultra-pure recycled resin ("UPRP") with virgin polypropylene ("PP"); (ii) material misstatements and omissions regarding PureCycle's possession of an allegedly "patented" PP recycling process and its ability to source post-consumer PP feedstock to produce UPRP at commercial volumes; (iii) material misstatements and omissions regarding the commercial viability of PureCycle's expected pricing for UPRP; (iv) material misstatements regarding and concealment of materially adverse information regarding PureCycle's internal control environment and the experience of PureCycle's management; (v) material misstatements and omissions concerning various power outages, production issues, availability of feedstock, and ability to meet certain production milestones; (vi) failure to provide adequate oversight of the Company to prevent any of the above; and (vii) failure to investigate claims in response to various investigation demands, wrongful

refusal of investigation demands and/or failure to obtain tolling agreements from current and former officers and directors.

The Settling Stockholders and Settling Stockholders' Counsel brought the claims in good faith and continue to believe that the claims asserted in the Derivative Matters have merit. However, the Settling Stockholders and Settling Stockholders' Counsel recognize and acknowledge the expense, time, and uncertainty inherent in the continued prosecution of their claims in the Derivative Matters through trial and any subsequent appeal(s). The Settling Stockholders and Settling Stockholders' Counsel also have taken into account the uncertain outcome and the risk of any litigation, especially in complex actions such as the Derivative Matters, as well as the difficulties and delays inherent in such litigation. The Settling Stockholders and Settling Stockholders' Counsel also are mindful of the inherent problems of proof of, and possible defenses to, the claims asserted in the Derivative Matters. Based on their investigation and evaluation set forth in more detail *infra*, the Settling Stockholders and Settling Stockholders' Counsel have determined that the Settlement set forth in this Stipulation is in the best interests of PureCycle and its stockholders.

Settling Stockholders' Counsel have conducted an extensive investigation, including, *inter alia*: (i) reviewing PureCycle's press releases, public statements, SEC filings, and securities analysts' reports and advisories about the Company; (ii) reviewing media reports about the Company and its technologies; (iii) researching the applicable law with respect to the claims alleged in the Derivative Matters and the potential defenses thereto; (iv) preparing and filing derivative complaints in the Derivative Matters and sending the demands detailed herein; (v) reviewing and analyzing relevant pleadings in the Securities Action, and evaluating the merits of, and Defendants' liability in connection with, the Securities Action and the Derivative Matters; (vi)

8

preparing and filing an amended derivative complaint in the Federal Action; (vii) reviewing the Company's existing corporate governance policies and preparing an extensive settlement demand detailing proposed corporate governance reforms to strengthen the Company's governance; (viii) separately reviewing and evaluating nearly 2,000 pages of non-public documents produced by the Company in response to the demands made pursuant to 8 *Del. C.* § 220; (ix) participating in extensive settlement discussions with Settling Defendants' Counsel, including three separate mediation sessions; and (x) negotiating the MOU and this Stipulation.

Based on Settling Stockholders' Counsel's thorough review and analysis of the relevant facts, allegations, defenses, and controlling legal principles, the Settling Stockholders and Settling Stockholders' Counsel submit that the Settlement set forth in this Stipulation is fair, reasonable, and adequate, and in the best interests of PureCycle and its stockholders. Each of the Settling Parties recognizes and acknowledges that the Derivative Matters have been initiated, filed, and prosecuted by Settling Stockholders in good faith and defended by Settling Defendants in good faith, that the Derivative Matters are being voluntarily settled with the advice of counsel, and that the terms of the Settlement are fair, reasonable, and adequate.

### D. <u>Defendants' Denials of Wrongdoing</u>

The Settling Defendants and Released Persons have denied and continue to deny all allegations of wrongdoing, fault, liability or damage to the Settling Stockholders, to the Company, or to the Company's current and former stockholders, including without limitations, deny that they engaged in any wrongdoing or violation of the law; deny that they breached any fiduciary duty, including the duty of care or duty of loyalty; deny that they wasted corporate assets, were unjustly enriched, engaged in gross mismanagement, or aided and abetted any breaches of fiduciary duty; deny that the Company's disclosures were deficient in any way; deny that any demand to

investigate, bring suit or obtain tolling agreements was wrongfully refused; deny that they violated any securities laws; and deny that they acted in bad faith or improperly in any way. The Settling Defendants believe that they and all Released Persons have acted properly at all times, believe that the complaints in the Federal Action and the Delaware Chancery Action and the Demanding Stockholders' demands have no merit, and believe that the Settling Stockholders have failed to and/or cannot meet their burden of pleading with particularity that any demand that the Company initiate legal action was excused and/or wrongfully rejected.

Nonetheless, taking into account the uncertainty and risks inherent in any litigation, especially in complex cases such as this one, the Settling Defendants have concluded that further litigation of the Derivative Matters would be protracted, burdensome, and expensive, and that it is desirable and beneficial that the claims asserted in or that could be asserted in the Derivative Matters be fully and finally settled and terminated in the manner and upon the terms and conditions set forth in this Stipulation.

## II.  TERMS OF STIPULATION AND AGREEMENT OF SETTLEMENT

### A.  Introduction

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED, by and among the Settling Stockholders (on behalf of themselves, and derivatively on behalf of PureCycle), Current PureCycle Stockholders (as defined in ¶ 1.2), and the Settling Defendants, by and through their respective undersigned counsel or attorneys of record that, subject to approval of the Court, in consideration of the benefits flowing to the Settling Parties from the Settlement set forth herein, the Derivative Matters and the Released Claims shall be finally and fully compromised, settled and released, and the Derivative Matters shall be dismissed with prejudice, as to all Settling Parties, upon and subject to the terms and conditions of this Stipulation.

## 1. Definitions

As used in this Stipulation the following terms have the meanings specified below:

1.1. "Court" means the United States District Court for the District of Delaware.

1.2. "Current PureCycle Stockholder" or "Current PureCycle Stockholders" means all record and beneficial owners of PureCycle common stock and the representatives, trustees, executors, heirs, administrators, transferees, agents, successors, or assigns of all such owners, immediate or remote, in each case solely in their capacities as stockholders of PureCycle, who own PureCycle stock as of the date of the execution of this Stipulation and continue to hold their PureCycle stock as of the date of the Settlement Hearing.

1.3. "Delaware Chancery Action" means *Brunson v. Otworth, et al.*, No. 2024-0326-NAC (Del. Ch.).

1.4. "Demanding Stockholders" means stockholders Tyler Begley and Thomas Workman.

1.5. "Derivative Matters" means the Federal Action, Delaware Chancery Action, and the Demanding Stockholders' demands.

1.6. "Effective Date" means the first date by which all of the events and conditions specified in ¶ 6.1 of this Stipulation have been met and have occurred.

1.7. "Federal Action" means *In re PureCycle Technologies, Inc. Derivative Litigation*, Lead Case No. 1:21-cv-01569-RGA (D. Del.), and includes all actions consolidated therein.

1.8. "Final" means (1) the Court has entered a Judgment approving the Settlement in all material respects, including but not limited to, *inter alia*, (a) approving the scope of the Releases, and (b) ordering the Clerk of the Court to enter final judgment in the form set forth in Exhibit D pursuant to Federal Rule 54(b), finding that there is no just reason for delay of enforcement or appeal of the order, and (2) the Judgment has been affirmed in all respects on any appeal or review

and is no longer subject to further appeal or review. Provided, however, and notwithstanding any provision to the contrary in this Settlement, "Final" shall not include (and the Settlement is expressly not conditioned upon) the Court's approval of attorneys' fees and the reimbursement of expenses sought by the Settling Stockholders' Counsel, or the approval of payment of a Service Award for the time and expenses expended by the Settling Stockholders, or any appeals solely related thereto.

1.9. "Individual Defendants" means Michael Otworth, Richard Brenner, Tanya Burnell, Jeffrey Fieler, Tim Glockner, Fernando Musa, John Scott, David Brenner, Michael E. Dee, James Donnally, Andy Glockner, Byron Roth and Tasmin Ettefagh.

1.10. "Insurers" means PureCycle's insurance carriers, as applicable and in accordance with what is commonly referred to as the "Side A" coverage of their policies, and is inclusive of their respective reinsurers. Insurers, however, does not include insurers of policies issued to ROCH.

1.11. "Judgment" means the proposed final order and judgment to be entered by the Court approving the Settlement, substantially in the form attached hereto as Exhibit D or in such other form as may be approved in writing by all of the Settling Parties acting by and through their respective counsel of record.

1.12. "Monetary Component" means the monetary component of this Settlement in the amount of three million dollars ($3,000,000.00) to be paid to PureCycle by the Insurers.

1.13. "Notice" means the Notice of Pendency and Settlement of Derivative Matters, a proposed version of which is submitted to the Court for approval and attached hereto as Exhibit C.

1.14. "Person" means an individual, corporation, partnership, limited partnership, limited liability company, association, joint stock company, estate, legal representative, trust,

unincorporated association, government or any political subdivision or agency thereof, and any business or legal entity and their spouses, heirs, predecessors, successors, representatives, or assigns.

1.15. "Preliminary Order" means an order preliminarily approving the Stipulation and the form and manner of Notice, substantially in the form attached hereto as Exhibit B.

1.16. "PureCycle Technologies, Inc.," "PureCycle," or the "Company" means PureCycle Technologies, Inc. and any of its predecessors, affiliates, or subsidiaries, including but not limited to PureCycle Technologies LLC or ROCH.

1.17. "Reforms" means the Board's adoption or agreement to adopt certain changes to its corporate governance practices, policies and procedures, internal controls and Board composition, as set forth herein.

1.18. "Related Parties" means each of Settling Defendants' past or present directors, officers, employees, partners, members, principals, agents, attorneys, Insurers, legal representatives, predecessors, successors, parents, subsidiaries, divisions, assigns, spouses, heirs, executors, administrators, and related or affiliated entities.

1.19. "Released Claims" shall collectively mean any and all manner of claims of relief, debts, demands, rights or causes of action or liabilities whatsoever (including, but not limited to, any claims for compensatory damages, punitive damages, interest, attorneys' fees, expert or consulting fees, and any other costs, expenses, liability or relief, monetary, injunctive, or otherwise), whether based on federal, state, local, foreign, international, statutory or common law or any other law, rule or regulation, whether fixed or contingent, accrued or unaccrued, liquidated or unliquidated, at law or in equity matured or unmatured, pleaded or unpleaded, known or unknown, suspected or unsuspected (including "Unknown Claims" as defined in ¶ 1.29 hereof), arising out of or related to

any of the claims that have been or could have been asserted in the Derivative Matters or the related action *Piot v. Bouck, et al.*, No. 2024-0475-NAC (Del. Ch.) or in any other forum by the Settling Stockholders, the Settling Defendants, or any Current PureCycle Stockholders derivatively on behalf of PureCycle, against the Released Persons that arise out of or relate to or in connection with the facts, allegations, transactions, events, matters, or occurrences, acts, disclosures, statements, representations, omissions or failures to act which were alleged in the Derivative Matters or otherwise based on the same set of operative facts as alleged in the Derivative Matters, and any and all claims (including Unknown Claims) arising out of, relating to, or in connection with the prosecution, defense, settlement or resolution of the Derivative Matters against the Released Persons, except for (i) any securities fraud claims by a class member pursuant to any plan of allocation as may be approved in the related Securities Action; (ii) any securities fraud claims alleged in the securities class action, *Southgate v. PureCycle Technologies, Inc., et al.*, No. 1:23-cv-8605 (S.D.N.Y.); and (iii) any claims by the Individual Defendants or any insured to enforce their rights relating to insurance coverage, indemnification, or under any contract.

1.20. "Released Persons" means each and all of the Settling Defendants and their Related Parties.

1.21. "ROCH" means Roth CH Acquisition I Co. and any of its predecessors, affiliates, or subsidiaries.

1.22. "Settlement" means the settlement contemplated by this Stipulation.

1.23. "Settlement Hearing" means the hearing or hearings at which the Court will review the adequacy, fairness, and reasonableness of the Settlement, and whether the agreement for the Fee and Expense Amount should be approved.

1.24. "Settling Defendants" means PureCycle, and the Individual Defendants.

1.25. "Settling Defendants' Counsel" means the law firms of Dechert LLP, DLA Piper LLP (US) and Dinsmore & Shohl LLP.

1.26. "Settling Parties" means the Settling Stockholders and the Settling Defendants.

1.27. "Settling Stockholders" means the plaintiffs in the Federal Action and Delaware Chancery Action and the Demanding Stockholders.

1.28. "Settling Stockholders' Counsel" means collectively, Weiss Law, Levi & Korsinsky, LLP, Kahn Swick & Foti, LLC, Kirby McInerney LLP, and Rigrodsky Law, P.A.

1.29. "Unknown Claims" means any Released Claim which any Settling Stockholder, Settling Defendant or Current PureCycle Stockholders do not know or suspect to exist in his, her or its favor at the time of the release of the Released Claims, including without limitation claims which, if known by him, her or it, might have affected his, her or its decision to enter into the Settlement with and release of the Released Persons, or might have affected his, her or its decision not to object to this Settlement. With respect to any and all Released Claims, the Settling Parties agree that the Stipulation shall provide that the Settling Parties expressly waive and each of the Current PureCycle Stockholders shall be deemed to have waived the provisions, rights, and benefits conferred by or under California Civil Code Section 1542, or any other law of the United States or any state or territory of the United States, or principle of common law, which is similar, comparable, or equivalent to Section 1542 of the California Civil Code.

## 2. Settlement of the Derivative Matters

2.1. The Settling Parties acknowledge and agree that the filing, pendency, and prosecution of the Derivative Matters were the sole cause for the Monetary Component of the Settlement and the primary cause of the Board's adoption or agreement to adopt certain changes to its corporate governance practices, policies and procedures, internal controls and Board composition, as set detailed below. The Settling Parties further acknowledge and agree that these

Reforms confer substantial benefits on the Company and that the Settlement on the terms set forth herein is in the best interests of the Company and Current PureCycle Stockholders.

2.2. PureCycle has made, or agreed to make, the following Reforms (outlined in Sections 2.3 herein) to its corporate governance practices, policies and procedures. The Reforms implemented pursuant to the changes outlined in Section 2.3 shall remain in effect for not less than five (5) years from the Effective Date (the "Commitment Term"). The Company may amend or eliminate any one or more of the Reforms during the Commitment Term if PureCycle's Board determines in a good faith exercise of its business judgment that a policy, procedure, control, or agreement is not in the Company's best interest or conflicts with the Board's fiduciary duties or any provision of any applicable law, including without limitation, the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, or any rules or regulations promulgated thereunder. Any changes that are made pursuant to the above shall be reported on an annual basis either in the Company's U.S. Securities and Exchange Commission ("SEC") Form 10-K or SEC Form 14(a) Proxy Statement. PureCycle's Board shall oversee and confirm the timely adoption and effective implementation of the Reforms.

2.3. The Board has implemented, or will implement within ninety (90) days, or such longer period as provided in Section 2(A)-( P) below after the Court enters an Order granting final approval of the Settlement, the following Reforms. The Board, on behalf of the Company and by resolution of the Board's independent directors, in a determination made in the good faith exercise of the Board's business judgment, confirms that: (i) the Settlement, including the Reforms, confer substantial benefits on the Company and its stockholders, and serve the best interests of the Company and its stockholders; and (ii) the Settling Stockholders' litigation, litigation demands, books and records demands pursuant to 8 *Del. C.* §220, and settlement efforts in the Derivative

Matters are the sole cause of the Monetary Component to be made as part of this Settlement and the primary cause of the Board's agreement to adopt, implement, and maintain the Reforms for the agreed term.

A.     The Company shall expand its Board from seven (7) members to nine (9) members by appointing two (2) new independent directors to the Board who meet NASDAQ's definition of "independent director."  The first new independent director will be appointed to the Board within twelve (12) months of a Final Court order approving the Settlement.  The second new independent director will be appointed to the Board within twenty-four (24) months of a Final Court order approving the Settlement.  Provided, however, that if, despite its best efforts, the Nominating and Corporate Governance Committee is unable to identify suitable candidates, then the Company shall have the remainder of the Commitment Term to appoint the new independent directors.

B.     The Company shall actively seek Board diversity and consider women and underrepresented minorities, as defined in NASDAQ Rule 5065(f), as Board candidates.  The Corporate Governance Guidelines, adopted pursuant to Sections 2(C), (L)-(P) below, and attached as Exhibit A-6, will provide that the Company will provide a graphic representation of current Board member diversity in its annual proxy statement, consistent with NASDAQ listing standards.

C.     The Corporate Governance Guidelines (attached as Exhibit A-6) have been drafted to express the Company's intent to continue to have the positions of Chief Executive Officer ("CEO") and Board Chairman held by separate persons.

D.     Within six (6) months of a Final Court order approving the Settlement, the Company will engage an independent corporate governance consultant or outside legal counsel to perform an analysis of the Company's corporate governance structure and processes and report to

the Board on the results of same and on trends and developments in the law and/or corporate best practices relating to corporate governance and the Board's responsibilities annually.

E. The Company will form an Operational Excellence Committee with duties and responsibilities as outlined in the Operational Excellence Committee Charter (attached as Exhibit A-1).

F. The Company will create a Chief Compliance Officer ("CCO") position with duties and responsibilities as outlined in the Chief Compliance Officer Duties and Responsibilities (attached as Exhibit A-4).

G. The Charters from various Committees, including certain Board Committees, as amended and outlined in Exhibits A-1 to A-5, will ensure that the Company has an existing framework in place for identification, assessment, and management of compliance risks, subject to the Company's available resources. The Corporate Governance Guidelines (attached as Exhibit A-6) and the Amended Audit and Finance Committee Charter (attached as Exhibit A-2) will provide that the Audit and Finance Committee shall assist the Board in its oversight of: (a) the integrity of the Company's financial statements; (b) the Company's compliance with legal and regulatory requirements; (c) the independent auditors' qualifications, independence, and performance; (d) the performance of the Company's internal audit function; (e) preparing the Committee's report to be included in the Company's annual proxy statement; (f) advising and consulting with management and the Board regarding the financial affairs of the Company; (g) appointing, compensating, retaining, terminating, overseeing and evaluating the work of the Company's independent auditors; (h) reviewing strategies and plans for significant transactions, including discussion of possible transactions and their financial impact and various reports on pending and completed transactions; and (i) reviewing the Company's financial outlook and plans

for financing its working and long-term capital requirements, including minimum cash requirements and liquidity targets and the Company's capital plan (capital allocation, funding, and capital expenditures).

H.      The Company will adopt a Disclosure Committee Charter (attached as Exhibit A-3) to formalize the Committee's responsibilities in assisting the Company's senior officers in fulfilling their responsibility for oversight of the accuracy and timeliness of the disclosures made by the Company.

I.      The Company will adopt the Charter of the Senior Leadership Team Committee (attached as Exhibit A-5) to formalize the Senior Leadership Team and the Executive Leadership Team that shall meet regularly to monitor the Company's strategic initiatives.

J.      The Company will amend the Audit and Finance Committee Charter (as outlined in the Amended Audit and Finance Committee Charter, attached as Exhibit A-2), to expand its oversight responsibilities and delegate its authority.

K.      The Corporate Governance Guidelines (attached as Exhibit A-6) will provide that the Nominating and Corporate Governance Committee will establish and periodically evaluate an orientation program for new directors and a continuing education program for existing directors. Such programs may include presentations by appropriate executives and opportunities for directors to visit the Company's principal facilities in order to provide greater understanding of the Company's business and operations. In addition, the Nominating and Corporate Governance Committee shall arrange for directors of the Company to attend outside educational programs pertaining to the directors' responsibilities.

L.      The Company will adopt Corporate Governance Guidelines which formalize the details of management's reporting obligations to the Audit and Finance Committee and the Board.

The policies or Corporate Governance Guidelines will provide that management will report to the Board on a quarterly basis regarding the status of operations, commercial contracts, litigation, and other topics relevant to the Board's oversight of the Company's operations and compliance with the law (in accordance with the Corporate Governance Guidelines, attached as Exhibit A-6).

M. The Company will adopt Corporate Governance Guidelines which formalize the details regarding the Independent Directors' executive sessions, including but not limited to, that an executive session of independent directors will be scheduled in conjunction with each regular meeting of the Board (in accordance with the Corporate Governance Guidelines, attached as Exhibit A-6).

N. The Company will adopt Corporate Governance Guidelines which formalize the details of the Company's training policies. The Corporate Governance Guidelines will provide that management will implement an annual training program for employees that will include relevant topics, including, but not limited to, ethical behavior, human resources polices and employee relations, and conflicts of interest (in accordance with the Corporate Governance Guidelines, attached as Exhibit A-6).

O. The Corporate Governance Guidelines will provide that management shall maintain a whistleblower hotline, which encourages interested parties to bring forward ethical and legal violations to the parties identified in the Code of Ethics, the Audit and Finance Committee, the Compensation Committee, the Nominating and Corporate Governance Committee, and/or the third-party reporting service provider so that action may be taken to resolve the problem and the complaints shall be reviewed by the applicable committee, in consultation with and under the supervision of the Company's legal counsel, and presented to the full Board (in accordance with

the Corporate Governance Guidelines, attached as Exhibit A-6). The Company will publish its Whistleblower Policy on its external website.

P.      The Company will add language to the Corporate Governance Guidelines indicating that the Board will maintain a Compensation Clawback and Recoupment Policy, first approved in March 2021, and that, pursuant to Reg S-K and NASDAQ listing standards, will maintain a separate clawback policy supplemental to, and not a replacement of, the policy, which such supplemental policy shall only be applicable to Section 16 Officers (in accordance with the Corporate Governance Guidelines, attached as Exhibit A-6).

2.4.    The Settling Stockholders' Counsel and the Settling Defendants' Counsel engaged in an arm's-length negotiation and ultimately agreed that the Insurers will pay three million dollars ($3,000,000.00) to PureCycle as the Monetary Component of this Settlement.   Specifically, PureCycle, on behalf of the Individual Defendants, shall cause its Insurers to wire or pay by check or draft, at the sole election of the Insurers, the Monetary Component to PureCycle within thirty (30) days of entry of the Preliminary Order, but subject to the obligation to repay the Insurers in the event that the Settlement is subsequently vacated or modified pursuant to any appeal that may be filed.

### 3. Settling Stockholders' Counsel's Fee and Expense Amount and Settling Stockholders' Service Awards

3.1.    Prior to discussing and agreeing upon the Fee and Expense Amount herein, the Settling Parties negotiated and agreed upon the Reforms to be adopted as part of the Settlement and negotiated the Monetary Component.   The Settling Parties agree that the Settlement confers substantial benefits upon PureCycle and its stockholders, and that the Settling Stockholders' Counsel are entitled to reasonable attorneys' fees and reimbursement of expenses in an amount not to exceed $2,000,000.00, subject to the approval of the Court. In connection with seeking final

approval of the proposed Settlement, Plaintiff's lead counsel, on behalf of Settling Stockholders' Counsel, intends to request approval of attorneys' fees and reimbursement of expenses in the amount of $1,750,000.00 (the "Fee and Expense Amount"). The Fee and Expense Amount shall be distributed to the Settling Stockholders' Counsel from the Monetary Component within forty-five (45) days of entry of the Preliminary Order, subject to Settling Stockholders' Counsel's obligations to repay the Company and/or its Insurers the portions of the Fee and Expense Amount allocated to them if, as a result of any order of the Court, appeal and/or further proceedings on remand, or successful collateral attack, the amount of the Fee and Expense Amount is reduced. Settling Defendants agree not to oppose reasonable service awards in the amount of $2,000 to each Settling Stockholder to be paid out of the Fee and Expense Amount in recognition of Stockholders' efforts to achieve the Settlement's benefits to the Company, subject to Court approval (the "Service Award").

3.2. Settling Stockholders' Counsel shall allocate the Fee and Expense Amount among themselves and shall use their best efforts to reach an agreement. If a dispute arises among Settling Stockholders' Counsel regarding the proposed allocation of the Fee and Expense Amount, then the Mediator will resolve such disputes pursuant to expedited arbitral procedures, as determined by the Mediator. The costs of any such allocation mediation or arbitration shall be borne solely by Settling Stockholders' Counsel and allocated by agreement or as finally determined by the Mediator.

3.3. Any order or proceeding (or any portion thereof) relating solely to an award of attorneys' fees and expenses, or any appeal from any order (or any portion thereof) relating thereto or reversal or modification thereof, shall have no effect on the Settlement and shall not operate to terminate or cancel this Stipulation or to affect or delay the finality of the Order and Final Judgment

22

approving this Stipulation. Except as provided in the Stipulation, the Settling Defendants shall bear no other expenses, costs, damages or fees incurred by the Settling Stockholders or any of their attorneys, experts, advisers, agents or representatives. The Settling Defendants and Settling Defendants' Counsel shall have no responsibility for or liability with respect to the allocation among any counsel for any Settling Stockholder of the Fee and Expense Amount as approved by the Court and the Settling Defendants take no position with respect to such matters.

### 4. Settlement Procedure and Notice

4.1. No later than seven (7) days after execution of the Stipulation, the Settling Parties shall submit the Stipulation and its Exhibits to the Court and apply for the Preliminary Order substantially in the form of Exhibit B hereto: (a) preliminarily approving the Settlement; (b) approving the form and manner of notice of the Settlement and directing that, within ten (10) days of entry of the Preliminary Order, PureCycle shall (i) publish the Notice in a press release on GlobeNewswire with a link to the Company's investor relations webpage where the Notice and Stipulation will be available; (ii) file with the Securities and Exchange Commission a Form 8-K attaching a copy of the Notice and Stipulation; and (iii) post the Notice and the Stipulation on the Company's website and maintain the documents there until after the Settlement Hearing; (c) setting a date and time for the Settlement Hearing, as well as deadlines for the submission of papers in support of Settlement and for objections to the Settlement; and (d) enjoining all other PureCycle stockholders from commencing, instituting, or prosecuting any of the claims asserted in the Derivative Matters. The Company shall pay all reasonable expenses incurred in providing Notice in the time and manner ordered by the Court. The Settling Stockholders' Counsel shall cause a copy of the Notice and Stipulation to be posted on their respective websites. The Settling Parties believe the content and manner of the notice, as set forth in this paragraph, constitutes adequate and reasonable notice to Current PureCycle Stockholders pursuant to applicable law and due process.

No later than twenty-one (21) days before the Settlement Hearing, Defendants' Counsel shall file with the Court an appropriate affidavit or declaration with respect to filing and posting of the Notice.

4.2. The Settling Parties will request that after Notice is provided, the Court hold the Settlement Hearing and approve the Settlement of the Derivative Matters as set forth herein and enter a Final Judgment substantially in the form attached hereto as Exhibit D: (a) approving the terms of the Settlement as fair, reasonable and adequate, including the payment of Fee and Expense Amount in the amount negotiated by the Settling Parties and Service Awards for the Settling Stockholders to be drawn therefrom; and (b) dismissing with prejudice all claims released against any of the Released Persons (as defined herein).

## 5. Releases

5.1. Upon the Effective Date, the Settling Stockholders (acting on their own behalf and, derivatively on behalf of PureCycle), the Settling Defendants, and each of the Current PureCycle Stockholders shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever released, relinquished and discharged the Released Claims against the Released Persons and shall be forever enjoined from prosecuting the Released Claims. Nothing herein shall in any way impair or restrict the rights of any Settling Party to enforce the terms of the Settlement.

5.2. Upon the Effective Date, each of the Released Persons shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever released, relinquished and discharged each and all of the Settling Stockholders and Settling Stockholders' Counsel and their subsidiaries, affiliates, members, directors, officers, employees, partners, agents, heirs, administrators, successors, and assigns from all claims (including Unknown Claims) arising out of, relating to, or in connection with, the institution, prosecution, assertion, settlement or resolution of the Derivative Matters or the Released Claims. Nothing herein shall in any way impair or restrict the rights of any Settling Party to enforce the terms of the Settlement.

24

5.3. Upon the Effective Date, each of the Released Persons shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever released, relinquished and discharged each and all of the other Released Persons from all Released Claims. Nothing herein shall in any way impair or restrict the rights of any Settling Party to enforce the terms of the Stipulation.

### 6. Conditions of Settlement, Effect of Disapproval, Cancellation or Termination

6.1. The Settlement shall not become effective until the first date upon which all of the following conditions have been satisfied, unless one or more of the conditions is expressly waived in writing by counsel for each of the Settling Parties:

A. Approval by PureCycle's Board, and all Settling Defendants of the Stipulation;

B. The entry of Final Judgment by the Court approving the Settlement and, within ten (10) days after the Final Judgment becomes final and non-appealable, dismissing with prejudice the Federal Action, as to the Settling Parties, without awarding costs to any party, except as provided herein;

C. The Judgment referred to above shall have become Final as defined in ¶ 1.8;

D. The payment of the Monetary Component to PureCycle (minus the Fee and Expense Amount as approved by the Court);

E. The payment of the Fee and Expense Amount to the Settling Stockholders' Counsel, to be distributed to the Settling Stockholders' Counsel and the Settling Stockholders as Service Awards as agreed by the Settling Stockholders' Counsel; and

F. The entry of an Order by the Delaware Court of Chancery dismissing with prejudice the Delaware Chancery Action, within ten (10) days after the Final Judgment by the Court becomes final and non-appealable, without awarding costs to any party, except as provided herein.

6.2.     If any of the conditions specified in ¶ 6.1 are not met, then the Stipulation shall be canceled and terminated unless counsel for the Settling Parties mutually agree in writing to proceed with the Stipulation.

### 7.  Miscellaneous Provisions

7.1.     The Settling Parties (a) acknowledge that it is their intent to consummate this Settlement as set forth in this Stipulation; and (b) agree to act in good faith and to cooperate to the extent reasonably necessary to expeditiously effectuate and implement all terms and conditions of the Stipulation and to exercise their best efforts to accomplish the foregoing terms and conditions of the Stipulation.

7.2.     The Settling Parties intend this settlement to be a final and complete resolution of all disputes between them with respect to the Derivative Matters.  The Settlement compromises claims which are contested and shall not be deemed an admission by any of the Settling Parties as to the merits of any claim, allegation or defense.  The Settling Parties further agree that the claims are being settled voluntarily after consultation with competent legal counsel.  The Settling Parties will jointly request that the Judgment contain a finding that during the course of the litigation, the Settling Parties and their respective counsel at all times complied with the applicable requirements of good faith litigation and that no action, allegation, position taken, or filing was undertaken or made in bad faith or in violation of Rule 11 of the Federal Rules of Civil Procedure, Rule 11 of the Rules of the Court of Chancery of the State of Delaware, or any other comparable provision of state law.

7.3.     Neither the Stipulation nor the Settlement, nor any act performed or document executed pursuant to or in furtherance of the Stipulation or the Settlement: (a) is or may be deemed to be or may be offered, attempted to be offered or used in any way by the Settling Parties or any other Person as a presumption, a concession or an admission of, or evidence of, jurisdiction over, fault

wrongdoing or liability of the Settling Defendants or of the validity of any Released Claims; or (b) is intended by the Settling Parties to be offered or received as evidence or used by any other Person in any other actions or proceedings, whether civil, criminal or administrative.

7.4.     The Released Persons may file the Stipulation and/or the Judgment in any action that may be brought against them in order to support a defense or counterclaim based on principles of res judicata, collateral estoppel, full faith and credit, release, good faith settlement, judgment bar or reduction or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim.

7.5.     The Exhibits to this Stipulation are material and integral parts hereof and are fully incorporated herein by this reference.

7.6.     The Stipulation may be amended or modified only by a written instrument signed by or on behalf of all Settling Parties or their respective successors-in-interest.

7.7.     This Stipulation and the Exhibits attached hereto constitute the entire agreement among the Settling Parties and no representations, warranties or inducements have been made to any Settling Party concerning the Stipulation or any of its Exhibits other than the representations, warranties and covenants contained and memorialized in such documents.  Except as otherwise provided herein and subject to applicable indemnities and policies of insurance, each of the Settling Parties shall bear their own costs. Nothing in this Stipulation is intended to alter in any way any of the Individual Defendants' indemnification rights arising under law or by contract with the Company or affect any agreement between any Individual Defendant and the Company.

7.8.     Settling Stockholders' Counsel, derivatively on behalf of PureCycle, are expressly authorized by the Settling Stockholders to take all appropriate action required or permitted to be taken pursuant to the Stipulation to effectuate its terms and also are expressly authorized by the Settling

Stockholders to enter into any modifications or amendments to the Stipulation which they deem appropriate on behalf of the Settling Stockholders.

7.9. Each counsel or other Person executing the Stipulation or its Exhibits on behalf of a Settling Party hereby warrants that such Person has the full authority to do so on behalf of that Settling Party. Moreover, each Settling Party hereby warrants that such Person has the full authority to enter into this Stipulation.

7.10. The Stipulation may be executed in one or more counterparts. All executed counterparts and each of them shall be deemed to be one and the same instrument. A complete set of counterparts, either originally executed or copies thereof, shall be filed with the Court.

7.11. The Stipulation shall be binding upon, and inure to the benefit of, the successors and assigns of the Settling Parties and the Released Persons.

7.12. The Court shall retain jurisdiction with respect to implementation and enforcement of the terms of the Stipulation, and the Settling Parties submit to the jurisdiction of the Court solely for purposes of implementing and enforcing the Settlement embodied in the Stipulation.

7.13. This Stipulation and the Exhibits attached hereto shall be considered to have been negotiated, executed and delivered, and to be wholly performed, in the State of Delaware, and the rights and obligations of the parties to the Stipulation shall be construed and enforced in accordance with, and governed by, the internal, substantive laws of the State of Delaware without giving effect to that State's choice-of-law principles.

7.14. Counsel for the Settling Parties agree to cooperate fully with one another in seeking Court approval of the Settlement, as embodied in this Stipulation, and to use best efforts to promptly agree upon and execute all such other documentation as may be reasonably required to obtain final approval by the Court of the Settlement.

7.15. The Stipulation shall be treated as jointly drafted and will not be construed against any Settling Party as the drafter.

7.16. The Settling Defendants have denied and continue to deny all of the claims in the Derivative Matters, and have denied and continue to deny having committed, aided, or attempted to commit any violations of law or breach of any duty of any kind or otherwise acted in any improper manner. But neither the Settling Defendants, the Company, nor their respective counsel will, in any statement made to any media representative (whether or not for attribution), assert that the Derivative Matters were commenced or prosecuted in bad faith, nor will they deny that the Derivative Matters were commenced and prosecuted in good faith and are being settled voluntarily after consultation with competent legal counsel. Likewise, Settling Stockholders and Settling Stockholders' Counsel shall retain their right to maintain that their claims have merit. In all events, none of the Settling Parties shall make any accusations of wrongful or actionable conduct by any Settling Party concerning the prosecution, defense, and resolution of the Derivative Matters, nor shall they otherwise suggest that the Settlement constitutes an admission of any claim or defense alleged.

7.17. Neither the Settlement nor any of its terms shall be construed as an admission or evidence of any violation of any law or admission as to the truth of any allegation.

7.18. Except as set forth herein, each party shall bear his or its own fees and costs.

IN WITNESS WHEREOF, the Settling Parties have caused this Stipulation to be executed,

by their duly authorized attorneys, dated July 17, 2024.

David C. Katz
Joshua M. Rubin
Mark D. Smilow
Weiss Law
305 Broadway, 7th floor
New York, NY 10007
(212) 682-3025
Email: dkatz@weisslawllp.com
        msmilow@weisslawllp.com
        jrubin@weisslawllp.com

*Lead Counsel in Federal Action*

Gregory M. Nespole
Correy A. Suk
Levi and Korsinsky, LLP
33 Whitehall Street, 17th Floor
New York, NY 10004
(212) 363-7500
Email: gnespole@zlk.com
        csuk@zlk.com

*Plaintiff's Counsel in Federal Action*

Melinda A. Nicholson
Nicolas Kravitz
Kahn Swick & Foti, LLC
1100 Poydras St., Suite 960
New Orleans, LA 70163
(504) 455-1400
Email: melinda.nicholson@ksfcounsel.com
        nicolas.kravitz@ksfcounsel.com

*Plaintiff's Counsel in Delaware Chancery Action*

Joni Jacobsen
Dechert LLP
35 West Wacker Drive Suite
3400 Chicago, IL 60601-1608
(312) 646-5800
Email: joni.jacobsen@dechert.com

*Counsel for Defendants PureCycle Technologies, Inc., Michael Otworth, Richard Brenner, Tanya Burnell, Fernando Musa, Jeffrey Fieler, Tim Glockner, John Scott, David Brenner, Tasmin Ettefagh, Michael Dee*

Kevin J. Mangan
Womble Bond Dickinson LLP
1313 North Market Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 252-4320
Email: kevin.mangan@wbd-us.com

OF COUNSEL:
Dinsmore & Shohl LLP
Mark G. Arnzen, Jr.
255 East Fifth Street, Suite 1900
Cincinnati, OH 45202
(513) 977-8440
mark.arnzen@dinsmore.com

*Attorney for Defendants James Donnally and Andy Glockner*

Thomas W. Elrod
Ira M. Press
Lauren Molinaro
Kirby McInerney LLP
250 Park Avenue, Suite 820
New York, NY 10177
(212) 371-6600
Email: telrod@kmllp.com
     ipress@kmllp.com
     lmolinaro@kmllp.com

*Counsel for Stockholder Tyler Begley*

Seth D. Rigrodsky
Vincent A. Licata
Rigrodsky Law, P.A.
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
(516) 683-3516
Email: sdr@rl-legal.com
     vl@rl-legal.com

*Counsel for Stockholder Thomas Workman*

John R. Loftus
Christine E. Ellice
DLA Piper LLP (US)
2000 Avenue of the Stars, Suite 400
North Tower Los Angeles, CA 90067
(310) 595-3000
Email: jake.loftus@dlapiper.com
     christine.ellice@dlapiper.com

*Counsel for Defendant Byron Roth*

# EXHIBIT A

<u>**GOVERNANCE TERM SHEET**</u>

***In re PureCycle Technologies, Inc. Derivative Litigation***, **Lead Case No. 21-cv-01569-RGA (D. Del.); *Brunson v. Otworth, et al.*, No. 2024-0326-NAC (Del. Ch.);**
**Stockholder Demands of Tyler Begley and Thomas Workman**

PureCycle Technologies, Inc. ("PureCycle" or the "Company") shall adopt and implement these Corporate Governance Reforms (the "Reforms"), which include the exhibits attached hereto, within 90 days of final settlement approval and the Reforms shall remain in effect for not less than five (5) years (the "Commitment Term"). The Company may amend or eliminate any one or more of the corporate governance reforms described herein during the Commitment Term if PureCycle's Board of Directors (the "Board") determines in a good faith exercise of its business judgment that a policy, procedure, control, or agreement term is not in the Company's best interest or conflicts with the Board's fiduciary duties or any provision of any applicable law, including without limitation, the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, or any rules or regulations promulgated thereunder. Any changes that are made pursuant to the above shall be reported on an annual basis either in the Company's SEC Form 10-K or SEC Form 14(a) Proxy Statement. PureCycle's Board shall oversee and confirm the timely adoption and effective implementation of the Reforms.

The Board, on behalf of the Company, shall confirm via the final Stipulation of Settlement and by resolution of the Board's independent directors that: (i) the Settlement, including the Reforms, confer substantial benefits on the Company and its stockholders, and serve the best interests of the Company and its stockholders; and (ii) Stockholders' litigation, litigation demands, books and records demands pursuant to 8 *Del. C.* §220 (collectively, the "Derivative Matters"), and settlement efforts in the Derivative Matters are the primary cause of the Board's agreement to adopt, implement, and maintain the Reforms for the agreed term.

**1.** <u>New Independent Directors</u>**.** The Company shall expand its Board from seven (7) members to nine (9) members by appointing two (2) new independent directors to the Board who meet NASDAQ's definition of "independent director." The first new independent director will be appointed to the Board within twelve (12) months of a final court order approving the settlement. The second new independent director will be appointed to the Board within twenty-four (24) months of a final court order approving the settlement. Provided, however, that if, despite its best efforts, the Nominating and Corporate Governance Committee is unable to identify suitable candidates, then the Company shall have the remainder of the Commitment Term (defined herein) to appoint the second new independent director.

**2.** <u>Board Diversity</u>**.** The Company shall actively seek Board diversity and consider women and underrepresented minorities, as defined in NASDAQ Rule 5065(f), as Board candidates. The Corporate Governance Guidelines, attached as Exhibit A-6, will provide that the Company will provide a graphic representation of current Board member diversity in its annual proxy statement, consistent with NASDAQ listing standards.

**3. Separation of CEO and Chairman.** The Corporate Governance Guidelines (attached as Exhibit A-6) will be amended to express the Company's intent to continue to have the positions of Chief Executive Officer ("CEO") and Board Chairman held by separate persons.

**4.** Corporate Governance Consultant or Outside Legal Counsel. Within six (6) months of a final court order approving the settlement, the Company will engage an independent corporate governance consultant or outside legal counsel to perform an analysis of the Company's corporate governance structure and processes and report to the Board on the results of same and on trends and developments in the law and/or corporate best practices relating to corporate governance and the Board's responsibilities annually.

**5.** Formation of Operational Excellence Committee. The Company will form an Operational Excellence Committee with duties and responsibilities as outlined in the Operational Excellence Committee Charter (attached as Exhibit A-1).

**6.** Creation of a Chief Compliance Officer ("CCO"). The Company will create a Chief Compliance Officer ("CCO") position with duties and responsibilities as outlined in the Chief Compliance Officer Duties and Responsibilities (attached as Exhibit A-4).

**7. Amendment to Board Committees and Corporate Governance Guideline to Ensure Compliance Framework.** The Charters from various Board Committees, as amended and outlined in Exhibits A-1 to A-5, will ensure that the Company has an existing framework in place for identification, assessment, and management of compliance risks, subject to the Company's available resources. The Corporate Governance Guidelines (attached as Exhibit A-6) and the Amended Audit and Finance Committee Charter (attached as Exhibit A-2) will provide that the Audit and Finance Committee shall assist the Board in its oversight of: (a) the integrity of the Company's financial statements; (b) the Company's compliance with legal and regulatory requirements; (c) the independent auditors' qualifications, independence, and performance; (d) the performance of the Company's internal audit function; (e) preparing the Committee's report to be included in the Company's annual proxy statement; (f) advising and consulting with management and the Board regarding the financial affairs of the Company; (g) appointing, compensating, retaining, terminating, overseeing and evaluating the work of the Company's independent auditors; (h) reviewing strategies and plans for significant transactions, including discussion of possible transactions and their financial impact and various reports on pending and completed transactions; and (i) reviewing the Company's financial outlook and plans for financing its working and long-term capital requirements, including minimum cash requirements and liquidity targets and the Company's capital plan (capital allocation, funding, and capital expenditures).

**8. Adoption of Management-Level Disclosure Committee Charter.** The Company will adopt a Disclosure Committee Charter (attached as Exhibit A-3) to formalize the Committee's responsibilities in assisting the Company's senior officers in fulfilling their responsibility for oversight of the accuracy and timeliness of the disclosures made by the Company.

**9. Adoption of Senior Leadership Team Committee Charter.** The Company will adopt the Charter of the Senior Leadership Team Committee (attached as Exhibit A-5) to formalize

the Senior Leadership Team and the Executive Leadership Team that shall meet regularly to monitor the Company's strategic initiatives.

**10. <u>Audit and Finance Committee Enhancements and Refreshments</u>.** The Company will amend the Audit and Finance Committee Charter (as outlined in the Amended Audit and Finance Committee Charter, attached as Exhibit A-2), subject to final approval from the Audit and Finance Committee, to expand its oversight responsibilities and delegate its authority.

**11. <u>Director Training</u>.** The Corporate Governance Guidelines (attached as Exhibit A-6) will provide that the Nominating and Corporate Governance Committee will establish and periodically evaluate an orientation program for new directors and a continuing education program for existing directors. Such programs may include presentations by appropriate executives and opportunities for directors to visit the Company's principal facilities in order to provide greater understanding of the Company's business and operations. In addition, the Nominating and Corporate Governance Committee shall arrange for directors of the Company to attend outside educational programs pertaining to the directors' responsibilities.

**12. <u>Enhanced Reporting to the Board</u>.** The Company will adopt Corporate Governance Guidelines which formalize the details of management's reporting obligations to the Audit and Finance Committee and the Board. The policies or Corporate Governance Guidelines will provide that management will report to the Board on a quarterly basis regarding the status of operations, commercial contracts, litigation, and other topics relevant to the Board's oversight of the Company's operations and compliance with the law (in accordance with the Corporate Governance Guidelines, attached as Exhibit A-6).

**13. <u>Meetings in Executive Session</u>.** The Company will adopt Corporate Governance Guidelines which formalize the details regarding the Independent Directors' executive sessions, including but not limited to, that an executive session of independent directors will be scheduled in conjunction with each regular meeting of the Board (in accordance with the Corporate Governance Guidelines, attached as Exhibit A-6).

**14. <u>Employee Compliance Training</u>.** The Company will adopt Corporate Governance Guidelines which formalize the details of the Company's training policies. The Corporate Governance Guidelines will provide that management will implement an annual training program for employees that will include relevant topics, including, but not limited to, ethical behavior, human resources polices and employee relations, and conflicts of interest (in accordance with the Corporate Governance Guidelines, attached as Exhibit A-6).

**15. <u>Whistleblower Hotline</u>.** The Corporate Governance Guidelines will provide that management shall maintain a whistleblower hotline, which encourages interested parties to bring forward ethical and legal violations to the parties identified in the Code of Ethics, the Audit and Finance Committee, the Compensation Committee, the Nominating and Corporate Governance Committee, and/or the third-party reporting service provider so that action may be taken to resolve the problem and the complaints shall be reviewed by the applicable committee, in consultation

with and under the supervision of the Company's legal counsel, and presented to the full Board (in accordance with the Corporate Governance Guidelines, attached as Exhibit A-6). The Company will publish its Whistleblower Policy on its external website.

16. **<u>Clawback Policy</u>**. The Company will add language to the Corporate Governance Guidelines indicating that the Board will maintain a Compensation Clawback and Recoupment Policy, first approved in March 2021, and that, pursuant to Reg SK and NASDAQ listing standards, will maintain a separate clawback policy supplemental to, and not a replacement of, the policy, which such supplemental policy shall only be applicable to Section 16 Officers (in accordance with the Corporate Governance Guidelines, attached as Exhibit A-6).

# EXHIBIT A-1



**PURECYCLE TECHNOLOGIES, INC.**
**OPERATIONAL EXCELLENCE COMMITTEE**
**CHARTER[1]**

**Adopted as of**

## I.       PURPOSE

The purpose of the Operational Excellence (the "***Committee***") is to assist the Board of Directors (the "***Board***" or "***Board of Directors***") of PureCycle Technologies, Inc. (the "***Company***") in carrying out the Board's overall responsibility relating to capital project execution and manufacturing and delivering PureCycle products and services.

## II.      COMMITTEE MEMBERSHIP

The Committee shall consist of a minimum of three directors designated by the Board.

The Board of Directors may appoint one member to be the Chair of the Committee. If the Board fails to appoint a Chair, the members of the Committee shall elect a Chair by majority vote of all members. The Chair will chair all regular sessions of the Committee and set the agenda for Committee meetings.

The members of the Committee shall serve until their successors shall be duly elected and qualified. Any member may be removed, with or without cause, by the Board of Directors at any time.

## III.     COMMITTEE MEETINGS

The Committee shall meet at least once quarterly, or more frequently as it deems appropriate and as circumstances dictate. Any member of the Committee may request a special meeting of the Committee. Meetings may take place in person or by teleconference, videoconference or other means of electronic communication permitted under Delaware law. The Chair of the Committee shall, in consultation with the other members of the Committee and appropriate officers of the Company, establish the agenda for each Committee meeting. Each Committee member may submit items to be included on the agenda. Committee members may also raise subjects that are not on the agenda during any such meeting. The Chair of the Committee or a majority of the Committee members may call a meeting of the Committee at any time. Except as otherwise provided by law, the presence of a majority of the then-appointed members of the Committee shall constitute a quorum for the transaction of

---

[1] All proposed language contained herein remain subject to Board/Committee approval.

business, and in every case where a quorum is present, the affirmative vote of a majority of the members of the Committee present shall be the act of the Committee. The Chair of the Committee shall supervise the conduct of the meetings and shall have other responsibilities, which the Committee may designate from time to time. The Committee may invite management to all or any portion of a meeting of the Committee in its discretion. Minutes of each meeting will be prepared by such person as may be designated by the Chair of the Committee and will be circulated to the Board.

## IV.　RESPONSIBILITIES

The responsibilities of the Committee shall include:

1. The Committee shall review the Company's manufacturing, project execution, technical and distribution processes, management systems, and results.  The Committee shall provide oversight and guidance to drive continuous improvement in the areas of "Operational Excellence" as noted in the following paragraphs 2 through 7.  The Committee shall review both leading and lagging metrics and relevant benchmarks to help establish strengths and weaknesses of the Company's operations.  The Committee shall have the authority to engage, at the Company's expense, outside industry benchmarking resources and qualified consultants to better assess the Company's performance relative to peers.  The Committee shall support management's goals of achieving top quartile performance compared to appropriate petrochemical, specialty chemical, specialty plastic, or plastics industry recycling peers.

2. Safety:  Safety is a key element of Operational Excellence.  The Committee shall review management's metrics on process safety and personnel safety and compare them to industry benchmarks published by the American Chemistry Council (ACC) or the American Fuels and Petrochemical Manufacturers (AFPM).  The Committee shall assess results versus top quartile performance and help access continuous improvement progress.  The Committee will arrange for management to report and present a root cause analysis and corrective action plan for all serious process safety events and personnel safety events or near misses.  Management will use the AFPM matrix for the purpose of defining "serious" incidents.

3. Environmental:  The Committee shall review management metrics on environmental performance.  Management shall report emissions and operating permit compliance to the Committee annually.  The Committee shall review quarterly all "Notices of Violation," and evaluate management's root cause and corrective action recommendations.   The Committee shall review Life Cycle Analysis (LCA) calculations annually for operating plants and for projects at final investment decision (FID).  The Committee will compare the LCA results with benchmarks for virgin resins and other recycling technologies, providing guidance to drive improvement.  The Committee shall review other uses of natural resources like annual water consumption and solid waste generation on a per unit of production basis supporting continuous improvement.

4. Quality:  Product quality and quality management systems are an essential element of Operational Excellence.   The Committee will review management plans and their

recommended schedule to apply for a well-accepted quality management system including, but not limited to, the International Standards Organization (ISO).  The Committee will review management quality incident investigations for any event costing or estimated to cost more than $250,000 to correct.

5. <u>Reliability and Capacity Utilization</u>:  Reliable operations drive safety, environmental, quality, and profitable performance.  The Committee shall review management metrics on operating rates and capacity utilization, and lost opportunity from downtime events.  The Committee shall review management incident reports for reliability related outages that cause a combined loss of more than $0.75 million including both costs to repair and lost opportunities from production downtime.  The Committee shall support management's development of benchmarking from third parties like IHS and others on operating comparison within the virgin resin and recycling producers.  The Committee may utilize other third-party consultants and benchmarking organizations to assess reliability and cost performance (e.g.,  Phillip Townsend Associates Incorporated (PTAI).

6. <u>Efficiency</u>:  Management shall present yield, energy, variable cost, fixed cost and other efficiency metrics they deem appropriate to the Committee annually.  The Committee shall review and provide guidance to management on improvement.  The Committee may engage consultants (e.g., PTAI)  to review fixed and variable cost performance.

7. <u>Capital Project Execution</u>: Efficient capital project execution is essential to the Company's growth and performance.  The Committee shall review annually high-level Company project execution results and process improvements.  The quarterly Committee meetings shall include a review of key metrics of all projects above $50 million.  The Committee shall require a 5-phase capital project development and execution process consistent with definitions from Independent Project Analysis (IPA) for all projects above $5 million.  The Committee will review management recommendations and recommend appropriate approvals to the Board consistent with the Company's DOA to advance projects through each stage-gate.  (stages include: (1) scoping studies, (2) development of options to a recommendation and +/- 25% cost and schedule estimate, (3) Front End Engineering and Design (FEED) for +/- 10% cost and schedule estimate for final investment decisions (FID), (4) Execution Engineering-Procurement-Construction (EPC) commissioning and start-up, and (5) review of performance on cost, schedule, operability and profitability).  The Committee will review cost, schedule, and operability benchmarks for all projects over $50 million.  The committee may use third party resources (e.g.,  IPA or Pathfinder) as appropriate.

8. <u>Additional Strategic Areas</u>: Paragraphs 1-7 above form the key elements of Operational Excellence for the Committee to provide guidance and support to management. In addition to those elements, the key strategies, actions and results for 1) feedstock acquisition, 2) international and JV operations, and 3) technology development and protection should be reviewed at least annually with the Committee.

9. Risk Management:  The Committee shall be responsible for determining, implementing, and assessing risk management with respect to the elements of Operational Excellence detailed in paragraphs 1-8 above. The Committee shall review and provide guidance to

management on improvement and shall be responsible for evaluating material risks relating to these elements and compliance with applicable laws and regulations. If the Committee identifies a material compliance, disclosure, or other risk, the Committee shall report the same to the Audit and Finance Committee or the full Board, including specific recommendations regarding proposals for mitigating these risks, as well as relevant considerations relating to public disclosures of these risks.

10. Conduct an annual self-evaluation of the performance of the Committee, including its effectiveness and compliance with the Charter of the Committee. In addition, the Committee shall annually review and reassess the adequacy of this Charter and recommend to the Board any improvements to this Charter that the Committee considers necessary or valuable.

11. Discharge any other duty or responsibility assigned to the Committee by the Board.

Consistent with the listing requirements of the NASDAQ Stock Market or any other stock exchange on which the Company's shares may be listed or traded, this Charter will be included on the Company's website and will be made available to the Company's Corporate Secretary.

## V.  RESOURCES AND AUTHORITY

The Board of the Company has constituted and established the Committee with authority, responsibility and specific duties as described in this committee charter.

The Committee may, in its sole discretion, retain or obtain the advice of industry operations or project consultants. The Committee shall be directly responsible for the appointment, compensation and oversight of the work of any such consultant, independent legal counsel or other adviser retained by the Committee. The Company must provide appropriate funding, as determined by the Committee, for payment of reasonable compensation to a such consultant, independent legal counsel or any other adviser retained by the Committee. The Committee may select such consultants, legal counsel or other adviser to the Committee, other than in-house counsel, only after taking into consideration all factors relevant to that person's independence from management. Such an assessment shall be made at least annually. The Committee will not be required to implement or act consistently with the advice or recommendation of its consultants, legal counsel or other advisor, and the authority granted in this charter will not affect the ability or obligation of the Committee to exercise its own judgment in fulfillment of its duties.

## VI.  DELEGATION

The Committee may, in its discretion, delegate all or a portion of its duties and responsibilities to a subcommittee of the Committee.

# EXHIBIT A-2



**PURECYCLE TECHNOLOGIES, INC. AUDIT
AND FINANCE COMMITTEE CHARTER[1]**

**Dated:** <mark>_____</mark>

## I. PURPOSE

The purpose of the Audit and Finance Committee (the "***Committee***") is to assist the Board of Directors (the "***Board***" or the "***Board of Directors***") of PureCycle Technologies, Inc. (the "***Company***") in fulfilling its responsibility to oversee:

(A)     the integrity of the Company's accounting and financial reporting process, including by (x) overseeing the preparation, presentation and integrity of the financial statements and other financial information provided by the Company to any governmental or regulatory body, the public or other users thereof and (y) assessing the appropriateness of the accounting and reporting policies that are used by the Company,

(B)     the Company's compliance with legal and regulatory requirements, including but not limited to, all laws and regulations concerning public disclosures about PureCycle's business affairs, financial reporting and marketing,

(C)     the independent auditors' qualifications, performance, and independence,

(D)     the performance of the Company's internal audit function, its independent auditors and its systems of internal accounting and financial controls,

(E)     the audits of the financial statements of the Company,

(F)     the Company's Code of Business Conduct and Ethics as established by the Board,

(G)     the Company's risk management policies and the operation of the Company's risk management framework as it applies to financial risks,

(H)     the Company's design, adoption, implementation, and monitoring of appropriate procedures and policies to ensure accurate and timely collection of information for inclusion into the Company's SEC filings and public disclosures,

(I)     the Company's financial policies, strategies and capital structure and make

---

[1] All proposed language contained herein remain subject to Board/Committee approval.

such reports and recommendations to the Board as it deems advisable, and

(J) the Company's compliance with financial reporting required of the Company. The Committee will also prepare all reports required to be included in the Company's proxy statement, pursuant to and in accordance with applicable rules and regulations of the Securities and Exchange Commission (the "*SEC*").

## II.     COMMITTEE MEMBERSHIP

The Committee shall consist of a minimum of three directors designated by the Board, each of whom shall be an "Independent Director" under the rules of the SEC, under the Sarbanes-Oxley Act of 2002 (the "*Sarbanes-Oxley Act*") and the rules of the NASDAQ Stock Market or any other stock exchange on which the Company's shares are listed or traded and applicable law. No Committee member shall have participated in the preparation of the financial statements of the Company or any current subsidiary of the Company at any time during the three years prior to the proposed appointment of such member to the Committee. All members of the Committee must be familiar with basic finance and accounting practices and be able to read and understand fundamental financial statements, including balance sheets, income statements and cash flow statements. In addition, at least one member shall have accounting or related financial management expertise sufficient to meet the criteria of Item 407(d) of Regulation S-K as an "audit committee financial expert." The Board shall determine whether a member is financially literate and whether at least one member of the Committee has the requisite accounting or financial expertise to meet the financial expert criteria.

The members of the Committee shall serve until their successors shall be duly elected and qualified. Any member may be removed, with or without cause, by the Board of Directors at any time.

If a Committee member simultaneously serves on the audit committee of more than three public companies (including the Company), the Board must determine that such simultaneous service would not impair the ability of such member to effectively serve on the Committee. The Company will be required to disclose any such determination in its annual proxy statement.

The Board of Directors may appoint one member to be the Chair of the Committee. If the Board fails to appoint a Chair, the members of the Committee shall elect a Chair by majority vote of all members. The Chair will chair all regular sessions of the Committee and set the agenda for Committee meetings.

## III.     COMMITTEE MEETINGS

The Committee shall meet at least quarterly, or more frequently as it deems appropriate and as circumstances dictate. Any member of the Committee may call a special meeting of the Committee. Meetings may take place in person or by teleconference, videoconference or other means of electronic communication permitted under Delaware law. The Chair of the Committee shall, in consultation with the other members of the Committee and appropriate officers of the Company, establish the agenda for each

Committee meeting. Each Committee member may submit items to be included on the agenda. Committee members may also raise subjects that are not on the agenda at any meeting. The Chair of the Committee or a majority of the Committee members may call a meeting of the Committee at any time. Except as otherwise provided by law, the presence of a majority of the then-appointed members of the Committee shall constitute a quorum for the transaction of business, and in every case where a quorum is present, the affirmative vote of a majority of the members of the Committee present shall be the act of the Committee. The Chair of the Committee shall supervise the conduct of the meetings and shall have other responsibilities, which the Committee may designate from time to time. The Committee may invite management, including management directors, to all or any portion of a meeting of the Committee in its discretion. Minutes of each meeting will be prepared by such person as may be designated by the Chair of the Committee and will be circulated to the Board.

The Committee shall periodically meet with members of the Company's management, including the Chief Financial Officer, the Corporate Controller, the Chief Executive Officer, the Chief Compliance Officer, the senior internal audit executive or the third-party firm performing the internal audit function (the "*IA Executive*"), and the independent auditors (including the audit engagement partner) in separate or combined executive sessions (in the discretion of the Committee) to discuss any matters that the Committee or any of the foregoing believes would be appropriate to discuss privately. In addition, the Committee shall meet with the independent auditors and management quarterly to review the Company's financial statements.

In addition, the Committee may invite to its meetings any director, member of management of the Company and such other persons as it deems appropriate in order to carry out its responsibilities. The Committee may also exclude from its meetings any persons it deems appropriate in order to carry out its responsibilities.

### IV. RESPONSIBILITIES

The Committee's primary responsibility is one of oversight and it recognizes that the Company's management is responsible for the preparation, presentation and integrity of the Company's financial statements and for the appropriateness of the accounting and reporting policies that are used by the Company. The independent auditors are responsible for auditing the Company's financial statements, reviewing the Company's interim financial statements and attesting to the effectiveness of the Company's internal controls in accordance with Section 404 of the Sarbanes-Oxley Act, as applicable. The Committee also recognizes that the Company's management, as well as the independent auditors, have more time, knowledge and more detailed information on the Company than do Committee members; consequently, in carrying out its oversight responsibilities, the Committee is not providing any expert or special assurance as to the Company's financial statements or any professional certification as to the independent auditor's work. The Committee shall also carry out any other responsibilities assigned to it by the Board from time to time.

The following responsibilities are set forth as a guide with the understanding that the Committee may diverge as appropriate given the circumstances, provided that at all times

the Committee must undertake the responsibilities ascribed to it under the Sarbanes-Oxley Act, Rule 10A-3(b) of the Securities Exchange Act of 1934, as amended (the "***Exchange Act***"), and the rules of the NASDAQ Stock Market or any other stock exchange on which the Company's shares are listed or traded. The Committee is authorized to carry out these and such other responsibilities assigned by the Board from time to time, and take any actions reasonably related to the mandate of this Charter.

In fulfilling its responsibilities, the Committee shall:

<u>Independent Auditors</u>

1. Have the sole authority to, and be directly responsible for (a) the appointment, retention, oversight and termination of the independent auditors and (b) the approval of all auditor compensation, including engagement fees, terms and services. The independent auditor is ultimately accountable to the Board and the Committee as representatives of the Company's stockholders and shall report directly to the Committee. The Committee's responsibility includes the resolution of disagreements between management and the independent auditor regarding financial reporting.

2. Review and discuss with the independent auditors the plans for, and the scope of, the annual audit and other examinations, including the adequacy of staffing and compensation.

3. Review and approve in advance any audit or permitted non-audit services (including the fees and terms thereof) to be provided to the Company by the independent auditors. The Committee may adopt pre-approval procedures that delegate to one or more designated Committee members the authority to grant pre- approvals required by the foregoing sentence. The decisions of any Committee member to whom authority is delegated hereunder shall be presented to the Committee at each of its scheduled meetings. The Committee is to exercise this authority in a manner consistent with Sections 201 and 202 of the Sarbanes-Oxley Act.

4. At least annually, obtain, review and discuss a report by the independent auditors describing (i) the firm's internal quality-control procedures; (ii) any material issues raised by the most recent internal quality-control review, or peer review, of the firm, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, regarding one or more independent audits carried out by the firm, and any steps taken to deal with any such issues; and (iii) all relationships between the independent auditors and the Company.

5. On an annual basis (i) review a formal written statement from the independent auditor delineating all relationships between the independent auditor and the Company that in the auditor's judgment may reasonably be thought to affect their independence, consistent with applicable ethics and independence rules promulgated by the Public Company Accounting Oversight Board (as modified

or supplemented); (ii) actively engage in a dialogue with the independent auditor with respect to any disclosed relationships or services that may impact the objectivity and independence of the independent auditor; and (iii) take appropriate action, or recommend that the Board take appropriate action, in response to the independent auditor's report to satisfy itself of the auditor's independence.

6.    Review and discuss quarterly with the independent auditors (i) all critical accounting policies and practices to be used; (ii) any significant changes in Company accounting policies; (iii) all alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor; (iv) any accounting and financial reporting proposals that may have a significant impact on the Company's financial reports; (v) other material written communications between the independent auditor and management, such as any management letter or schedule of unadjusted differences; and (vi) the reports of the results of such other examinations outside of the course of the independent auditors' normal audit procedures that the independent auditors may from time to time undertake. The foregoing is to include the reports required by Section 204 of the Sarbanes-Oxley Act.

7.    For each regularly scheduled Committee meeting, as a routine item on its agenda, hold separate executive sessions with the independent auditors and management.

8.    The Committee is to obtain assurance from the independent auditors that in the course of conducting the audit, there have been no acts detected or that have otherwise come to the attention of the audit firm that require disclosure to the Committee under Section 10A(b) of the Exchange Act (relating to an auditor's duty to report illegal acts.)

9.    Review and evaluate, at least annually, the qualifications, performance and independence of the independent auditors, including information relating to the non-audit services provided or expected to be provided by the auditors, and report on its conclusions to the Board. In conducting its review and evaluation, the Committee should:

(a)    Review and evaluate the lead audit partner (having primary responsibility for the audit) or the audit partner responsible for reviewing the audit and determine whether the lead audit partner is required to rotate in compliance with the Sarbanes-Oxley Act and Section 10A of the Exchange Act.

(b)    Take into account the opinions of management.

(c)    Consider whether, in order to assure continuing auditor independence, there should be a regular rotation of the firm of independent auditors.

10. Establish hiring policies for the Company in respect of employees and former employees of the independent auditors, which include the restrictions set forth in Section 206 of the Sarbanes-Oxley Act.

11. Have the sole authority to, and be directly responsible for, appointing, retaining, compensating, overseeing and terminating, if necessary, any other registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company.

<u>Financial Reporting Process</u>

12. Consider and review with the independent auditors, management, and legal counsel: (i) the adequacy of the Company's disclosure controls and procedures and internal controls, including computerized information system disclosure controls and procedures and security (ii) all changes in the Company's internal control over financial reporting which could materially affect the Company's ability to record, process, summarize and report financial data; (iii) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting; and (iv) the related findings and recommendations of the independent auditors together with management's responses. Without excluding other possibilities, the Committee may wish to review with the independent auditors (i) any accounting adjustments that were noted or proposed by the auditors but were "passed" (as immaterial or otherwise); (ii) any communications between the audit team and the audit firm's national office respecting auditing or accounting issues presented by the engagement; and (iii) any "management" or "internal control" letter issued, or proposed to be issued, by the independent auditors to the Company or any other material written communications between the accounting firm and management, such as any management letter or schedule of "unadjusted differences."

13. For each regularly scheduled Committee meeting, as a routine item on its agenda, hold executive sessions with the financial or accounting management (and/or independent auditors, as appropriate).

14. Consider and review with the independent auditors: (i) significant findings during the year, including the status of previous audit recommendations; (ii) any audit problems or difficulties encountered in the course of audit work including any restrictions on the scope of activities or access to required information; (iii) any changes required in the planned scope of the audit plan; (iv) the audit budget and staffing; and (v) the coordination of audit efforts in order to monitor completeness of coverage, reduction of redundant efforts, and the effective use of audit resources.

15. Review periodically the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company. Inquire as to independent auditor's view of the accounting treatment related to significant

new transactions or other significant matters or events not in the ordinary course of business.

16. Review with management and the independent auditors significant financial risks or exposures to the Company's business and assess the steps management has taken to monitor and minimize such risks. Discuss with management and the independent auditors the Company's underlying policies and guidelines with respect to risk assessment and risk management, including with respect to cybersecurity, data privacy, data security and business continuity.

Review of Reports and Earnings Press Releases

17. Prior to public release, (A) review and pre-approve with management, the Disclosure Committee, legal counsel, and the independent auditors the Company's annual and quarterly financial statements, including, but not limited to, (i) the related footnotes, (ii) the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and (iii) the disclosures regarding internal controls and other matters required to be reported to the Committee by Section 302 of the Sarbanes-Oxley Act and any rules promulgated thereunder by the SEC and (B) discuss with the independent auditors the matters required to be discussed pursuant to applicable auditing standards.

18. With respect to the Company's annual financial statements, make a recommendation that such financial statements be included in the Company's Annual Report on Form 10-K and its annual report to shareholders. With respect to the Company's quarterly financial statements, make a recommendation that such financial statements be included in the Company's Quarterly Report on Form 10-Q. The Committee will also prepare all reports required to be included in the Company's proxy statement, pursuant to and in accordance with applicable rules and regulations of the SEC, and will review the matters described in such reports with the Disclosure Committee.

19. Review and discuss with management and the independent auditors the Company's earnings and other financial press releases (including any use of any "pro forma" or "non-GAAP" information), as well as financial information and earnings guidance provided to analysts and rating agencies.

20. Review and discuss with the Disclosure Committee the timing and content of disclosures of material adverse events which may reasonably materially impact the Company.

21. Review the Company's periodic public reports to ensure proper disclosure of risks and risk factors. If such review reveals a false statement or omission of material fact, report the deficiency to the Board.

<u>Compliance</u>

22.  Conduct an annual review of Company's Code of Business Conduct and Ethics ("Code") and the effectiveness of compliance with the Code with the assistance of the General Counsel/CCO, and monitor the implementation of changes to the Company's policies as necessary.

23.  Prepare a report to the Board with the assistance and input of the CCO whenever any material risks relating to compliance are identified which includes specific recommendations regarding proposals for mitigating these risks, as well as relevant considerations relating to PureCycle's public disclosures of these risks.

24.  Review any material issues that arise under the Company's Code of Business Conduct and Ethics. The Committee is to receive reports from Company management of evidence of any violation of securities laws or breaches of fiduciary duties or violation of the Code of Business Conduct and Ethics by (a) any officer or director of the Company or any material subsidiary of the Company or (b) any other employee whose violation or breach is significant, as determined by either Company management or the IA Executive.

25.  Ensure that all whistleblower complaints are provided to the General Counsel/CCO and ensure that all complaints are fully investigated, and that appropriate remedial action is taken based on the results of the investigation. The Committee shall prepare reports discussing each complaint which shall be timely provided to the Board.

26.  Ensure that all whistleblower complaints are completely and fully investigated, and that appropriate remedial action is taken, to the extent required, based on the results of the investigation.

27.  Ensure that the non- retaliation policies described in PureCycle's Code of Business Conduct and Ethics are strictly complied with to protect any employee who reports a complaint.

28.  Establish and maintain procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submissions by employees of concerns regarding questionable accounting or auditing matters as required by Section 301 of the Sarbanes-Oxley Act and Exchange Act Rule 10A-3(b)(3).

29.  Discuss with management and the independent auditors any material correspondence with regulators or governmental agencies and any significant complaints or concerns which are brought to its attention regarding the Company's financial statements or accounting policies.

30.  Review and approve or disapprove any related party transactions in advance

of such transaction. In those instances in which the Chief Financial Officer or General Counsel determines that it is not practicable or desirable for the Company to wait until the next Committee meeting, the related party transaction will be submitted to the Chair of the Committee, who will possess delegated authority to act between Committee meetings. The Committee or Chair of the Committee, as applicable, shall review the material facts of all related person transactions. In reviewing any related person transaction, the Committee or Chair of the Committee, as applicable, will take into account, among other factors that it deems appropriate, whether the related person transaction is on terms no less favorable to the Company than terms generally available in a transaction with an unaffiliated third-party under the same or similar circumstances and the extent of the related person's interest in the transaction.

31. Review and discuss with the independent auditors any critical audit matter ("*CAM*") addressed in the audit of the Company's financial statements and the relevant financial statement accounts and disclosures that relate to each CAM.

32. Review the Chief Executive Officer, Chief Financial Officer, and the senior management team's contribution to the Company's culture of ethics and compliance and their effectiveness and dedication to ensuring the Company's compliance with applicable laws, rules, and regulations.

Relationship Between the Audit Committee and the Internal Audit Function

33. Review with management the appointment, replacement, reassignment or dismissal of the IA Executive. The IA Executive will report on a substantive basis to the Chair of the Committee and on an administrative basis to the Chief Financial Officer. The Chair of the Committee and the Chief Financial Officer shall coordinate on the annual performance evaluation of the IA Executive. Notwithstanding the foregoing, the Committee shall have final say on all matters relating to the employment/engagement and compensation of the IA Executive in his, her, or its Internal Audit capacity.

34. Periodically review and discuss with the IA Executive the internal audit charter and approve any changes proposed thereto.

35. Review and discuss with the IA Executive and appropriate members of the staff of the internal audit function (who will have first consulted with management) the plans for and the scope of their ongoing audit activities, including adequacy of budget, staffing and compensation. The Committee will consider and review with management and IA Executive any changes to the planned scope of the internal audit plan that the Committee considers advisable.

36. Have the IA Executive report regularly to the Committee regarding the audit activities, examinations and results thereof of the internal audit function. The Committee is to review and discuss such report with management.

37. Review and discuss with the IA Executive, the Chief Financial Officer, the Corporate Controller, and, if and to the extent deemed appropriate by the Committee, members of their respective staffs the adequacy of the Company's internal accounting and risk management controls, and the Company's financial, auditing and accounting organizations and personnel, which shall include the disclosures regarding internal controls and matters required to be reported to the Committee by Section 302 of the Sarbanes-Oxley Act and any rules promulgated thereunder by the SEC.

Finance Duties

38. Review the Company's financial outlook and plans for financing its working and long-term capital requirements, including minimum cash requirements and liquidity targets and the Company's capital plan (capital allocation, funding, and capital expenditures);

39. Review changes to the Company's capital structure, including proposed capital and debt issuances and, if applicable, redemptions;

40. Review any significant financial exposures and contingent liabilities of the Company, including inflation risk, commodity market risk and raw material price risk and the methods used to hedge those exposures;

41. Review strategies and plans for significant transactions, including discussion of possible transactions and their financial impact and various reports on pending and completed transactions; and

42. Review the Company's policies and strategies with respect to insurance and risk management.

General

43. Review and approve in advance (i) all related-party transactions (as defined by Item 404 of Regulation S-K and relevant SEC and stock exchange rules), other than executive compensation decisions approved by the Compensation Committee or decisions relating to the compensation of directors or Board committee members approved by the Board and (ii) possible conflicts of interest of members of the Board and management.

44. Assist the Board with its oversight of (a) the integrity of the Company's financial statements, (b) the Company's compliance with legal and regulatory requirements, (c) the independent auditors' qualifications, independence, and performance, and (d) the performance of the Company's internal audit function.

45. Report regularly to the Board of Directors in such manner and at such times as the Committee and the Board deem appropriate, which reports shall include any issues that arise with respect to the quality or integrity of the Company's financial

statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the Company's independent auditors or the performance of the internal audit function, and with respect to such other matters as are relevant to the Committee's discharge of its responsibilities. The Committee shall provide such recommendations regarding proposals for mitigating risks, as well as relevant considerations relating to the Company's public disclosures of these risks, as the Committee may deem appropriate. The report to the Board may take the form of an oral report by the Chair or any other member of the Committee designated by the Committee to make such report.

46.    Conduct an annual self-evaluation of the performance of the Committee, including its effectiveness and compliance with the Charter of the Committee and prepare a report to the Board summarizing the Committee's activities, conclusions, and recommendations for the past year. In addition, the Committee shall annually review and reassess the adequacy of this Charter and recommend to the Board any improvements to this Charter that the Committee considers necessary or valuable.

47.    Discharge any other duty or responsibility assigned to the Committee by the Board

48.    Review quarterly reports from the Chief Compliance Officer.

49.    At least annually review and assess the Company's non-financial metrics disclosed in its SEC filings.

Consistent with the listing requirements of the NASDAQ Stock Market or any other stock exchange on which the Company's shares may be listed or traded, this Charter will be included on the Company's website and will be made available to the Company's Corporate Secretary.

There may be some overlap of oversight and other responsibilities between the Audit and Finance Committee, and the Operational Excellence Committee. In such an event, the committees may meet to realign their responsibilities to avoid unnecessary duplication of efforts. However, these committees shall work cooperatively to oversee, identify, and assess potential reporting risks and the effectiveness of internal controls.

## V.    RESOURCES AND AUTHORITY

The Board of the Company has constituted and established the Committee with authority, responsibility and specific duties as described in this committee charter.

In discharging its oversight role, the Committee is authorized to investigate any matter that the Committee deems appropriate, with unlimited access to all books, records, facilities, management, and personnel of the Company. The Committee is to have the resources and authority (including funding from the Company) appropriate to discharge its responsibilities and carry out its duties as required by law and this Charter, including the authority to engage and determine appropriate funding for payment of compensation to the independent auditors

for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company, and for special audits, reviews and other procedures and to engage and compensate independent counsel and other independent advisors, experts or consultants, and for ordinary administrative expenses of the Committee that are necessary or appropriate in carrying out its duties.

## VI.    DELEGATION

The Committee may form and delegate authority to subcommittees consisting of one or more members when appropriate, including the authority to grant pre-approvals of audit and permitted non-audit services provided that the decisions of such subcommittee to grant preapprovals shall be presented to the full Committee at its next scheduled meeting.

# EXHIBIT A-3

**PURECYCLE TECHNOLOGIES, INC.**
**CHARTER OF THE DISCLOSURE COMMITTEE[1]**
**(Adopted as of ▆▆▆▆▆▆▆ )**

The principal executive officer and principal financial officer (together, the "Certifying Officers") of PureCycle Technologies, Inc. (together with its direct and indirect subsidiaries, the "Company") have established the Disclosure Committee (the "Committee") with the authority, responsibility and specific duties described in this Charter of the Disclosure Committee, as amended from time to time (the "Charter").

## I.  Purpose

The purpose of the Committee is to ensure that (A) the Company timely, accurately and comprehensively reports to the holders of its securities and/or to the investment community all information required to be disclosed by (1) the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and the rules and regulations promulgated thereunder, (2) the Nasdaq Stock Market ("Nasdaq") Listing Rules, and (3) any other applicable regulatory requirements, and (B) such information fairly presents the Company's financial condition and results of operations in all material respects.

The Committee is also tasked with ensuring that (A) the Certifying Officers can accurately make the U.S. Securities and Exchange Commission ("SEC") certifications accompanying each of the Company's Annual Reports on Form 10-K and Quarterly Reports on Form 10-Q (collectively, the "Periodic Reports"), (B) the information filed or furnished in other SEC filings is fairly presented, and (C) the Company's press releases, investor presentations, and other material public communications (together with the Periodic Reports and other SEC filings, the "Disclosure Statements") are fairly presented and consistent with the Company's Periodic Reports and other information filed with the SEC.

## II.  Membership

The membership of the Committee will be determined by the Certifying Officers and shall be chaired by the principal financial officer (or as otherwise determined by the Certifying Officers). If the Chair is not designated or present at a meeting of the Committee, the Chair may delegate responsibilities to another Committee member.

Membership shall generally include senior representatives from the following departments: Accounting, Finance, Internal Controls, Manufacturing, Investor Relations, Human Resources, and Legal/Compliance. Representatives from other departments may attend Committee meetings and/or be consulted on Disclosure Statements as needed. The Certifying Officers may add, replace, or remove members of the Committee at any time and for any reason. A subcommittee may also be appointed or established by the Committee to review and approve certain Disclosure Statements (e.g., SEC filings on Form 8-K).

---

[1] All proposed language contained herein remain subject to Board/Committee approval, and all references to Disclosure Controls and Procedures are subject to review by the Company's Controller.

### III. Authority and Responsibilities

#### A. Authority

The Committee has the authority to:

1. Review, or authorize or conduct investigations into, any matter within the scope of the responsibilities delegated to the Committee as it deems appropriate, including the authority to request any officer, employee, or advisor of the Company to meet with the Committee.

2. Utilize any Company resources (including books, records, facilities and personnel) that are necessary or appropriate to fulfill the Committee's responsibilities under this Charter.

3. Delegate to its Chair or any of its members the responsibility and authority for any particular matter, as it deems appropriate from time to time under the circumstances.

4. If so directed by the Certifying Officers, engage outside advisors, experts and other resources as necessary or appropriate to fulfill the Committee's responsibilities under this Charter.

#### B. Responsibilities

The Committee has the following responsibilities:

1. Design procedures (which may include procedures currently used by the Company) to ensure that the Company accurately and comprehensively reports all information (i) required to be disclosed by (a) the Exchange Act, and the rules and regulations promulgated thereunder, (b) the Nasdaq Listing Rules, and (c) any other applicable regulatory requirements, (ii) within the required time periods, and (iii) pursuant to procedures that enable Management to (a) make timely disclosure-related decisions, and (b) oversee the accuracy and timeliness of disclosures made by the Company.

2. Review and supervise the preparation of, and ensure the accuracy, completeness and consistency of, the Company's (a) Periodic Reports, proxy statements, registration statements and any other information filed with the SEC and (b) other Disclosure Statements.

3. Monitor the updates to the investor section of the Company's website to confirm timely additions and deletions.

4. Work with the VP of Technology or other relevant executive to ensure that the Company's public disclosures fully, accurately, and timely describe the Company's patents, as well as any agreements, protocols, or guidance provided by relevant

regulatory agencies overseeing use of the Company's products. On a quarterly basis confirm that applicable Disclosure Controls and Procedures have been implemented in connection with the Company's technologies, manufacturing, and marketing efforts, and communications with regulators, including but not limited to, the SEC.

5. Ensure that a Committee member shall listen to earnings calls or review a transcript thereof within 5 days of publication to assess consistency with internally known information.

6. Receive a report from appropriate Company personnel regarding the effectiveness of the Company's Disclosure Controls and Procedures as of the end of the periods covered by the Company's Periodic Reports.

7. Evaluate the materiality of information and events relating to or affecting the Company, and determine the timing and appropriate method of disclosure of information deemed material.

8. Ensure that the Audit and Finance Committee is informed of all significant communications (oral and written) with the SEC, including all interactions the Disclosure Committee evaluated, whether they are deemed material or not.

9. Consult with appropriate Company personnel on changes to the Disclosure Controls and Procedures that may be necessary or advisable in connection with the preparation of the Company's upcoming Periodic Reports or other Disclosure Statements, taking into account developments since the most recent Disclosure Committee meeting, including changes in the Company's organization and operating segments and any change in economic or industry conditions.

10. Discuss with the Certifying Officers all relevant information with respect to the Committee's proceedings, the preparation of the Company's Disclosure Statements and the Committee's receipt of updates on the status of the Company's Disclosure Controls and Procedures.

11. Report, at least quarterly, to the Audit and Finance Committee on all corrections to public statements that are recommended for issuance by the Disclosure Committee, the action to be taken regarding each recommendation and, for any recommendation not followed, document the reason(s) for not following the recommendation.

12. Confirm to the Audit and Finance Committee prior to the filing with the SEC of each Periodic Report as to (a) the Committee's compliance with its policies and procedures and proper performance of the responsibilities that have been assigned to it, (b) the Committee's receipt from appropriate personnel of the effectiveness of the Company's Disclosure Controls and Procedures, and (c) any other relevant matters regarding the Disclosure Controls and Procedures.

13. The minutes will reflect that the Disclosure Committee has reviewed each Periodic Report and proxy statement filed with the SEC and made recommendations to the Certifying Officers and the Audit and Finance Committee as presented sufficiently prior to the filing or distribution of the final document for the Certifying Officers to satisfy themselves as to the adequacy of the process and to provide their own input on disclosure.

14. At least on an annual basis, the Disclosure Committee Chair shall provide a report on whether there are any concerns regarding disclosure issues to the full Board.

15. Perform any other activities consistent with this Charter, as it deems necessary or appropriate or as directed by the Chair, the Certifying Officers or the Disclosure Committee.

## IV. Procedures

A. *Meetings*. The Committee will meet at the call of its Chair no less than quarterly and as frequently as circumstances dictate. Meetings of the Committee will be held at such time and place, and upon such notice, as its Chair may from time to time determine.

Meetings may, at the discretion of the Committee, include members of the Board of Directors of the Company, members of management, representatives from other Company departments, independent advisors, consultants or any other persons whose presence the Committee believes to be necessary or appropriate.

Notwithstanding the foregoing, the Committee may also exclude from its meetings any person(s) it deems appropriate to exclude.

The Committee shall maintain records of each regular, ad hoc, or other meeting of the Committee including, but not limited to, minutes, materials, exhibits and attachments, and all written reports or other communications created by or on behalf of the Committee, for a period of not less than five (5) years following each meeting, report, and/or communication.

B. *Review of Charter*. At least annually, or more frequently as directed by the Chair, the Certifying Officers, the General Counsel or the CCO of the Company, the Committee will review the need for changes in this Charter and recommend any proposed changes to the Certifying Officers or, at the Certifying Officers' discretion, the Disclosure Committee for approval.

***

*While the Committee members have the duties and responsibilities set forth in this Charter, nothing contained in this Charter is intended to create, or should be construed as creating, any responsibility or liability of the Committee members, except to the extent otherwise provided under*

*applicable federal or state law.*

# EXHIBIT A-4

# ESTABLISHMENT OF CCO[1]

PureCycle shall establish the new position of Chief Compliance Officer, which could be held by the person holding the existing General Counsel position, within ninety (90) days after settlement. The responsibilities of the CCO shall include reporting to the Board, oversight and administration of PureCycle's corporate governance policies, including the Company's Code of Business Conduct and Ethics, fostering a culture that integrates compliance and ethics into business processes and practices through awareness and training, and investigating potential compliance and ethics concerns.

The CCO shall be primarily responsible for managing PureCycle's ethics and compliance program and for assisting the Board in fulfilling its oversight duties with regard to the Company's compliance with applicable laws, regulations, and the dissemination of true and accurate Information.

1.  The CCO's responsibilities shall also include:

a)  Managing and overseeing the Company's ethics and compliance programs already in place (including, but not limited to the compliance with the Code of Business Conduct & Ethics), implementing procedures for monitoring and evaluating the performance of those programs, and communicating with the Audit & Finance Committee regarding progress toward meeting the goals of those programs;

b)  Assisting the Board, Audit & Finance Committee, and Operational Excellence Committee in: (a) identifying organizational risk for misconduct and noncompliance with applicable laws and regulations; (b) overseeing, identifying, and assessing potential reporting risks; and (c) reporting material risks relating to compliance or disclosure issues to the Audit & Finance Committee promptly after identification of these risks;

c)  Assisting the Audit and Finance Committee to prepare a report to the Board whenever any material risks relating to compliance are identified which includes specific recommendations regarding proposals for mitigating these risks, as well as relevant considerations relating to PureCycle's public disclosures of these risks;

d)  Assisting the Audit & Finance Committee by performing an independent review of PureCycle's draft quarterly and annual reports filed with the SEC on Forms 10-Q and 10-K, and related materials prior to their publication to ensure (accurate reporting of any material issues that may merit disclosure to the Board or any committee thereof;

---

[1] All proposed language contained herein remain subject to Board/Committee approval.

e) Assisting the Audit & Finance Committee by approving PureCycle's press releases and related materials prior to their publication to ensure the accuracy, completeness, and timeliness of disclosures relating to any material risks to the Company's compliance with applicable laws and regulations, and reporting any material issues that may merit disclosure to the Board or any committee thereof;

f) Providing quarterly reports to the Board or any committee thereof reporting any allegations of compliance and ethics concerns or financial fraud or reporting violations, and, where necessary, recommending any remedial action;

g) Serving on the Company's Disclosure Committee; and

h) Overseeing investigations of all whistleblower complaints and employee training in risk assessment and compliance.

The CCO shall have the authority to retain independent advisors to assist in the design, maintenance, and enforcement of PureCycle's ethics program.



**EXHIBIT A-5**

**PURECYCLE TECHNOLOGIES, INC.**
**CHARTER OF THE SENIOR LEADERSHIP TEAM COMMITTEE[1]**
**(Adopted as of ▮▮▮▮▮▮▮▮)**

### I.  Purpose

The purpose of the Senior Leadership Team Committee (the "SLT") is to oversee the strategic direction of PureCycle Technologies, Inc. ("PureCycle" or the "Company"), and facilitate management decision-making. The SLT shall have the authority to undertake the specific duties and responsibilities described below.

### II.  Membership

The SLT shall at all times consist of the Chief Executive Officer ("CEO"), the Chief Financial Officer, the General Counsel/Chief Compliance Officer, the Chief Sustainability Officer, and such other senior officers as designated by the CEO. The CEO shall serve as the Chair of the SLT.

The SLT, through its Chair, may request that any employee of the Company attend a meeting of the SLT.

### III.  Meetings and Procedures

The SLT shall meet as deemed necessary or appropriate, in its judgment, to discharge its duties and responsibilities, but no less frequently than monthly. Meetings of the SLT may be held in-person and/or via telephonic or electronic conference, and at such times and places as the SLT determines.

A majority of the members of the SLT shall constitute a quorum. If a quorum is present, a majority of the members present shall decide any matter brought before the SLT.

In discharging its responsibilities, the SLT shall have sole authority to, as it deems appropriate, select, retain, and/or replace, as needed, outside advisors to provide independent advice to the SLT.

The Chair of the SLT shall report to the Board at least quarterly or more frequently as requested by the Chairman of the Board.

### IV.  Responsibilities

In addition to acting upon recommendations and requests of the Board, the SLT shall be responsible for the following:

---

[1] All proposed language contained herein remain subject to Board/Committee approval.

1. Reviewing operational performance of the Company's manufacturing facilities and reporting on same to the Operational Excellence Committee;

2. Reviewing short-term operational objectives including, but not limited to, material leases, status of offtake and feedstock contract negotiations, joint ventures and other strategic partnerships, and reporting on same to the Operational Excellence Committee;

3. Monitoring the Company's key performance indicators to assess progress towards the Company's strategic goals related to plant construction and operations, and reporting on same to the Operational Excellence Committee;

4. Monitoring the compliance of all employees with the Company's Code of Business Conduct and Ethics; and

5. Discussing such other matters as requested by the Chair or other members of the SLT.

The SLT shall review and reassess the SLT's charter on a periodic basis and submit any recommended changes to the Board for its consideration.

The SLT shall perform such other functions and have such other powers as may be necessary or convenient in the efficient discharge of the foregoing.

# EXHIBIT A-6



PURECYCLE TECHNOLOGIES, INC.
CORPORATE GOVERNANCE GUIDELINES[1]

Approved by the Board of Directors on [   ]. 2024

The following Corporate Governance Guidelines (the "Guidelines") have been adopted by the Board of Directors (the "Board") of PureCycle Technologies, Inc. (the "Company") to (1) assist the Board and its committees in the exercise of their responsibilities to the Company and its stockholders and (2) provide a framework for the corporate governance of the Company within which the Board shall conduct is business. These Guidelines should be interpreted in the context of all applicable laws, the Company's certificate of incorporation and bylaws, and other corporate governance documents.

## ROLE AND FUNCTIONS OF THE BOARD OF DIRECTORS

The role of the Board is to provide oversight, counseling and direction to the Chief Executive Officer ("CEO") and other members of senior management to ensure that management achieves the long-term strategic, financial and organizational goals of the Company while acting in a competent and ethical manner. The primary responsibility of the directors is to exercise their business judgment to act in a manner they reasonably believe is in the best interests of the Company and its stockholders.

In discharging these obligations, directors should be entitled to rely reasonably on the honesty and integrity of one another and the Company's executives and its outside advisors and auditors. The directors shall be entitled to (i) reasonable directors' and officers' liability insurance on their behalf; (ii) the benefits of indemnification to the fullest extent permitted by law under the Company's charter, by-laws and any indemnification agreements; and (iii) exculpation as provided by state law and the Company's charter.

The Board may discharge its responsibilities either directly or by delegating them to its committees, except that the Board may not delegate any of its responsibilities which, under applicable law or the Company's charter, may not be delegated to a committee of the Board. The Board and each Board committee shall have the full power and authority to hire, at the expense of

---

[1] All proposed language contained herein remain subject to Board/Committee approval.

the Company, independent financial, accounting, legal or other advisors, as necessary to fulfill their duties, without consulting or obtaining the approval of any officer of the Company.

The Board shall promote policies within the Company that encourage a corporate culture of openness, honesty, fairness and accountability. These policies also apply to the Board and to relationships among and between the Board, stockholders and employees. The Board shall periodically review and amend these policies if needed.

The Board should recognize that the actual management of the business and affairs of the Company should be conducted by the CEO and other senior executives under his or her supervision and that, in performing the management function, the CEO and other senior managers are obliged to act in a manner that is consistent with the oversight functions and powers of the Board and the standards of the Company and to execute any specific plans, instructions or directions of the Board.

## DIRECTOR QUALIFICATIONS

*Independence.*

A majority of the members of the Board must meet the criteria for independence set forth in the Nasdaq listing standards, except as otherwise permitted by such rules. Directors have an affirmative obligation to inform the Board promptly of any material changes in their circumstances or relationships that may impact their designation by the Board as independent. The Nominating and Corporate Governance Committee is responsible for conducting an annual evaluation of whether each member of the Board qualifies as independent under applicable standards and for presenting its recommendation to the Board. Based on this recommendation and any other facts and circumstances the Board deems appropriate, the Board will affirmatively determine and identify which directors qualify as independent.

*Board Membership Criteria.*

The Nominating and Corporate Governance Committee is responsible for periodically assessing, developing and communicating with the Board concerning the appropriate criteria required of Board members and the composition of the Board as a whole. This assessment should include factors such as independence; skill; integrity; diversity with respect to race, ethnicity, gender and sexual orientation; age; background and experience with comparable businesses and industries; the interplay of the candidate's experience with the experience of other Board members; the extent to which the candidate would be a desirable addition to the Board and any committees of the Board; and any other factors that the Nominating and Corporate Governance Committee deems relevant to the current needs of the Board.

The Company shall make its best efforts to actively seek Board diversity and consider women and underrepresented minorities, as defined in NASDAQ Rule 5065(f), as Board candidates. The Company will provide a graphic representation of current Board member diversity in its annual proxy statement, consistent with NASDAQ listing standards.

*Service on Other Boards.*

A director who also serves as an executive officer of a public company may not serve on more than two U.S. public company boards, including the Company's Board. Other directors may not serve on more than four U.S. public company boards, including the Company's Board. Exceptions to these limits will be approved on a case-by-case basis by the Board, upon a recommendation by the Nominating and Corporate Governance Committee.

Directors are expected to notify the Chairman of the Board and the Chair of the Nominating and Corporate Governance Committee in advance of accepting an invitation to serve on the board of directors (or similar body) of another company (including non-profit or charitable organizations) to allow the Company to conduct a review to confirm that no actual or potential conflict exists. Directors are also expected to refrain from accepting any such seat if the Nominating and Corporate Governance Committee or the Chairman of the Board determines such position to be inadvisable and not in the Company's best interests.

### *Term Limits.*

The Board does not believe that it should limit the number of terms for which an individual may serve as a director. While term limits facilitate Board refreshment, they can also result in the loss of experience and expertise that is critical to effective operation of the Board. Longer tenured directors can provide valuable insight into the Company and its operations. To ensure that the Board continues to evolve and benefit from fresh perspectives and ideas, the Nominating and Governance Committee shall evaluate the qualifications and contributions of each incumbent director before recommending the nomination of such director for an additional term.

### *Directors with Significant Job Changes.*

When a director retires from his or her present employment, or a director's principal occupation changes substantially during his or her tenure as a director, that director shall notify the Chair of the Nominating and Corporate Governance Committee. For such purpose, serving as a chair of a board of directors does not constitute employment or principal occupation. The Nominating and Corporate Governance Committee, with the input of the CEO, will evaluate whether the director should remain a director based on an assessment of whether the director continues to meet the Board's membership criteria under the circumstances.

### *Majority Voting Policy for the Election of Directors.*

Any incumbent nominee for director in an uncontested election (i.e., an election where the only nominees are those recommended by the Board) who receives a greater number of votes "against" his or her election than votes "for" such election (a "Majority Against Vote") will promptly tender his or her resignation following certification of the stockholder vote.

The Nominating and Corporate Governance Committee will promptly consider the tendered resignation and will recommend to the Board whether to accept the tendered resignation or to take some other action, such as rejecting the tendered resignation and addressing the apparent underlying causes of the Majority Against Vote. In making this recommendation, the Nominating and Corporate Governance Committee will consider all factors deemed relevant by its members

including, without limitation, the underlying reasons why stockholders voted against the director (if ascertainable), the length of service and qualifications of the director whose resignation has been tendered, the director's contributions to the Company, whether by accepting such resignation the Company will no longer be in compliance with any applicable law, rule, regulation or governing document, and whether or not accepting the resignation is in the best interests of the Company and its stockholders.

The Board will act on the Nominating and Corporate Governance Committee's recommendation no later than at its first regularly scheduled meeting following certification of the stockholder vote. In considering the Nominating and Corporate Governance Committee's recommendation, the Board will consider the factors considered by the Nominating and Corporate Governance Committee and such additional information and factors the Board believes to be relevant.

Any director who tenders his or her resignation pursuant to this provision will not participate in the Nominating and Corporate Governance Committee recommendation or Board consideration regarding whether or not to accept the tendered resignation. However, such director will remain active and engaged in all other Nominating and Corporate Governance Committee and Board activities, deliberations and decisions during this review process.

*Board Leadership Structure*

*Chairman.*

The Chairman of the Board will be selected by the Board. Any replacement shall be recommended by the Nominating and Corporate Governance Committee. The Board recognizes that the leadership structure and combination or separation of the Chief Executive Officer (the "CEO") and Chairman roles are driven by the needs of the Company, which may change over time. As a result, no policy exists requiring combination or separation of leadership roles. Currently, the roles of Chairman and CEO are separated, and it is the Company's intent to continue to have the two positions held by separate persons.

*Lead Director.*

The Board will select a lead director from the independent directors if the positions of Chairman of the Board and CEO are held by the same person or if the Chairman is another non-independent director. The lead director will: (i) develop, in collaboration with the Chairman and CEO, an annual set of topics to be addressed in Board agendas with a focus on the areas of board responsibility; (ii) review and consult with the Chairman on the quality, quantity and timeliness of information sent to the Board; (iii) preside over executive sessions of independent Board members; (iv)  lead the Board's evaluation of the CEO in conjunction with the Compensation Committee; (v) call meetings of the independent members of the Board; (vi) communicate feedback to the Chairman from sessions of the independent directors; (vii) provide advice and counsel to the Chairman and other senior management, where appropriate; (viii) maintain availability for communications with major stockholders and other stakeholders, as appropriate; (ix)  consult with the Chairman on the retention of outside consultants retained specifically for the Board, and

authorize the retention of consultants when engagement for directors at the exclusion of the Chairman is deemed appropriate in the lead director's judgment; (x) coordinate with the Chairman on development of crisis management procedures; and (xi) serve as interim chairman in the event of an unforeseen vacancy in the Board Chairmanship. .

*Board Committees*

The Board currently has the following standing committees: Audit and Finance; Compensation; Nominating and Corporate Governance; and Operational Excellence Committee. Subject to "controlled company" status and any permissible phase-in period, in accordance with Nasdaq listing standards, the Audit and Finance, Compensation, and Nominating and Corporate Governance Committees are composed entirely of independent directors. Audit and Finance and Committee members must meet additional independence standards under SEC and Nasdaq rules. The Board may, from time to time, establish or maintain additional or alternative committees that it determines to be necessary or appropriate.

A brief description of each committee's duties are as follows:

- *Audit and Finance Committee*: The responsibilities of the Audit and Finance Committee generally include, but are not limited to: (1) assisting the Board in its oversight of (a) the integrity of the Company's financial statements, (b) the Company's compliance with legal and regulatory requirements, (c) the independent auditors' qualifications, independence, and performance, and (d) the performance of the Company's internal audit function; (2) preparing the Committee's report to be included in the Company's annual proxy statement; (3) advising and consulting with management and the Board regarding the financial affairs of the Company; (4) appointing, compensating, retaining, terminating, overseeing and evaluating the work of the Company's independent auditors; (5) reviewing strategies and plans for significant transactions, including discussion of possible transactions and their financial impact and various reports on pending and completed transactions; and (6) reviewing the Company's financial outlook and plans for financing its working and long-term capital requirements, including minimum cash requirements and liquidity targets and the Company's capital plan (capital allocation, funding, and capital expenditures).

- *Compensation Committee*: The responsibilities of the Compensation Committee generally include, but are not limited to: (1) establishing the Company's policies, programs and procedures for compensating and providing benefits to its officers and non-employee directors; (2) administering the Company's equity and cash incentive plans (including reviewing, recommending and approving stock option and other equity incentive grants to officers); and (3) preparing the Committee's report to be included in the Company's annual proxy statement.

- *Nominating and Corporate Governance Committee*: The responsibilities of the Nominating and Corporate Governance Committee generally include, but are not necessarily limited to: (1) identifying individuals qualified to become members of the Board, consistent with criteria approved by the Board; (2) recommending candidates (a)

for election as directors at annual meetings of stockholders and (b) to fill Board vacancies and newly-created director positions; (3) recommending whether incumbent directors should be nominated for re-election to the Board upon expiration of their terms; (4) developing, recommending and annually reviewing the Guidelines and overseeing corporate governance matters applicable to the Board and the Company's employees; (5) overseeing an annual review and evaluation of the Board and its committees; (6) assessing and making recommendations to the Board regarding appointments to committees of the Board and (7) oversee the Company's policies, objectives and initiatives regarding corporate social responsibility matters.

- *Operational Excellence Committee.* The responsibilities of the Operational Excellence Committee generally include, but are not limited to: (1) reviewing the Company's manufacturing, project execution, technical and distribution processes, management systems, and results; (2) reviewing management's metrics on process and personnel safety; (3) reviewing environmental performance, including compliance with permitting and natural resource usage; (4) reviewing product quality and quality management; (5) reviewing , reliability and capacity utilization; and (6) reviewing management's oversight of capital project execution,.

## *Committee Membership.*

Board committee assignments and chair positions are reviewed each year by the Nominating and Corporate Governance Committee, and committee members and committee chairs are appointed by the Board upon the recommendation of the Nominating and Corporate Governance Committee. The Board recognizes the importance of continuity and experience in committee membership but generally favors rotation of committee members and committee chairs where appropriate and practical. The Board does not believe that rotation should be mandated as a policy.

## *Committee Meetings and Charters.*

Committee meetings are generally held in conjunction with full Board meetings. The charters of the Audit and Finance, Compensation, Nominating and Corporate Governance and Operational Excellence Committees are published on the Company's website.

## *Board Meetings*

### *Schedule.*

The Board will meet as frequently as it may determine necessary or appropriate in light of the circumstances and in accordance with the schedule determined by the Chairman of the Board. The Board may meet in person, telephonically or by other communications equipment by means of which all persons participating in the meeting can hear each other. Directors are expected to adequately prepare for and attend all scheduled Board and committee meetings, as relevant. Directors are expected to attend the Company's annual meeting of stockholders.

*Agenda and Meeting Materials.*

An agenda and meeting materials will be distributed to all directors before Board and committee meetings with sufficient time for directors to review and reflect on key issues and to request supplemental information as necessary. At least annually, the agenda should reserve time to address the following areas: corporate strategy, management of significant risks, including reputational risk, material corporate responsibility matters, stockholder proposals and key stockholder concerns. Regularly scheduled Board meetings should include presentations from management on appropriate topics such as status updates on operational activities, commercial supplier and customer agreements, global expansion, and technological developments.

*Executive Sessions*

An executive session of the non-management directors will be held in conjunction with each regular meeting of the Board. If the Board includes non-management directors who are not independent, executive sessions comprised only of independent directors will also be scheduled in conjunction with each regular meeting of the Board.

## Director Access to Management and Independent Advisors

The Board must have accurate, complete information to do its job, as the quality of information received by the Board directly affects its ability to perform its oversight function effectively. Directors should be provided with, and review, information from a variety of sources, including management, Board committees, outside experts, auditor presentations and other reports. The Board and its committees have the right at any time to retain independent financial, legal or other advisors for the purpose of assisting with their oversight duties, and the Company will provide appropriate funding for such purposes.

Effective corporate directors are diligent monitors, but not managers, of business operations. Directors should have access to management, as needed, to fulfill their oversight responsibilities. Any meetings outside of regularly scheduled meetings that a director wishes to initiate with management should be coordinated through the Chairman of the Board or the CEO.

Additionally, management shall report to the Board, on a quarterly basis or more frequently as appropriate, about: (i) the Company's actual or expected financial performance, including the Company's ability to execute on its business plan; and (ii) the Company's recycling process, including its ability to source feedstock.

## Director Orientation and Continuing Education

The Nominating and Corporate Governance Committee will establish and periodically evaluate an orientation program for new directors and a continuing education program for existing directors. Such programs may include presentations by appropriate executives and opportunities for directors to visit the Company's principal facilities in order to provide greater understanding of the Company's business and operations. In addition, the Nominating and Corporate Governance

Committee may arrange for directors of the Company to attend outside educational programs at the Company's expense pertaining to the directors' responsibilities.

*Director Compensation and Performance*

*Compensation Policy and Review.*

It is the policy of the Board to offer non-employee directors a mix of equity and cash compensation as compensation for their Board service in the form of annual cash retainers, meetings fees and equity grants. The Company's non-employee director compensation program is designed to attract and retain highly qualified directors by ensuring that non-employee director compensation is competitive relative to market practices, addresses the time, effort, expertise and accountability required of active Board membership, and aligns directors' interests with those of stockholders through the equity component of the compensation program. Employee directors do not receive compensation for their Board service.

Proposed changes in Board compensation will initially be reviewed by the Compensation Committee, but any changes in the compensation of directors will require the approval of the Board. The Compensation Committee will periodically review the status of Board compensation in relation to the factors described above, as well as other factors the Committee deems appropriate. The Compensation Committee will discuss its review with the Board. The Compensation Committee will also establish minimum stock ownership guidelines for directors, if any.

*Annual Performance Review and Self-Evaluation.*

At least annually, the Nominating and Corporate Governance Committee will oversee an evaluation of the performance of the Board and each director. As part of this process, the Board will conduct a self-evaluation to determine whether the Board and its committees are functioning effectively. The evaluations will be based on such objective and subjective criteria, as the Board deems appropriate.

The Nominating and Corporate Governance Committee shall annually evaluate the performance of the Chairman of the Board and, if deemed appropriate, recommend replacing the Chairman of the Board.

*Succession Planning*

The Board has the primary responsibility for succession planning and management development, and will review and discuss such topics on at least an annual basis, and more frequently as it deems appropriate. The Board should identify, and periodically update, the qualities and characteristics necessary for an effective CEO and other senior leaders. With these principles in mind, the Board should periodically monitor and review the development and progression of potential internal candidates against these standards. The Board's goal is to have in place a long-term program for effective senior leadership development and succession, as well as short-term contingency plans

for emergency and ordinary course contingencies, such as the departure, death, or disability of the CEO or other senior leaders.

*Communication with Third Parties*

The Board believes that management speaks for the Company. It is expected that Board members would not speak for the Company, absent unusual circumstances (or as required by regulations, Nasdaq listing standards or the Board), and that directors will adhere to such confidentiality policies as may be adopted by the Board from time to time.

The Board believes that effective communication with the Company's stockholders is important, and has established means for the Company's stockholders and other interested parties to contact the Chairman of the Board or the independent directors as a group. Information regarding how to contact the Chairman of the Board or the independent directors is posted on the Company's website.

## CODE OF BUSINESS CONDUCT AND ETHICS

The Board shall adopt and maintain the Code of Business Conduct and Ethics (the "Code") for the directors, officers and employees of the Company in compliance with Securities and Exchange Commission requirements. The Code shall be posted on the Company's website. The purpose of the Code shall be to focus the directors, officers and employees on areas of ethical risk, provide guidance in recognizing and dealing with ethical issues, provide mechanisms to report unethical conduct, and help foster a culture of honesty and accountability. Each director and employee should annually acknowledge their review of, and continued compliance with, the Code.

Each director shall act at all times in accordance with the requirements of the Code. Waivers of the Code for any officer or director may only be made by the Board or by a Board committee composed of independent directors. Any waiver for an officer or director must be posted on the Company website and otherwise disclosed as required by law.

The Board will oversee management's implementation of an annual training program for employees that will include relevant topics such as ethical behavior, human resources polices and employee relations, and conflicts of interest. Upon completion of training, the person receiving the training shall provide a written certification of completion of the training. The General Counsel/Chief Compliance Officer will keep a record of all written certifications and shall promptly notify employees who fail to provide annual certifications and their supervisors..

## REPORTS OF IRREGULARITIES

Any reports of concerns regarding accounting, internal auditing controls, or other irregularities or concerns whether financial or otherwise shall be brought to the attention of the Chairman of the Audit and Finance Committee. These reports are confidential and may be anonymous if the reports are submitted to the Audit and Finance Committee through the procedures established by the Audit and Finance Committee. The Board shall be notified of these reports at every quarterly Board meeting or sooner, if necessary.

The Board will oversee management's implementation and maintenance of a whistleblower hotline intended to encourage interested parties to bring forward ethical and legal violations to the parties identified in the Whistleblower Policy so that action may be taken to resolve the problem. In accordance with the Whistleblower Policy complaints may be presented to the applicable committee of the Board, in consultation with and under the supervision of the Company's legal counsel, and presented to the full Board. The Company will publish its Whistleblower Policy on the Company's website.

**CLAWBACK POLICY**

The Board will maintain a Compensation Clawback and Recoupment Policy, first approved in March 2021, and pursuant to Regulation S-K and NASDAQ listing standards, will maintain a separate clawback policy supplemental to, and not a replacement of, the policy, which such supplemental policy shall only be applicable to Section 16 Officers.

# Exhibit B

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE: PURECYCLE TECHNOLOGIES, INC. DERIVATIVE LITIGATION | Lead Case No. 21-1569-RGA |

**[PROPOSED] ORDER GRANTING PRELIMINARY APPROVAL OF SETTLEMENT**

Plaintiff in the above-captioned Federal Action made an application, pursuant to Rule 23.1 of the Federal Rules of Civil Procedure, for an order: (i) preliminarily approving the Settlement, in accordance with the Stipulation and Agreement of Settlement (the "Stipulation") dated July 17, 2024, which, together with the exhibits annexed thereto, sets forth the terms and conditions for a proposed settlement of the Derivative Matters (the "Settlement") and for dismissal of the Federal Action with prejudice, and (ii) approving the form and content of the Notice to be published via GlobeNewswire, filed by PureCycle Technologies, Inc. ("PureCycle") with the U.S. Securities and Exchange Commission ("SEC") and posted, along with the Stipulation, on PureCycle's and Settling Stockholders' Counsels' websites. The Court having read and considered the Stipulation and exhibits annexed thereto; and all parties to the Settlement having agreed to the entry of this Order, and all capitalized terms herein having the same meaning as set forth in the Stipulation;

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED:**

1. The Court preliminarily approves, subject to further consideration at the Settlement Hearing described below, the Stipulation and the Settlement set forth therein, including the terms and conditions for settlement and dismissal with prejudice of the Federal Action.

2. A hearing (the "Settlement Hearing") shall be held before the Court on_____, 2024, at ____ _.m., either in person at the J. Caleb Boggs Federal Building, 844 N. King Street,

Wilmington, Delaware, 19801, or by telephone or videoconference (in the discretion of the Court), for the purpose of determining: (i) whether the Settlement of the Derivative Matters on the terms and conditions provided for in the Stipulation is fair, reasonable, and adequate to PureCycle and Current PureCycle Stockholders, and should be finally approved by the Court; (ii) whether a Judgment as provided in, and attached as Exhibit D to the Stipulation should be entered; (iii) whether to approve the payment of the Fee and Expense Amount in the amount negotiated by the Settling Parties and Service Awards for the Settling Stockholders to be drawn therefrom; and (iv) such other matters as may be necessary or proper in the circumstances.

3. The Court approves, as to form and content, the Notice, annexed as Exhibit C to the Stipulation, and finds that the distribution of the Notice substantially in the manner and form set forth in this Order fully satisfies Rule 23.1 of the Federal Rules of Civil Procedure and the requirements of due process, complies with the rules of this Court, and is the best notice practicable under the circumstances and shall constitute due and sufficient notice for all purposes to all Current PureCycle Stockholders. Non-material changes to the form of the Notice may be made without further approval of the Court.

4. PureCycle is hereby authorized and empowered, no later than ten (10) days following the entry of this Order, to (i) cause a copy of the Notice, substantially in the form annexed as Exhibit C to the Stipulation, to be published in a press release on GlobeNewswire with a link to the Company's investor relations webpage where the Notice and Stipulation will be available, (ii) file with the SEC a Form 8-K attaching a copy of the Notice and Stipulation, and (iii) post the Notice and the Stipulation on the Company's website. In addition, Settling Stockholders' Counsel shall cause a copy of the Notice and the Stipulation to be posted on their websites.

5.      No later than twenty-one (21) days prior to the Settlement Hearing provided for in ¶ 2 of this Order, Settling Defendants' Counsel shall file with the Court proof, by affidavit or declaration, of such notice.

6.      No later than seven (7) calendar days before the Objection Deadline described in ¶ 7 below, Settling Stockholders' Counsel shall file: (1) their motion in support of final approval of the Settlement; and (2) their application for an award of attorneys' fees and reimbursement of expenses to Settling Stockholders' Counsel and for the Service Award to Settling Stockholders.

7.      Any Current PureCycle Stockholder may, but is not required to, appear at the Settlement Hearing and express an opinion as to whether the Settlement, Fee and Expense Amount, and/or the Service Award should be approved; provided, however, that no Current PureCycle Stockholder or any other person shall be heard or entitled to object to the approval of the terms and conditions of the Settlement, Fee and Expense Amount, and/or Service Award, if approved, and the judgment to be entered thereon approving same, unless on or before fourteen (14) calendar days prior to the Settlement Hearing ("Objection Deadline"), such Person has filed their written objection(s) with the Court and sent their written objection(s) by hand or by first class mail, postage pre-paid, to Settling Stockholders' Counsel.  The written objections must be postmarked by the Objection Deadline and sent to Lead Counsel:

David C. Katz
Joshua M. Rubin
Weiss Law
4 Brighton Rd., Suite 204
Clifton, NJ 07012

The written objection(s) must contain the following information: (i) notice of such Person's intent to appear at the Settlement Hearing; (ii) such Person's name, legal address, and telephone number; (iii) state that such Person is a Current PureCycle Stockholder as of July 17, 2024 and represent that the Person will continue to own PureCycle common stock as of the date of the Settlement

Hearing; (iv) provide the date(s) such Person acquired his, her, or its PureCycle shares and the number of PureCycle shares held; (v) contain a detailed statement of such Person's specific position with respect to the matters to be heard at the Settlement Hearing, including a statement of each objection being made; and (vi) state the grounds for each objection or the reasons for such Person's desire to appear and be heard.

8. Any Current PureCycle Stockholder who fails to object in the above-prescribed manner shall be deemed to have waived his, her, or its right to object to any aspect of the Settlement or otherwise request to be heard (including the right to appeal) and will be forever barred from raising such objection or request to be heard in this or any other action or proceeding, but shall otherwise be bound by the Judgment to be entered and the releases to be given.

9. No later than seven (7) calendar days prior to the Settlement Hearing, the Settling Parties shall file and serve their responses to any objection from Current PureCycle Stockholders.

10. All discovery and other pretrial proceedings in the Federal Action are hereby stayed and suspended until further order of this Court. Pending the final determination on the approval of the Settlement, no stockholder of PureCycle may either directly, representatively, or in any other capacity, prosecute, institute, commence, or continue to prosecute on behalf of PureCycle or any stockholders thereof, any claim which has been or could have been asserted in the Derivative Matters or any other claim arising out of or in any way related to any of the acts, facts, transactions, occurrences, representations, or omissions or other subject matter set forth, alleged, embraced, or otherwise asserted by plaintiffs in the Derivative Matters. The provisions of this paragraph shall expressly not apply to the proceedings styled as *Theodore v. PureCycle Technologies, Inc., et al.*, Case No. 6:21-cv-809-PGB-RMN, in the United States District Court for the Middle District of

Florida and *Southgate v. PureCycle Technologies, Inc., et al.*, Case No. 1:23-cv-8605, in the United States District Court for the Southern District of New York.

11.     In the event the proposed dismissal as provided for in the Stipulation is not approved by the Court, or for any reason the Settling Parties fail to obtain a final judgment pursuant to the Stipulation, then, in either of such events, the Stipulation shall become null and void and of no further force or effect, and shall not be used or referred to for any purpose whatsoever.  In such event, the Stipulation and all negotiations and proceedings related thereto shall be withdrawn without prejudice as to the rights of any and all such Settling Parties thereto, who, in accordance with the provisions of the Stipulation, shall be restored to their respective positions existing as of the date of the Stipulation.

12.     The Court reserves the right to approve the Stipulation with further modifications as may be agreed to by counsel for the Settling Parties and without further notice to Current PureCycle Stockholders, and retains jurisdiction to consider all further applications arising out of or connected with the proposed Settlement.  The Court may also adjourn the Settlement Hearing provided for herein without further notice other than to counsel for the Settling Parties.

**SO ORDERED** in the District of Delaware on_____, 2024.

_____
THE HON. RICHARD G. ANDREWS
UNITED STATES DISTRICT JUDGE

# Exhibit C

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE: PURECYCLE TECHNOLOGIES, INC. DERIVATIVE LITIGATION | Lead Case No. 21-1569-RGA |

<u>**NOTICE OF PROPOSED SETTLEMENT OF STOCKHOLDER DERIVATIVE
MATTERS, HEARING THEREON, AND RIGHT TO APPEAR**</u>

**TO: ALL CURRENT RECORD HOLDERS AND BENEFICIAL OWNERS OF COMMON STOCK OF PURECYCLE TECHNOLOGIES, INC. ("PURECYCLE" OR "THE COMPANY") AS OF JULY 17, 2024 (THE "RECORD DATE").**

**PLEASE READ THIS NOTICE CAREFULLY AND IN ITS ENTIRETY. THIS NOTICE RELATES TO A PROPOSED SETTLEMENT AND DISMISSAL OF LITIGATION AND CONTAINS IMPORTANT INFORMATION REGARDING YOUR RIGHTS. YOUR RIGHTS MAY BE AFFECTED BY THESE LEGAL PROCEEDINGS. IF THE COURT APPROVES THE SETTLEMENT, YOU WILL BE FOREVER BARRED FROM CONTESTING THE APPROVAL OF THE PROPOSED SETTLEMENT AND FROM PURSUING THE SETTLED CLAIMS.**

**IF YOU HOLD PURECYCLE COMMON STOCK FOR THE BENEFIT OF ANOTHER, PLEASE PROMPTLY TRANSMIT THIS DOCUMENT TO SUCH BENEFICIAL OWNER.**

**THE COURT HAS MADE NO FINDINGS OR DETERMINATIONS CONCERNING THE MERITS OF THE DERIVATIVE MATTERS. THE RECITATION OF THE BACKGROUND AND CIRCUMSTANCES OF THE SETTLEMENT CONTAINED HEREIN DOES NOT CONSTITUTE THE FINDINGS OF THE COURT. IT IS BASED ON REPRESENTATIONS MADE TO THE COURT BY COUNSEL FOR THE PARTIES.**

**THE DERIVATIVE MATTERS ARE NOT A "CLASS ACTION." THUS, THERE IS NO COMMON FUND UPON WHICH YOU CAN MAKE A CLAIM FOR A MONETARY PAYMENT. THERE IS NO PROOF OF CLAIM FORM FOR STOCKHOLDERS TO SUBMIT IN CONNECTION WITH THIS SETTLEMENT, AND STOCKHOLDERS ARE NOT REQUIRED TO TAKE ANY ACTION IN RESPONSE TO THIS NOTICE.**

Notice is hereby provided to you of the proposed Settlement[1] of the above-captioned derivative lawsuit and certain other Derivative Matters. This Notice is provided by order of the United States District Court for the District of Delaware (the "Court"). It is not an expression of any opinion by the Court. It is to notify current stockholders of the terms of the proposed Settlement of the Derivative Matters.

## I. WHY THIS NOTICE HAS BEEN POSTED AND FILED WITH THE U.S. SECURITIES AND EXCHANGE COMMISSION

This Notice is intended to notify all PureCycle stockholders affected by the settlement of a consolidated stockholder derivative action styled *In re PureCycle Technologies, Inc. Derivative Litigation*, Lead Case No. 1:21-cv-01569-RGA (D. Del.) (the "Federal Action") and all related Derivative Matters (as defined below) of the Proposed Settlement of Stockholder Derivative Matters, Hearing Thereon, and Right to Appear (the "Notice"). The following Settling Parties (defined herein) through their respective counsel have agreed upon terms to settle the Derivative Matters and have signed a written Stipulation and Agreement of Settlement (the "Stipulation") setting forth the terms of the Settlement: (i) stockholder Patrick Ayers, plaintiff in the derivative action on behalf of PureCycle Technologies, Inc. ("PureCycle" or the "Company") styled *In re PureCycle Technologies, Inc. Derivative Litigation*, Lead Case No. 1:21-cv-01569-RGA (D. Del.) (the "Federal Action"), as consolidated; (ii) stockholder John Brunson, plaintiff in the derivative action on behalf of PureCycle styled *Brunson v. Otworth, et al.*, No. 2024-0326-NAC (Del. Ch.) (the "Delaware Chancery Action"), who also served a litigation demand on the Company's Board of Directors (the "Board") and a demand on the Company pursuant to 8 *Del. C.* § 220; (iii) stockholder Tyler Begley, who served a litigation demand on the Board and a demand on the

---

[1] The capitalized terms used in this Notice and not otherwise defined are defined in the Stipulation of Settlement (dated July 17, 2024).

Company pursuant to 8 *Del. C.* § 220; (iv) stockholder Thomas Workman (with Tyler Begley, the "Demanding Stockholders"), who served a demand on the Company pursuant to 8 *Del. C.* § 220 (the Federal Action, Delaware Chancery Action, and the Demanding Stockholders' demands are collectively referred to as the "Derivative Matters," and the plaintiffs in the Federal Action and Delaware Chancery Action and the Demanding Stockholders are collectively referred to as the "Settling Stockholders"); (v) Michael Otworth, Richard Brenner, Tanya Burnell, Jeffrey Fieler, Tim Glockner, Fernando Musa, John Scott, David Brenner, Michael E. Dee, James Donnally, Andy Glockner, Byron Roth and Tasmin Ettefagh (collectively, the "Individual Defendants"); and (vi) PureCycle (together with the Individual Defendants, the "Settling Defendants") (Settling Stockholders and Settling Defendants are collectively referred to as the "Settling Parties").

On _____ 2024, at \_\_\_, the Court will hold a hearing (the "Settlement Hearing"). The purpose of the Settlement Hearing is to determine: (i) whether the Settlement of the Derivative Matters on the terms and conditions provided for in the Stipulation is fair, reasonable, and adequate to PureCycle and Current PureCycle Stockholders, and should be finally approved by the Court; (ii) whether a Judgment as provided in, and attached as Exhibit D to the Stipulation should be entered; (iii) whether to approve the payment of the Fee and Expense Amount in the amount negotiated by the Settling Parties and Service Awards for the Settling Stockholders to be drawn therefrom; and (iv) such other matters as may be necessary or proper in the circumstances.

## II.  SUMMARY OF THE LITIGATION

### A.  Federal Action

On November 3, 2021, the action *Han v. Otworth et al*, Civil Action No. 1:21-cv-01569-RGA (D. Del.) (the "*Han* Action") was filed in the United States District Court for the District of Delaware (the "Federal Court"), on behalf of the nominal defendant Company, against defendants Michael Otworth, David Brenner, Michael Dee, Tasmin Ettefagh, and Byron Roth, and nominal

defendant PureCycle, alleging claims for violation of Section 20(a) of the Exchange Act, breach of fiduciary duty, unjust enrichment, and waste of corporate assets.  Byron Roth was dismissed from the *Han* Action on December 15, 2021.  On January 18, 2022, the Federal Court granted the parties' stipulation providing for a stay of the *Han* Action pending resolution of a motion to dismiss in the related securities class action styled *Theodore v. PureCycle Technologies, Inc., et al.*, Case No. 6:21-cv-809-PGB-RMN (M.D. Fla.) (the "Securities Action").

On January 27, 2022, a related derivative action was filed in the Federal Court, captioned *Ayers v. Otworth et al.*, Civil Action No. 1:22-cv-00110-RGA (D. Del.) (the "*Ayers* Action").  The *Ayers* Action brought suit against the Individual Defendants and alleged substantially similar claims to those alleged in the *Han* Action, including violation of Section 20(a) of the Exchange Act, breach of fiduciary duty, unjust enrichment, and aiding and abetting.  The complaint in the *Ayers* Action also alleged claims for indemnification and contribution.  On March 17, 2022, the Federal Court granted the parties' stipulation providing for a stay of the *Ayers* Action pending resolution of a motion to dismiss in the Securities Action.

On June 15, 2023, the motion to dismiss in the Securities Action was granted in part and denied in part.  Thereafter, the remaining defendants in the Securities Action filed a motion for reconsideration of the court's order.

On July 27, 2023, the Federal Court entered an order consolidating the *Han* Action and the *Ayers* Action, under the caption *In re PureCycle Technologies, Inc. Derivative Litigation*, Lead Case No. 1:21-cv-01569-RGA (D. Del.), and appointing Weiss Law as lead counsel in the Federal Action.

On August 11, 2023, the Federal Action was further stayed pending resolution of the motion for reconsideration filed in the Securities Action.

On February 23, 2024, a Consolidated Verified Amended Complaint was filed in the Federal Action against the Individual Defendants and alleging claims for violation of Sections 14(a) and 20(a) of the Exchange Act, breach of fiduciary duty, unjust enrichment, waste of corporate assets, aiding and abetting, gross mismanagement, and indemnification and contribution. As set forth below, the plaintiff in the Federal Action agrees to be bound by the terms of the Stipulation.

**B.      Delaware Chancery Action**

On February 3, 2023, plaintiff Brunson sent PureCycle a letter seeking production of books and records pursuant to 8 *Del. C.* § 220. Following negotiations and the execution of a confidentiality agreement, the Company produced certain non-public books and records to plaintiff Brunson on a rolling basis from October 2023 through February 2024 pertaining to the wrongdoing alleged in the Securities Action.

Following receipt and review of those books and records, on February 23, 2024, plaintiff Brunson sent a letter to the Board demanding, among other things, that it undertake an independent investigation into the Individual Defendants' alleged breaches of fiduciary duty and/or aiding and abetting of such breaches of fiduciary duty within thirty (30) days and that the Company enter into appropriate tolling agreements with the Individual Defendants to protect its derivative claims during the pendency of the Board's investigation.

On March 23, 2024, upon expiration of the deadline requested in plaintiff Brunson's litigation demand letter for the Board to begin an independent investigation and obtain tolling agreements, plaintiff Brunson filed the Delaware Chancery Action captioned *Brunson v. Otworth, et al.*, No. 2024-0326-NAC (Del. Ch.). The Delaware Chancery Action asserted claims for wrongful demand refusal, breach of fiduciary duty, failure to obtain tolling agreements, and other

5

related claims under Delaware law against certain Individual Defendants, and all such claims are included as part of this Settlement. As set forth below, plaintiff Brunson agrees to be bound by the terms of the Stipulation, and further agrees to voluntarily dismiss the Delaware Chancery Action with prejudice within ten (10) days after the Final Judgment in the Court in the Federal Action approving the Settlement becomes final and non-appealable.

### C. The Demanding Stockholders

On October 6, 2023, stockholder Workman sent PureCycle a letter demanding production of books and records pursuant to 8 *Del. C.* § 220. On October 27, 2023, stockholder Begley sent PureCycle a letter also demanding the right to inspect books and records pursuant to 8 *Del. C.* § 220. Thereafter, the Company produced certain non-public books and records to the Demanding Stockholders.

On February 5, 2024, stockholder Begley sent a letter to the Board demanding that the Company initiate legal action against its officers, directors, or members of senior management for their alleged breach of fiduciary duties and take remedial measures for damages from alleged unjust enrichment and corporate waste.

As set forth below, the Demanding Stockholders agree to be bound by the terms of the Stipulation.

### D. Mediation

The Settling Parties, by and through their undersigned attorneys, have engaged in good faith, arm's-length discussions with regard to the possible settlement of the Derivative Matters. To that end, the Settling Parties agreed to participate in mediation before Jed D. Melnick, Esq. (the "Mediator") of Judicial Arbitration and Mediation Services ("JAMS"), a nationally recognized mediator with extensive experience mediating complex shareholder disputes similar to the

6

Derivative Matters.  Mediation began at the end of February 2024 with the Settling Parties participating in a full day mediation session on March 5, 2024.  The Settling Parties did not reach an agreement resolving the derivative litigation during the March 5, 2024 mediation session, but agreed to continue their settlement discussions under the aegis of the Mediator.  Counsel for the Settling Parties participated in another, half-day mediation session before the Mediator on March 13, 2024, where they made significant progress.  The negotiations continued for several weeks thereafter, including during an additional full-day mediation before the Mediator on April 2, 2024, in which the Settling Parties reached an agreement in principle on the terms of the corporate governance reforms detailed herein.

At the mediation sessions, the Settling Parties engaged in discussions regarding the strengths and weaknesses of the claims and defenses at issue, both indirectly through the Mediator and directly in joint sessions attended by counsel for the Settling Parties and the relevant insurers. During the joint sessions, and subject to the Confidential Mediation Agreement and all applicable mediation privileges, the Company provided information regarding the technical and practical considerations that drove its decision-making with respect to PureCycle's patented technology, its progress commercializing this technology, relevant disclosures and other related issues.  The Settling Parties debated their competing views of the essential facts, legal claims and defenses, and the broad range of possible litigation outcomes.  The Settling Parties also discussed a range of remedial options and were able to agree on a set of principles and target areas for corporate governance enhancements to be fleshed out through further negotiations, and sharpened the focus on monetary compensation for PureCycle as the driving factor in any potential settlement of the Derivative Matters.  The Settling Parties further exchanged written proposals with the assistance and guidance of the Mediator.

After reaching agreement on the principal terms of the Settlement, the Settling Parties commenced negotiations facilitated by the Mediator regarding reasonable attorneys' fees and expenses to be paid to Settling Stockholders Counsel, subject to Court approval, in consideration for the substantial benefits conferred upon PureCycle and its shareholders by the Settlement.

On May 2, 2024, the Settling Parties reached an agreement in principle on the remaining material terms for the Settlement, including the monetary component, and thereafter negotiated the terms of a written memorandum of understanding ("MOU") outlining the essential terms and conditions for the release of all claims asserted in the Derivative Matters in consideration for the Company's agreement to cause their insurers to pay $3 million to PureCycle as the monetary component of this Settlement ("Monetary Component"), and to adopt, implement, and/or maintain in accordance with the corporate governance practices, policies and procedures, internal controls and board composition reforms as set forth below (the "Reforms").  On May 7, 2024, the Settling Parties signed the MOU outlining the material terms and conditions of the Settlement.  The Settling Parties believe that the Settlement is in the best interests of PureCycle and Current PureCycle Stockholders.

## III.    TERMS OF THE PROPOSED DERIVATIVE SETTLEMENT

The principal terms, conditions and other matters that are part of the Settlement, which is subject to approval by the Court, are summarized below.  This summary should be read in conjunction with, and is qualified in its entirely by reference to, the text of the Stipulation, which has been filed with the Court and is also available for viewing on the website of PureCycle at https://www.purecycle.com/ and the website of Lead Counsel at https://www.weisslaw.co.

The Settling Parties acknowledge and agree that the filing, pendency, and prosecution of the Derivative Matters were the sole cause of the Monetary Component to be made as part of the Settlement and the primary cause of the Board's agreement to adopt or to agree to adopt certain

changes to its corporate governance practices, policies and procedures, internal controls and Board composition, as set forth below. The Settling Parties further acknowledge and agree that these changes confer substantial benefits on the Company and its stockholders and that the settlement of the Derivative Matters on the terms set forth herein is in the best interests of the Company and Current PureCycle Stockholders. As a result of the Settlement, PureCycle has made, or agreed to make, the following changes to its corporate governance practices, policies and procedures and, subject to the terms set forth in the Stipulation, has agreed to maintain them for no less than five (5) years from the Effective Date:

A.      The Company shall expand its Board from seven (7) members to nine (9) members by appointing two (2) new independent directors to the Board who meet NASDAQ's definition of "independent director." The first new independent director will be appointed to the Board within twelve (12) months of a Final Court order approving the Settlement. The second new independent director will be appointed to the Board within twenty-four (24) months of a Final Court order approving the Settlement. Provided, however, that if, despite its best efforts, the Nominating and Corporate Governance Committee is unable to identify suitable candidates, then the Company shall have the remainder of the Commitment Term to appoint the new independent directors.

B.      The Company shall actively seek Board diversity and consider women and underrepresented minorities, as defined in NASDAQ Rule 5065(f), as Board candidates. The Corporate Governance Guidelines will provide that the Company will provide a graphic representation of current Board member diversity in its annual proxy statement, consistent with NASDAQ listing standards.

C. The Corporate Governance Guidelines[2] have been drafted to express the Company's intent to continue to have the positions of Chief Executive Officer ("CEO") and Board Chairman held by separate persons.

D. Within six (6) months of a Final Court order approving the Settlement, the Company will engage an independent corporate governance consultant or outside legal counsel to perform an analysis of the Company's corporate governance structure and processes and report to the Board on the results of same and on trends and developments in the law and/or corporate best practices relating to corporate governance and the Board's responsibilities annually.

E. The Company will form an Operational Excellence Committee with duties and responsibilities as outlined in the Operational Excellence Committee Charter.

F. The Company will create a Chief Compliance Officer ("CCO") position with duties and responsibilities as outlined in the Chief Compliance Officer Duties and Responsibilities.

G. The Charters from various Committees, including certain Board Committees, will ensure that the Company has an existing framework in place for identification, assessment, and management of compliance risks, subject to the Company's available resources. The Corporate Governance Guidelines and the Amended Audit and Finance Committee Charter will provide that the Audit and Finance Committee shall assist the Board in its oversight of: (a) the integrity of the Company's financial statements; (b) the Company's compliance with legal and regulatory requirements; (c) the independent auditors' qualifications, independence, and performance; (d) the performance of the Company's internal audit function; (e) preparing the Committee's report to be included in the Company's annual proxy statement; (f) advising and consulting with management

---

[2] The Corporate Governance Guidelines and other governance documents referenced herein are attached to Exhibit A to the Stipulation, which can be viewed on the website of PureCycle at https://www.purecycle.com/ and the website of Lead Counsel at https://www.weisslaw.co.

and the Board regarding the financial affairs of the Company; (g) appointing, compensating, retaining, terminating, overseeing and evaluating the work of the Company's independent auditors; (h) reviewing strategies and plans for significant transactions, including discussion of possible transactions and their financial impact and various reports on pending and completed transactions; and (i) reviewing the Company's financial outlook and plans for financing its working and long-term capital requirements, including minimum cash requirements and liquidity targets and the Company's capital plan (capital allocation, funding, and capital expenditures).

H.      The Company will adopt a Disclosure Committee Charter to formalize the Committee's responsibilities in assisting the Company's senior officers in fulfilling their responsibility for oversight of the accuracy and timeliness of the disclosures made by the Company.

I.      The Company will adopt the Charter of the Senior Leadership Team Committee to formalize the Senior Leadership Team and the Executive Leadership Team that shall meet regularly to monitor the Company's strategic initiatives.

J.      The Company will amend the Audit and Finance Committee Charter to expand its oversight responsibilities and delegate its authority.

K.      The Corporate Governance Guidelines will provide that the Nominating and Corporate Governance Committee will establish and periodically evaluate an orientation program for new directors and a continuing education program for existing directors. Such programs may include presentations by appropriate executives and opportunities for directors to visit the Company's principal facilities in order to provide greater understanding of the Company's business and operations. In addition, the Nominating and Corporate Governance Committee shall

arrange for directors of the Company to attend outside educational programs pertaining to the directors' responsibilities.

L. The Company will adopt Corporate Governance Guidelines which formalize the details of management's reporting obligations to the Audit and Finance Committee and the Board. The policies or Corporate Governance Guidelines will provide that management will report to the Board on a quarterly basis regarding the status of operations, commercial contracts, litigation, and other topics relevant to the Board's oversight of the Company's operations and compliance with the law (in accordance with the Corporate Governance Guidelines).

M. The Company will adopt Corporate Governance Guidelines which formalize the details regarding the Independent Directors' executive sessions, including but not limited to, that an executive session of independent directors will be scheduled in conjunction with each regular meeting of the Board (in accordance with the Corporate Governance Guidelines).

N. The Company will adopt Corporate Governance Guidelines which formalize the details of the Company's training policies. The Corporate Governance Guidelines will provide that management will implement an annual training program for employees that will include relevant topics, including, but not limited to, ethical behavior, human resources polices and employee relations, and conflicts of interest (in accordance with the Corporate Governance Guidelines).

O. The Corporate Governance Guidelines will provide that management shall maintain a whistleblower hotline, which encourages interested parties to bring forward ethical and legal violations to the parties identified in the Code of Ethics, the Audit and Finance Committee, the Compensation Committee, the Nominating and Corporate Governance Committee, and/or the third-party reporting service provider so that action may be taken to resolve the problem and the

complaints shall be reviewed by the applicable committee, in consultation with and under the supervision of the Company's legal counsel, and presented to the full Board (in accordance with the Corporate Governance Guidelines). The Company will publish its Whistleblower Policy on its external website.

P. The Company will add language to the Corporate Governance Guidelines indicating that the Board will maintain a Compensation Clawback and Recoupment Policy, first approved in March 2021, and that, pursuant to Reg S-K and NASDAQ listing standards, will maintain a separate clawback policy supplemental to, and not a replacement of, the policy, which such supplemental policy shall only be applicable to Section 16 Officers (in accordance with the Corporate Governance Guidelines).

The Stipulation also provides for the entry of judgment dismissing the Federal Action and the Delaware Chancery Action against PureCycle and the Individual Defendants with prejudice and, as explained in more detail in the Stipulation, barring and releasing certain known or unknown claims that have been or could have been brought in any court by Settling Stockholders in the Derivative Matters or by PureCycle, or any of its stockholders, against PureCycle and the Individual Defendants relating to any of the claims or matters that were or could have been alleged or asserted in any of the Derivative Matters. The Stipulation further provides that the entry of judgment will bar and release any known or unknown claims that have been or could have been brought in any court by Settling Defendants against Settling Stockholders or Settling Stockholders' Counsel related to any of the claims or matters that were or could have been alleged or asserted in any of the Derivative Matters or based upon or arising out of the institution, prosecution, assertion, settlement, or resolution of the Derivative Matters.

**IV.  SETTLING STOCKHOLDERS' COUNSELS' FEE AND EXPENSE AMOUNT AND SETTLING STOCKHOLDERS' SERVICE AWARD**

Prior to discussing and agreeing upon the Fee and Expense Amount, the Settling Parties negotiated and agreed upon the Reforms to be adopted as part of the Settlement and negotiated the Monetary Component.  The Settling Parties agree that the Settlement confers substantial benefits upon PureCycle and its stockholders, and that Settling Stockholders' Counsel are entitled to reasonable attorneys' fees and reimbursement of expenses in an amount of $2,000,000.00, subject to the approval of the Court. In connection with seeking final approval of the proposed Settlement, Plaintiff's lead counsel, on behalf of Settling Stockholders' Counsel, intends to request approval of attorneys' fees and reimbursement of expenses in the amount of $1,750,000.00 (the "Fee and Expense Amount").  The Fee and Expense Amount includes fees and expenses incurred by Settling Stockholders' Counsel in connection with the prosecution and settlement of the Derivative Matters. To date, Settling Stockholders' Counsel have not received any payments for their efforts on behalf of PureCycle stockholders nor have Settling Stockholders' Counsel been reimbursed for their out-of-pocket litigation expenses.  The Fee and Expense Amount will compensate Settling Stockholders' Counsel for the substantial benefits achieved in the Derivative Matters, and the risks of undertaking the prosecution of the Derivative Matters on a contingent basis.

Settling Defendants agree not to oppose reasonable service awards in the amount of $2,000.00 to each Settling Stockholder to be paid out of the Fee and Expense Amount in recognition of Stockholders' efforts to achieve the Settlement's benefits to the Company, subject to Court approval (the "Service Award").

**V.  REASONS AND BENEFITS OF THE SETTLEMENT**

Counsel for the Settling Parties believe that the Settlement is in the best interests of PureCycle, and its public stockholders.

**A.      Why Did the Settling Stockholders Agree to Settle?**

The Settling Stockholders and Settling Stockholders' Counsel brought the claims in good faith and continue to believe that the claims asserted in the Derivative Matters have merit. However, the Settling Stockholders and Settling Stockholders' Counsel recognize and acknowledge the expense, time, and uncertainty inherent in the continued prosecution of their claims in the Derivative Matters through trial and any subsequent appeal(s).  The Settling Stockholders and Settling Stockholders' Counsel also have taken into account the uncertain outcome and the risk of any litigation, especially in complex actions such as the Derivative Matters, as well as the difficulties and delays inherent in such litigation.  The Settling Stockholders and Settling Stockholders' Counsel also are mindful of the inherent problems of proof of, and possible defenses to, the claims asserted in the Derivative Matters.

Based upon their investigation, Settling Stockholders and Settling Stockholders' Counsel have concluded that the terms and conditions of the Stipulation are fair, reasonable and adequate to Settling Stockholders, Current PureCycle Stockholders, and PureCycle, and in their best interests, and have agreed to settle the claims raised in the Derivative Matters pursuant to the terms and provisions of the Stipulation after considering, among other things: (a) the substantial benefits that Current PureCycle Stockholders and PureCycle have received or will receive from the Settlement, (b) the attendant risks of continued litigation, (c) actions taken by the Company and its Board of Directors in response to the alleged material misstatements and omissions; and (d) the desirability of permitting the Settlement to be consummated.

In particular, Settling Stockholders and Settling Stockholders' Counsel considered the significant litigation risk inherent in shareholder derivative litigation.  The law imposes significant burdens on plaintiffs for pleading and proving a shareholder derivative claim.  While Settling

Stockholders believe their claims are meritorious, Settling Stockholders acknowledge that there is a substantial risk that the Derivative Matters may not succeed in producing a recovery in light of the applicable legal standards and possible defenses. Settling Stockholders and Settling Stockholders' Counsel believe that, under the circumstances, they have obtained the best possible relief for PureCycle and Current PureCycle Stockholders.

**B.  Why Did the Settling Defendants Agree to Settle?**

Settling Defendants have strenuously denied, and continue strenuously to deny, each and every allegation of liability or wrongdoing made against them in the Derivative Matters, and assert that they have meritorious defenses to those claims and that judgment should be entered dismissing all claims against them with prejudice. Settling Defendants have thus entered into this Stipulation solely to avoid the continuing additional expense, inconvenience, and distraction of litigating the Derivative Matters and/or any related litigation and to avoid the risks inherent in any lawsuit, and without admitting any wrongdoing or liability whatsoever.

## VI.  SETTLEMENT HEARING

On         , 2024, at __.m., the Court will hold the Settlement Hearing either in person at the United States District Courthouse for the District of Delaware, 844 N. King Street, Wilmington, Delaware, 19801, or by telephone or videoconference (at the discretion of the Court). At the Settlement Hearing, the Court will consider whether the Settlement is fair, reasonable and adequate and thus should be finally approved and whether the Federal Action should be dismissed with prejudice pursuant to the Stipulation. The Court also will rule upon the Fee and Expense Amount to Settling Stockholders' Counsel and Settling Stockholders' Service Award.

## VII.  RIGHT TO ATTEND SETTLEMENT HEARING

Any Current PureCycle Stockholder may, but is not required to, appear in person at the Settlement Hearing. If you want to be heard at the Settlement Hearing in opposition to the

Settlement, the Fee and Expense Amount or the Service Award, then you must first comply with the procedures for objecting, which are set forth below. The Court has the right to change the hearing dates or times without further notice. Thus, if you are planning to attend the Settlement Hearing, you should confirm the date and time before going to the Court. CURRENT PURECYCLE STOCKHOLDERS WHO HAVE NO OBJECTION TO THE SETTLEMENT DO NOT NEED TO APPEAR AT THE SETTLEMENT HEARING OR TAKE ANY OTHER ACTION.

**VIII. RIGHT TO OBJECT TO THE SETTLEMENT AND PROCEDURES FOR DOING SO**

You have the right to object to any aspect of the Settlement. You must object in writing, and you may request to be heard at the Settlement Hearing. If you choose to object, then you must follow these procedures.

**A. You Must Make Detailed Objections in Writing**

Any objections must be presented in writing and must contain the following information:

1. Notice of intent to appear at the Settlement Hearing;

2. Your name, legal address, and telephone number;

3. Proof of being a Current PureCycle Stockholder as of the Record Date and representation that you will continue to own PureCycle common stock as of the date of the Settlement Hearing;

4. The date(s) you acquired your PureCycle shares and the number of PureCycle shares held;

5. A <u>detailed statement</u> of your specific position with respect to the matters to be heard at the Settlement Hearing, including a statement of each objection being made; and

6. The grounds for each objection or the reasons for your desire to appear and to be heard.

The Court will not consider any objection that does not substantially comply with these requirements.

**B.      You Must Timely Deliver Written Objections to Lead Counsel**

YOUR WRITTEN OBJECTIONS MUST BE FILED WITH THE COURT AND SENT BY HAND OR BY FIRST CLASS MAIL, POSTAGE PRE-PAID TO SETTLING STOCKHOLDERS' COUNSEL.  THE WRITTEN OBJECTIONS MUST BE FILED WITH THE COURT AND POSTMARKED NO LATER THAN _____, 2024, WHICH IS FOURTEEN (14) CALENDAR DAYS PRIOR TO THE SETTLEMENT HEARING to the following address:

David C. Katz
Joshua M. Rubin
Weiss Law
4 Brighton Rd., Suite 204
Clifton, NJ 07012
Lead Counsel

The Court will not consider any objection that is not timely filed with the Court and delivered to Settling Stockholders' Counsel.

Any person or entity who fails to object or otherwise requests to be heard in the manner prescribed above will be deemed to have waived the right to object to any aspect of the Settlement or otherwise request to be heard (including the right to appeal) and will be forever barred from raising such objection or request to be heard in this or any other action or proceeding, but shall otherwise be bound by the Judgment to be entered and the releases to be given.

**IX.      HOW TO OBTAIN ADDITIONAL INFORMATION**

This Notice summarizes the Settling Parties' Stipulation.  It is not a complete statement of the events of the Derivative Matters or the Stipulation.  Although the Settling Parties believe that the descriptions about the Settlement that are contained in this Notice are accurate in all material

respects, in the event of any inconsistencies between the descriptions in this Notice and the Stipulation, the Stipulation will control.

You may inspect the Stipulation and other papers at https://www.purecycle.com/ and https://www.weisslaw.co.

PLEASE DO NOT CALL, WRITE, OR OTHERWISE DIRECT QUESTIONS TO EITHER THE COURT OR THE CLERK'S OFFICE. Any questions you have about matters in this Notice should be directed by telephone or in writing to Settling Stockholders' Counsel, David C. Katz or Joshua M. Rubin, at the address set forth above.

## X.    NOTICE TO PERSONS OR ENTITIES HOLDING OWNERSHIP ON BEHALF OF OTHERS

Brokerage firms, banks and/or other persons or entities who held shares of PureCycle common stock for the benefit of others are requested to immediately send this Notice to all of their respective beneficial owners. If Current PureCycle Stockholders have questions or comments about the Settlement, they should follow the procedures listed in Section IX.


Dated _____                                        BY ORDER OF THE UNITED STATES
                                                        DISTRICT COURT FOR THE DISTRICT
                                                        OF DELAWARE

# Exhibit D

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: PURECYCLE TECHNOLOGIES, INC. DERIVATIVE LITIGATION | Lead Case No. 21-1569-RGA |

## [PROPOSED] FINAL JUDGMENT AND ORDER OF DISMISSALWITH PREJUDICE

**WHEREAS:**

(A)     This Federal Action was originally commenced on November 3, 2021 as the *Han* Action, Civil Action No. 1:21-cv-01569-RGA.  By order dated July 27, 2023, the *Han* Action was consolidated with the *Ayers* Action, Civil Action No. 1:22-cv-00110-RGA, and this Court appointed Weiss Law as lead counsel.

(B)     Following a full day mediation session on March 5, 2024, a half-day mediation session on March 13, 2024, and an additional full day mediation session on April 2, 2024, all before Jed D. Melnick, Esq. of Judicial Arbitration and Mediation Services ("JAMS"), and subsequent negotiations, the parties reached an agreement to settle the claims asserted in the Derivative Matters as reflected in the Stipulation and Agreement of Settlement dated July 17, 2024.

(C)     Pursuant to the Preliminary Order entered on _____,  this Court scheduled a Settlement Hearing for_____, 2024, at _____ _.m. to, *inter alia*, determine whether the proposed Settlement was fair, reasonable, and adequate, and should be approved by the Court.

(D)     The Court has received affidavit(s) and/or declaration(s) attesting to compliance with the terms of the Preliminary Order, including the Company publishing a press release, and filing a Form 8-K with the U.S. Securities and Exchange Commission disclosing the Settlement and attaching a copy of the Notice, and posting of the Notice and Stipulation to the Company's website, and Settling Stockholders' Counsel posting the Notice and Stipulation to their websites.

(E)     Due to adequate notice having been given to Current PureCycle Stockholders as required by the Preliminary Order, and the Court having held a Settlement Hearing on ___, 2024, and the Court having considered all papers filed and proceedings in this Federal Action and otherwise being fully informed of the matters herein and good cause appearing.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED:**

1.      The Provisions of the Stipulation, including definitions of the terms used therein, are hereby incorporated by reference as though fully set forth herein.  All capitalized terms used herein have the meanings set forth in the Stipulation.

2.      This Court has jurisdiction over the subject matter of this Federal Action, including all matters necessary to effectuate the Settlement, and over all parties to this Federal Action.

3.      This Court finds that the publishing, posting and filing of the Notice, which was implemented in accordance with the terms of the Stipulation and the Court's Preliminary Order:

(a)  Constituted the best practicable notice to Current PureCycle Stockholders under the circumstances of this Federal Action;

(b) Was reasonably calculated, under the circumstances, to apprise Current PureCycle Stockholders of: (i) the Settlement of the Derivative Matters; (ii) their right to object and the procedures to object to any aspect of the Settlement; (iii) their right to appear at the Settlement Hearing, either on their own or through counsel hired at their own expense; (iv) the Fee and Expense Amount to Settling Stockholders' Counsel; (v) the Service Award to Settling Stockholders; and (vi) the binding effect of the proceedings, rulings, orders, and judgments in this Federal Action on other potential or filed actions or claims, whether favorable or unfavorable; and

(c)  Was reasonable and constituted due, adequate, and sufficient notice to all persons entitled to be provided with notice and fully satisfied Rule 23.1 of the Federal Rules of

Civil Procedure and the requirements of due process and complied with the rules of this Court.

4. The terms and provisions of the Stipulation were negotiated by the parties at arm's length and were entered into by the parties in good faith.

5. The Court finds that the Settlement set forth in the Stipulation provides substantial benefits to PureCycle and is fair, reasonable, adequate, and in the best interests of Current PureCycle Stockholders, taking into account, *inter alia*, the benefits to PureCycle and Current PureCycle Stockholders; the complexity, expense, and possible duration of further litigation; the risks of establishing liquidity and damages; and the costs of continued litigation. The Settlement set forth in the Stipulation is hereby finally approved in all respects, in accordance with the terms and provisions therein, and all Settling Parties are hereby bound by the terms of the Settlement as set forth in the Stipulation.

6. Upon the Effective Date, the Settling Stockholders (acting on their own behalf and, derivatively on behalf of PureCycle), the Settling Defendants, and each of the Current PureCycle Stockholders shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever released, relinquished and discharged the Released Claims against the Released Persons and shall be forever enjoined from prosecuting the Released Claims. Nothing herein shall in any way impair or restrict the rights of any Settling Party to enforce the terms of the Settlement.

7. Upon the Effective Date, each of the Released Persons shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever released, relinquished and discharged each and all of the Settling Stockholders and Settling Stockholders' Counsel and their subsidiaries, affiliates, members, directors, officers, employees, partners, agents, heirs, administrators, successors, and assigns from all claims (including Unknown Claims) arising out of, relating to, or in connection with, the institution, prosecution, assertion, settlement or resolution

of the Derivative Matters or the Released Claims. Nothing herein shall in any way impair or restrict the rights of any Settling Party to enforce the terms of the Settlement.

8. Upon the Effective Date, each of the Released Persons shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever released, relinquished and discharged each and all of the other Released Persons from all Released Claims. Nothing herein shall in any way impair or restrict the rights of any Settling Party to enforce the terms of the Stipulation.

9. The Stipulation, and all related documents, shall not be construed as or deemed to be evidence of (i) any presumption, an admission, or concession on the part of any Settling Defendant, or any of the Released Persons, with respect to any claim of any fact alleged by Settling Stockholders or any PureCycle stockholder, the validity of any claim that was or could have been asserted by Settling Stockholders or any PureCycle stockholder, or any deficiency or any defense that has been or could have been asserted by Settling Defendants in the Derivative Matters, or in any other litigation, or (ii) any liability, negligence, fault, wrongdoing, or damage whatsoever of any kind of any of the Released Persons, or in any way referred to for any other reason as against any of Released Persons, in any civil, criminal, or administrative action or proceeding, other than such proceeding.

10. Whether or not the Effective Date occurs or the Stipulation is terminated, neither the Stipulation nor the Settlement contained therein, nor any act performed or document executed pursuant to or in furtherance of the Stipulation or the Settlement:

(a) may be deemed, or shall be used, offered, or received against Settling Defendants or Released Persons, or each or any of them, as an admission, concession or evidence of, the validity of any Released Claims, the truth of any fact alleged by Settling Stockholders, the deficiency of any defense that has been or could have been asserted in the litigation, or

of any alleged wrongdoing, liability, negligence, or fault of the Settling Defendants and the Released Persons, or any of them;

(b) may be deemed, or shall be used, offered or received against Settling Stockholders or any Current PureCycle Stockholder, or each or any of them, as an admission, concession or evidence of, the validity or invalidity of any of the Released Claims, the infirmity or strength of any claims raised in the Derivative Matters, the truth or falsity of any fact alleged by Settling Defendants, or the availability or lack of availability of meritorious defenses to the claims raised in the Derivative Matters.

11. Any party or any of the Released Persons may file the Stipulation and/or this Judgment in any action that may be brought against such party or parties in order to support a defense or counterclaim based on principles of *res judicata*, collateral estoppels, release, good faith settlement, judgment bar or reduction or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim.

12. In the event that the Settlement does not become effective in accordance with the terms of the Stipulation, this Judgment shall be rendered null and void to the extent provided by and in accordance with the Stipulation and shall be vacated, and in such event, all orders entered and releases delivered in connection herewith shall be null and void to the extent provided by and in accordance with the Stipulation.

13. The Court finds that during the course of this Federal Action, all Settling Parties, Settling Stockholders' Counsel, and Settling Defendants' Counsel at all times complied with the requirements of Rule 11 of the Federal Rules of Civil Procedure and all other rules of professional conduct.

14.     The Fee and Expense Amount and Service Awards, as set forth in the Stipulation, are hereby approved. Settling Stockholders' Counsel shall allocate the Fee and Expense Amount among themselves in accordance with the Stipulation.

15.     Without affecting the finality of this Judgment in any way, this Court hereby retains continuing jurisdiction over: (i) implementation of the Settlement; and (ii) the Settling Parties for the purpose of construing, enforcing, and administering the Stipulation and the Settlement, including, if necessary, setting aside and vacating this Judgment, on motion of a party, to the extent consistent with and in accordance with the Stipulation if the Effective Date fails to occur in accordance with the Stipulation.

16.     This Federal Action and all Released Claims are dismissed with prejudice.  The parties are to bear their own fees and costs, except as otherwise provided in the Stipulation or this Judgment.

17.     The provisions of this Judgment constitute a full and complete adjudication of the matters considered and adjudged herein, and the Court determines that there is no just reason for delay in the entry of this Judgment.  The Clerk is hereby directed to immediately enter this Judgment.

**SO ORDERED** in the District of Delaware on_____, 2024.

_____
THE HON. RICHARD G. ANDREWS
UNITED STATES DISTRICT JUDGE