**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE: PURECYCLE TECHNOLOGIES, INC. DERIVATIVE LITIGATION | Lead Case No. 21-1569-RGA |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION
<u>FOR FINAL APPROVAL OF SETTLEMENT</u>**

Dated:  April 10, 2025

Of Counsel:

**WEISS LAW**
David C. Katz
Joshua M. Rubin
Mark D. Smilow
305 Broadway, 7th Floor
New York, NY 10007
Telephone: (212) 682-3025
dkatz@weisslawllp.com
jrubin@weisslawllp.com
msmilow@weisslawllp.com

*Lead Counsel for Plaintiff*

**LEVI & KORSINSKY, LLP**
Gregory M. Nespole
Correy A. Suk
33 Whitehall Street, 17th Floor
New York, NY 10004
Telephone: (212) 363-7500
gnespole@zlk.com
csuk@zlk.com

*Additional Counsel for Plaintiff*

**COOCH AND TAYLOR, P.A.**
Blake A. Bennett (#5133)
The Brandywine Building
1000 N. West St., Suite 1500
Wilmington, DE 19801
Telephone: (302) 984-3800
bbennett@coochtaylor.com

*Liaison Counsel for Plaintiff*

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................... 1

II.    STATEMENT OF FACTS ....................................................................................... 3

III.   THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE ......................... 5

  A.   Legal Standards Governing Final Approval............................................................ 5

  B.   The Settlement Merits A Presumption Of Fairness.................................................. 6

  C.   The Benefit Provided To PureCycle Strongly Supports Final Approval.................... 9

  D.   Evaluation Of The Other Relevant Factors Demonstrates The Substantive Fairness, Reasonableness, And Adequacy Of The Settlement ............................................... 13

    1.   The Nature and Risks of Litigation .................................................................. 14

    2.   The Reaction of PureCycle's Stockholders....................................................... 16

    3.   The Stage of Proceedings and Discovery Completed ......................................... 17

    4.   The Ability of Defendants to Withstand a Greater Judgment............................... 18

    5.   The Range of Reasonableness of the Settlement in Light of the best Possible Recovery and Litigation Risks ......................................................................................... 19

IV.    CONCLUSION ..................................................................................................... 20

## TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*Bell Atl. Corp. v. Bolger*,
  2 F.3d 1304 (3d Cir. 1993) ...................................................................................5, 6, 9

*Citron v. Burns*,
  1985 Del. Ch. LEXIS 382 (Del. Ch. Feb. 4, 1985) ...................................................11

*Clark v. Ecolab Inc.*,
  2010 U.S. Dist. LEXIS 47036 (S.D.N.Y. May 11, 2010) ..........................................6

*Cohn v. Nelson*,
  375 F. Supp. 2d 844 (E.D. Mo. 2005) .....................................................................11

*Curiale v. Lenox Grp., Inc.*,
  2008 U.S. Dist. LEXIS 92851 (E.D. Pa. Nov. 14, 2008) ...........................................9

*Du v. Blackford*,
  2018 U.S. Dist. LEXIS 211796 (D. Del. Dec. 17, 2018) ...........................................6

*Ehrheart v. Verizon Wireless*,
  609 F.3d 590 (3d Cir. 2010) .................................................................................6, 9

*Girsh v. Jepson*,
  521 F.2d 153 (3d Cir. 1975) ........................................................................ *passim*

*Glickenhaus & Co. v. Household Int'l, Inc.*,
  787 F.3d 408 (7th Cir. 2015) .................................................................................15

*In re Cendant Corp. Litig.*,
  264 F.3d 201 (3d Cir. 2001) ..................................................................................14

*In re Chemed Corp., S'holder Derivative Litig.*,
  2019 U.S. Dist. LEXIS 36168 (D. Del. Feb. 26, 2019) ............................................15

*In re Educ. Testing Serv. Praxis Principles of Learning & Teaching, Grades 7-12 Litig.*,
  447 F. Supp. 2d 612 (E.D. La. 2006) .......................................................................7

*In re Healthcare Servs. Grp., Inc. Deriv. Litig.*,
  2022 U.S. Dist. LEXIS 134005 (E.D. Pa. July 28, 2022) ...........................................8

*In re Impinj, Inc. Derivative Litig.*,
2021 U.S. Dist. LEXIS 224687 (D. Del. Nov. 22, 2021) ...............................................14, 16, 18

*In re Intel Corp. Derivative Litig.*,
2010 U.S. Dist. LEXIS 74661 (D. Del. July 22, 2010) ........................................................6, 16

*In re Johnson & Johnson Derivative Litig.*,
900 F. Supp. 2d 467 (D.N.J. 2012) .........................................................................................17

*In re Lucent Techs., Inc. Sec. Litig.*,
307 F. Supp. 2d 633 (D.N.J. 2004)..........................................................................................19

*In re Mego Fin. Corp. Sec. Litig.*,
213 F.3d 454 (9th Cir. 2000) .....................................................................................................7

*In re Metro. Life Ins. Co. Sales Practices Litig.*,
1999 U.S. Dist. LEXIS 22688 (W.D. Pa. Dec. 28, 1999) ........................................................8

*In re Nat'l Football League Players Concussion Inj. Litig.*,
821 F.3d 410 (3d Cir. 2016) ....................................................................................................17

*In re NeuStar, Inc. Sec. Litig.*,
2015 U.S. Dist. LEXIS 165320 (E.D. Va. Dec. 8, 2015) ..........................................................7

*In re Pfizer Inc. S'holder Derivative Litig.*,
780 F. Supp. 2d 336 (S.D.N.Y. 2011) .....................................................................................14

*In re Processed Egg Prod. Antitrust Litig.*,
284 F.R.D. 249 (E.D. Pa. 2012) ..............................................................................................17

*In re Warfarin Sodium Antitrust Litig.*,
391 F.3d 516 (3d Cir. 2004) ....................................................................................................15

*In re Wilmington Tr. Sec. Litig.*,
2018 U.S. Dist. LEXIS 114132 (D. Del. July 10, 2018) ..........................................................18

*In re Wilmington Tr. Sec. Litig.*,
2018 U.S. LEXIS 196644 (D. Del. Nov. 19, 2018) ..........................................................16, 19

*Kahn v. Lynch Commc'n Sys., Inc.*,
669 A.2d 79 (Del. 1995) ..........................................................................................................15

*Pfeiffer v. Alpert*,
2011 U.S. Dist. LEXIS 174370 (D. Del. August 3, 2011) ........................................................13

*Shlensky v. Dorsey*,
    574 F.2d 131 (3d Cir. 1978) ........................................................................................5

*Unite Nat'l Ret. Fund v. Watts*,
    2005 U.S. Dist. LEXIS 26246 (D.N.J. Oct. 27, 2005) ......................................... *passim*

*United Food and Com. Workers Union v. Zuckerberg*,
    262 A.3d 1034. (Del. Sept. 23, 2021) ......................................................................14

**Statutes**

*Fed. R. Civ. P. 23.1* ....................................................................................................3, 16

8 *Del. C.* §220 ...........................................................................................................2, 8, 17

iv

Plaintiff Patrick Ayers ("Plaintiff") in the above-captioned consolidated derivative action (the "Federal Action") respectfully submits this Memorandum of Law in Support of the Motion for Final Approval of Settlement[1] (the "Motion").

## I.    INTRODUCTION

Plaintiff is pleased to present the Settlement of the Derivative Matters.[2] The Settlement is an outstanding resolution of this highly complex action. The Settlement provides for (i) a cash payment of $3,000,000 to nominal defendant PureCycle Technologies, Inc. ("PureCycle" or the "Company"), the real party in interest here, and (ii) the implementation of material changes to the Company's practices, policies and procedures, internal controls and Board composition (the "Reforms"). The Reforms will substantially reduce the likelihood that the Company will suffer the damaging consequences of similar alleged misconduct going forward and lay a necessary foundation for restoring the confidence of investors and financial markets. *See* Stip. ¶¶2.3, 2.4; Ex. 3 ("Korsmo Decl.") ¶¶2, 10, 14, 27, 61–62, 67–68, 71–77. The Settlement constitutes an exceptional outcome, particularly considering that a cash recovery is rare in stockholder derivative litigation, especially in the absence of a regulatory action or criminal charges to provide a roadmap to recovery. Accordingly, Plaintiff seeks final approval of the Settlement in recognition of the immediate and substantial benefits the Settlement provides to PureCycle and its stockholders.

---

[1] The terms of the Settlement are set forth in the Stipulation and Agreement of Settlement dated July 17, 2024 (the "Stipulation" or "Stip.," D.I. 33-1). All capitalized terms that are not otherwise defined herein shall have the same definitions as set forth in the Stipulation. Additionally, unless otherwise noted, all internal quotation marks and citations are omitted, and all emphasis is supplied. "Ex. __" citations herein refer to the Exhibits attached to the Declaration of David C. Katz in Support of Plaintiff's Motions for Final Approval of Settlement and of Fee and Expense Amount and Service Awards ("Katz Decl.") filed contemporaneously herewith.

[2] This Settlement also resolves the claims asserted in a related stockholder derivative action pending in the Delaware Court of Chancery captioned *Brunson v. Otworth, et al.*, No. 2024-0326-NAC (Del. Ch.) (the "Delaware Chancery Action"), as well as demands made by PureCycle stockholders Thomas Workman and Tyler Begley (the "Demanding Stockholders") (the Demanding Stockholders' demands, together with this Federal Action and the Delaware Chancery Action, are referred to herein as the "Derivative Matters").

The Settlement results from extensive, arm's-length negotiations by experienced, well-informed counsel representing the Settling Parties after substantial investigation, with the assistance of a nationally recognized, well-respected and experienced neutral, Jed D. Melnick, Esq. (the "Mediator"), who separately served as mediator for the related Securities Action. As such, the Settlement warrants the presumption of fairness that such mediated compromises are typically afforded. Indeed, the Mediator confirms that the negotiations were substantive, difficult, and conducted at arm's length, without a hint of collusion. Ex. 4 ("Melnick Decl."), ¶12. If the Settlement is approved, the Company's Insurers will pay $3 million to PureCycle (the "Monetary Component") and the Company will adopt, implement, and/or maintain the Reforms for a period of at least five years. *See* Stip. ¶¶2.3 (A)-(P), 2.4.

Plaintiff's expert, Professor Charles R. Korsmo of Case Western Reserve University, confirms in his accompanying declaration the significant value of the Reforms to the Company and its stockholders, even under highly conservative assumptions. *See* Ex. 3, ¶2. Specifically, Professor Korsmo concludes that, while the Reforms' economic value cannot be determined with mathematical precision, an estimate of the harm to the Company as a result of the alleged misconduct, combined with conservative estimates of the reduced risk of recurrence due to the Reforms and a review of the empirical academic literature on the value of similar governance improvements confirm to a reasonable degree of certainty that the Reforms have a monetary value to the Company and its stockholders of at least $33.8 million. *Id*. at ¶14.

The Board, on behalf of the Company and by resolution of the Board's independent directors, in a determination made in the good faith exercise of the Board's business judgment, confirmed that: (i) the Settlement, including the Reforms, confer substantial benefits on the Company and its stockholders, and serve the best interests of the Company and its stockholders; and (ii) the Settling Stockholders' litigation, litigation demands, books and records demands pursuant to 8 *Del. C.* §220, and settlement efforts in the Derivative Matters are the sole cause of the Monetary Component to be made as part of this Settlement and

the primary cause of the Board's agreement to adopt, implement, and maintain the Reforms for the agreed five year term. *See* Stip. ¶2.3.

In the Preliminary Approval Order entered on February 13, 2025 (D.I. 51), the Court found that the $3,000,000 Monetary Component and the Reforms appear "to be a fair and reasonable settlement." After entry of the Preliminary Approval Order, PureCycle and Settling Stockholders' Counsel disseminated and published the Notice in the manner approved by the Court as meeting Rule 23.1 and due process standards. *See* Ex. 1. Since that Notice was disseminated, no objections have been received by Plaintiff's Counsel, indicating strong support for the Settlement among PureCycle's substantial stockholder base, including numerous large financial institutions. Katz Decl. ¶¶12, 70. For these reasons, and the reasons in Plaintiff's Memorandum of Law in Support of Final Approval of Fee and Expense Amount and Service Awards filed contemporaneously herewith, Plaintiff now respectfully submits that the Settlement should be approved in all respects, and the proposed Judgment entered by the Court.

## II.    STATEMENT OF FACTS

PureCycle holds a license for restoring waste Polypropylene, or "PP," into virgin-like resin using a proprietary process that removes color, odor, and other contaminants from recycled "feedstock." ¶75.[3] This technology has substantial value in the marketplace given that Polypropylene represents 28% of all plastic used internationally, but only 0.8% of all Polypropylene used can be recycled since it is used in food packaging and other products that make it difficult to sort and clean. ¶68.

On November 16, 2020, PureCycle announced that it would list its common stock on the NASDAQ via a reverse merger with Roth CH Acquisition I Co., a special purpose acquisition company or "SPAC." ¶74. The press release announcing the Merger touted the Company's "revolutionary and

---

[3] All references to Plaintiff's Consolidated Verified Stockholder Derivative Complaint (D.I. 26) (the "Complaint") will take the form "¶___."

proprietary cost-effective method to recycle waste [P]olypropylene to virgin-like resin," which was "more cost-efficient and environmentally sustainable than the traditional manufacturing process of producing virgin [P]olypropylene, utilizing approximately 75% less energy," "suitable for high-value, good-grade consumer products." ¶¶74-75.  In the press release, it was further represented that PureCycle was "well-positioned to meet the consumer demand" since it held "long term contracts for feedstock" to recycle and satisfy "long term offtake agreements with leading global customers and Fortune 500 partners for all of the production." ¶75. The press release touted PureCycle's "experienced management team," representing that they had over 23 years of experienced leading and "scaling early-stage companies." ¶77.

The Individual Defendants made similar statements in the offering materials for the Merger and, subsequently, in periodic public filings with the SEC. In the Preliminary Proxy filed on November 16, 2020, and amended on February 12, 2021, the Defendants touted the Company's "ground-breaking patented recycling process," which "converts waste plastic into near-virgin plastic, fully closing the loop on the reuse of recycled plastics while making recycled [P]olypropylene more accessible at scale to companies desiring to use a sustainable, recycled resin." ¶87. As to PureCycle's "strong management team," the Defendants represented that it "has broad experience across plastics manufacturing, plant development, technology, R&D, sales, marketing accounting and finance," that Defendant Michael Otworth "has over 23 years' experience leading and scaling early stage companies" and has a "proven track record of founding and capitalizing startups," and that Defendant David Brenner "brings over 15 years' experience leading transformational projects in a range of industries." ¶89.

Subsequently, a detailed research report published by an investment research firm, Hindenburg Research, made allegations regarding the various representations purportedly made by PureCycle and its directors and officers. After speaking with numerous former employees of an entity which formerly employed one of PureCycle's highly touted "strong management team," the firm reported that all of the

companies previously taken public by this separate entity had failed. ¶108. The report also alleged that PureCycle was facing much higher competition for high quality feedstock—an essential raw material— than it had led investors to believe, that the Company's technological process was a long way from being functional, and that it was currently unable to scale recycled PP on a commercial level. ¶¶116–122. The cumulative impact of these allegations damaged PureCycle's credibility among investors. PureCycle's shares dropped precipitously by 40%, from its May 5, 2021, closing price of $24.59 per share to a May 6, 2021 closing price of $14.83 per share. ¶123.

After publication of the report, securities class action lawsuits were filed against PureCycle, its then-CEO, and other officers of the Company alleging violations of the anti-fraud provisions of the federal securities laws which were later consolidated under the caption *Theodore v. PureCycle Technologies, Inc. et al.*, Case No. 6:21-cv-809 (M.D. Fla.). Under the auspices of the Mediator, the Securities Action was settled for $12 million. A second securities class action, captioned *Southgate v. PureCycle Technologies, Inc. et al*., No. 1:23-cv-08605 (S.D.N.Y.), was filed against the Company and certain of its officers on behalf of a class that purchased PureCycle stock between April 25, 2023, and December 18, 2023, inclusive, which was dismissed with prejudice.

## III.     THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE

### A.        Legal Standards Governing Final Approval

The Court's role when considering final approval is to determine whether the proposed settlement is "fair, adequate, reasonable and proper, and in the best interests of the class and the shareholders." *Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1310 (3d Cir. 1993). The "principal factor" to be considered "is the extent of the benefit to be derived from the proposed settlement by the corporation, the real party in interest." *Shlensky v. Dorsey*, 574 F.2d 131, 147 (3d Cir. 1978). Courts in the Third Circuit employ the factors set forth in *Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975), to evaluate the fairness, reasonableness, and adequacy of a proposed settlement, which include:

(1) the complexity, expense and likely duration of the litigation; (2) the reaction of the shareholders to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the derivative action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement agreement in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*In re Intel Corp. Derivative Litig.*, 2010 U.S. Dist. LEXIS 74661, at *3-4 (D. Del. July 22, 2010).

Final approval of the settlement should be granted unless the Court finds reason to doubt the fundamental fairness of the settlement or discovers other obvious deficiencies. *See Bell Atl.*, 2 F.3d at 1318 (affirming substantive fairness of a non-collusive derivative settlement).

**B.     The Settlement Merits A Presumption Of Fairness**

There is a "strong presumption in favor of voluntary settlement agreements" in the Third Circuit. *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 594 (3d Cir. 2010). "This presumption is especially strong in class actions and other complex cases." *Id.* at 595. Thus, "[t]he strong judicial policy in favor of class action settlement contemplates a circumscribed role for the district courts in settlement review and approval proceedings." *Id.* When a settlement is achieved through arm's-length negotiations between or among experienced counsel, it merits a presumption of fairness and reasonableness. *See Du v. Blackford*, 2018 U.S. Dist. LEXIS 211796, at *13 (D. Del. Dec. 17, 2018); *see also Clark v. Ecolab Inc.*, 2010 U.S. Dist. LEXIS 47036, at *17-18 (S.D.N.Y. May 11, 2010) ("Absent fraud or collusion, [courts] should be hesitant to substitute [their] judgment for that of the parties who negotiated the settlement.") (alterations in original).

The presumption of fairness applies here because the Settlement is the product of extensive, arm's-length negotiations by well-informed, skilled, and experienced counsel. *See* Katz Decl. ¶28; Melnick Decl. ¶¶16, 18, 20, 21. Among Settling Stockholders' Counsel are nationally recognized leaders in the field of stockholder rights litigation with decades of experience and an extensive track record of securing substantial

recoveries for corporations and their stockholders.[4] *See In re NeuStar, Inc. Sec. Litig.*, 2015 U.S. Dist. LEXIS 165320, at *11 (E.D. Va. Dec. 8, 2015) (where counsel include "nationally recognized members of the securities litigation bar," the Court "may pay heed to Counsel's judgment in approving, negotiating, and entering into a putative settlement"). Defendants were at all times represented by highly skilled and experienced lawyers from renowned law firms Dechert LLP, DLA Piper LLP (US), and Dinsmore & Shohl LLP.

Settling Stockholders' Counsel acted on an informed basis in negotiating the Settlement. *See* Katz Decl. ¶¶29, 50, 67, 71; Melnick Decl. ¶¶16, 18, 21.[5] "[T]he question is not whether the parties have completed a particular amount of discovery, but whether the parties have obtained sufficient information about the strengths and weaknesses of their respective cases to make a reasoned judgment about the desirability of settling the case on the terms proposed or continuing to litigate it." *In re Educ. Testing Serv. Praxis Principles of Learning & Teaching, Grades 7-12 Litig.*, 447 F. Supp. 2d 612, 620-21 (E.D. La. 2006); *see also In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) ("[F]ormal discovery is not a necessary ticket to the bargaining table where the parties have sufficient information to make an informed decision about settlement."). Here, Plaintiff's Counsel thoroughly considered the relevant facts and law and conducted an extensive investigation relating to the claims and the underlying events alleged

---

[4] *See* D.I. 33-2, 33-4 - 33-10 (firm resumes of Settling Stockholders' Counsel).

[5] *See also* Declaration of Melinda A. Nicholson on Behalf of Kahn Swick & Foti, LLC in Support of Plaintiff's Motions for Final Approval of Settlement and of Fee and Expense Amount and Service Awards Ex. 5, ¶¶3, 11, 12; Declaration of Seth D. Rigrodsky on Behalf of Rigrodsky Law, P.A. in Support of Plaintiff's Motions for Final Approval of Settlement and of Fee and Expense Amount and Service Awards Ex. 6, ¶¶3,11; Declaration of Thomas W. Elrod on Behalf of Kirby McInerney in Support of Plaintiff's Motions for Final Approval of Settlement and of Fee and Expense Amount and Service Awards Ex. 7, ¶¶4–12; Declaration of Lesley F. Portnoy on Behalf of Portnoy Law in Support of Plaintiff's Motions for Final Approval of Settlement and of Fee and Expense Amount and Service Awards Ex. 8, ¶¶4–12.

in the Federal Action, including the review of books and records produced pursuant to 8 *Del. C.* §220. *See* Katz Decl., ¶29; Melnick Decl., ¶18.

Plaintiff believes that the claims asserted in the Federal Action have merit, but also recognizes and acknowledges the significant risk, expense, and length of time that would be spent in continued proceedings necessary to prosecute the matter through trial and appeal. *See* Katz Decl., ¶¶30, 43. After weighing the risks of continued litigation, Settling Stockholders' Counsel determined that it is in the best interests of PureCycle and its stockholders that the Derivative Matters be fully and finally settled in the manner and upon the terms and conditions set forth in the Stipulation, and that those terms and conditions are fair, reasonable, adequate, and confer substantial benefits upon PureCycle and its stockholders. *See* Stip. §C; Katz Decl. ¶30; Melnick Decl. ¶¶18, 19.[6]

As agreed by the Settling Parties, "the terms of the Settlement are fair, reasonable, and adequate." Stip. §C; *see also* Katz Decl. ¶31; Melnick Decl. ¶19. Courts will presume that settlements are fair, reasonable, and adequate when—as is true here—they result from "arms-length negotiations conducted by experienced and highly capable counsel." *In re Metro. Life Ins. Co. Sales Practices Litig.*, 1999 U.S. Dist. LEXIS 22688, at *76 (W.D. Pa. Dec. 28, 1999); *see also* Katz Decl., ¶31; Melnick Decl. ¶16. In addition, the use of a mediator further "provides assurance that the negotiations occurred at arm's length, without fraud or collusion." *In re Healthcare Servs. Grp., Inc. Deriv. Litig.*, 2022 U.S. Dist. LEXIS 134005, at *22 (E.D. Pa. July 28, 2022). Here, the Mediator confirms that "[c]ounsel involved in the negotiations were

---

[6] *See also* Declaration of Patrick Ayers in Support of Plaintiff's Motions for Final Approval of Settlement and of Fee and Expense Amount and Service Awards Ex. 9 ("Ayers Decl."), ¶¶8, 9, 10, 13; Declaration of John Brunson in Support of Plaintiff's Motions for Final Approval of Settlement and of Fee and Expense Amount and Service Awards Ex. 10, ¶¶8, 9, 10, 13; Declaration of Thomas Workman in Support of Plaintiff's Motions for Final Approval of Settlement and of Fee and Expense Amount and Service Awards Ex. 11, ¶¶8, 9, 10, 13; and Declaration of Tyler Begley in Support of Plaintiff's Motions for Final Approval of Settlement and of Fee and Expense Amount and Service Awards Ex. 12, ¶¶8, 9, 10, 13.

well prepared and fully versed in the facts and law and the Settlement was reached by the Settling Parties after making a careful, well-informed, and considered judgment with respect to the value of the Settlement benefit relative to the risks, costs, and delay that would be entailed in further litigation." Melnick Decl. ¶18. Consideration of the benefits achieved by the Settlement, as well as the relevant *Girsh* factors, demonstrates that the Settlement warrants final approval.

### C.      The Benefit Provided To PureCycle Strongly Supports Final Approval

In determining whether to approve a stockholder derivative settlement, "*[t]he principal factor*…is the extent of the benefit to be derived from the proposed settlement by the corporation, the real party in interest." *Bell Atl.*, 2 F.3d at 1311 (omission in original). The settlement of complex stockholder litigation is both favored and encouraged. *See Ehrheart*, 609 F.3d at 594-95 ("This presumption is especially strong in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation."); *Curiale v. Lenox Grp., Inc.*, 2008 U.S. Dist. LEXIS 92851, at *13 (E.D. Pa. Nov. 14, 2008). Weighed against the substantial risk that continued litigation would yield no greater benefit while imposing substantial costs on PureCycle, the recovery here is fair, reasonable, and adequate.

The Settlement will confer a significant monetary recovery on PureCycle, which is a rarity in stockholder derivative litigation.  A recent study found that only 26% of derivative settlements in cases with a parallel securities class action resulted in any monetary recovery whatsoever; of those more than 25% are fueled by regulatory actions and another 10% are fueled by criminal charges providing a roadmap for recovery, circumstances that did not exist here.[7] *See* Katz Decl. ¶33.

The negotiated Reforms have substantial value to PureCycle and its Stockholders and directly address the root causes of the misconduct and governance failures underlying the allegations in the Federal

---

[7] Laarni T. Bulan & Matthew Davis, *Cornerstone Rsch.*, Parallel Derivative Action Settlement Outcomes: 2023 Review and Analysis (2024), https://www.cornerstone.com/wp-content/uploads/2024/08/Parallel-Derivative-Action-Settlement-Outcomes-2023-Review-and-Analysis.pdf.

Action. *See* Katz Decl. at ¶34; Korsmo Decl. at ¶¶2; 6, 31–32, 62, 64–68, 78. Stip., ¶2.3 (A)-(P). The Reforms, which are set out fully in the Stipulation, include, *inter alia*:

- Expanding the Board by adding two independent directors;

- Requiring the Company to maintain separation of the Board Chair and CEO positions, and requiring the independent directors to meet regularly in executive sessions;

- Requiring engagement of an independent governance consultant or outside legal counsel to analyze the Company's governance practices and report annually to the Board on potential improvements;

- Creating an Operational Excellence Committee ("OEC") of the Board which will be charged with the responsibility of assisting the Board in carrying out the Board's overall responsibility relating to capital project execution and manufacturing and delivering PureCycle products and services;

- Creating a CCO position responsible for managing and overseeing the Company's ethics and compliance programs and implementing procedures for monitoring and evaluating the performance of those programs. These responsibilities include assisting the Board in fulfilling its oversight and disclosure responsibilities, and assisting the Audit and Finance Committee in reviewing material disclosures and reporting to the full Board on material risks and disclosure issues;

- Formalizing the responsibilities of the Company's management-level Disclosure Committee through the adoption of a Disclosure Committee Charter;

- Expanding the responsibility of the Audit and Finance Committee to include compliance and risk management, and formalizing their collaboration with the Disclosure Committee and CCO to enhance disclosure practices and compliance, as well as reporting to the full Board;

- Formalizing the responsibilities of the Company's Senior Leadership Team to ensure the regular monitoring of the Company's strategic initiatives through the adoption of a Senior Leadership Team Charter;

- Strengthening orientation and training programs for directors and employees regarding compliance policies and procedures;

- Requiring management to report to the Board on a quarterly basis regarding the Company's status of operations, commercial contracts, litigation, and other topics relevant to the Board's oversight of the Company's operations and compliance with the law;

- Requiring the Company to maintain and publicize a whistleblower hotline, encouraging interested parties to report ethical, disclosure, and other legal violations that can then be elevated to the Board level where appropriate;

- Requiring the maintenance of the Company's March 2021 Compensation Clawback and Recoupment Policy to ensure that the Company has the ability to recoup executive compensation in the event of detrimental activity and the maintenance of a separate policy pursuant to NASDAQ listing standards applicable to Section 16 Officers; and

- Committing to keep the Reforms in place for five years prior to reassessing them.

These Reforms confer substantial benefits on PureCycle and its stockholders, working to prevent the recurrence of similar misconduct, signaling a compliance-focused "tone at the top" at PureCycle, enhancing the independence and disinterest of the Board and improving the control systems that support the Company's decision-making processes and operations. Korsmo Decl. ¶¶2; 6, 31–32, 62, 64–68, 78; *see Citron v. Burns*, 1985 Del. Ch. LEXIS 382, at *7 (Del. Ch. Feb. 4, 1985). "[S]trong corporate governance is fundamental to the economic well-being and success of a corporation[;]" accordingly, courts have long "recognized that corporate governance reforms such as those achieved here provide valuable benefits for public companies."). Courts encourage settlements that provide for corporate governance reforms "specifically designed to minimize the probability of violations of fiduciary duties and federal securities laws[.]" *Cohn v. Nelson*, 375 F. Supp. 2d 844, 853 (E.D. Mo. 2005). Among other benefits, such reforms make it "far less likely [that the corporation will] become subject to long and costly securities litigation in the future, as well as prosecution or investigation by regulators or prosecutors." *Id.*

The Reforms will significantly reduce the probability that the same or similar lapses in internal controls, disclosure practices, and oversight alleged in the Complaint will recur, will signal to the market the Company's commitment to good governance, legal and regulatory compliance, and proper disclosure practices, and will strengthen the control systems supporting its decision-making processes and operations. Korsmo Decl., at ¶¶2; 6, 30–32, 62, 64–68, 78. The addition of two new independent members to the Board will be a significant step in enhancing objective decision making and implementing strategic discipline and operational improvements. *Id.* ¶¶2, 30(a), 66, 78.  Indeed, three of the seven members of the current Board were designated to the Board in the March 18, 2021 Merger through which PureCycle went public, and

adding two new independent directors will thus not only bring new important, diverse perspectives (D.I. 33-1 Ex. A at 1) to the Board but also help move the Company past the damaging events alleged in the Derivative Matters and the Securities Action and ensure that the Board is acting in a more disinterested and independent manner. Korsmo Decl., ¶30(a). The Reforms further these goals through other means as well, including, but not limited to, requiring that the Company maintain the separation of the CEO and Board Chair positions and that the independent directors regularly meet in executive sessions. *Id.* ¶¶8(b), 30(a).

The creation of the CCO position with oversight over the Company's ethics and legal and regulatory compliance programs will ensure the prompt identification, reporting, mitigation and remediation of material risks relating to compliance or disclosure issues. Korsmo Decl., ¶30(b). The CCO will assist the Audit and Finance Committee by performing an independent review of material disclosures, preparing reports to the full Board regarding material risks, and considering public disclosure thereof. *Id.* The CCO will also oversee investigations into whistleblower complaints and employee risk assessment and compliance training. *Id.*

The Reforms mandate the formation and maintenance of the Board-level OEC with direct oversight over PureCycle's capital project execution and the manufacture and delivery of PureCycle products and services. Korsmo Decl., ¶30(c). The formation of the OEC will ensure that the Board has the information it needs to make better decisions, working to bolster the controls systems that support the Company's decision-making processes and operations. *Id.* at ¶65. The Reforms formalize the duties of PureCycle's Senior Leadership Team, which will serve to support the OEC and management, further optimizing the Company's operations, compliance, and public disclosures. Korsmo Decl. ¶8(k).

Further, the Reforms formalize the management-level Disclosure Committee's duties to directly address the alleged deficiencies in the Company's disclosure controls and procedures. Korsmo Decl., ¶30(d). Expanding the responsibilities of the Audit and Finance Committee to include compliance and risk

management and their collaboration with the Disclosure Committee, CCO, and OEC will provide an additional layer of oversight and a critical cross-check to enhance disclosure practices, legal and regulatory compliance, and operational efficiency. *Id.* These reforms will be complemented by enhanced Board reporting, strengthened clawback and whistleblower policies, and mandatory employee training and director education, all aimed at increasing transparency, accountability, and expertise within the Company. *See* Korsmo Decl. ¶¶ 30(b), (h)-(i), 64.

The Reforms collectively serve to ensure that the Board and its Committees have access to the information they need to exercise effective independent oversight.  They impose detailed decision-making process requirements that will increase the Board's engagement and strengthen its oversight across the enterprise. Studies confirm that this kind of strong, independent Board oversight correlates with better operational decision-making, risk management, and outcomes over time. *See* Korsmo Decl. ¶¶63-65.

As investors and stock analysts come to understand and appreciate PureCycle's strengthened internal controls, enhanced disclosure practices, robust compliance risk management framework, and the many additional ways in which the Reforms have strengthened Board oversight of key operations and public reporting, their value will prompt investors to pay the premium for PureCycle's stock that the market tends to award firms recognized for strong corporate governance regimes.[8] Korsmo Decl., Section V.

### D.    Evaluation Of The Other Relevant Factors Demonstrates The Substantive Fairness, Reasonableness, And Adequacy Of The Settlement

In addition to considering the benefit derived from the settlement, courts "approving shareholder derivative settlements consider the factors applicable to approval of class action settlements." *Pfeiffer v. Alpert*, 2011 U.S. Dist. LEXIS 174370, at *4 (D. Del. August 3, 2011) (quoting *Shlensky*, 574 F.2d at 147)

---

[8] *See e.g., McKinsey & Company Investor Opinion Survey,* McKinsey & Company (June 2000) (Ex. 28) (three-quarters of investors cite board practices as at least as important as financial performance, and, all else being equal, would pay average premium of 18% for securities issued by well-governed company).

("'[T]he standards annunciated in *Girsh v. Jepson* for class suit settlements have accordingly been applied, although perhaps with somewhat less rigor, in the settlement of shareholders' derivative suits.'"). The nine-factor test developed by the Third Circuit in *Girsh* "provides the analytic structure for determining whether a class action settlement is fair, reasonable, and adequate under Rule 23(e)." *In re Cendant Corp. Litig.*, 264 F.3d 201, 231 (3d Cir. 2001). Consideration of these factors weighs in favor of final approval.

### 1.    The Nature and Risks of Litigation

An important purpose of settlement is to avoid the inherent uncertainty, risk, cost, and delay in seeking to better the result through further litigation, concerns that are particularly significant in complex stockholder derivative litigation. *See Unite Nat'l Ret. Fund v. Watts*, 2005 U.S. Dist. LEXIS 26246, at *10 (D.N.J. Oct. 27, 2005); *In re Impinj, Inc. Derivative Litig.*, 2021 U.S. Dist. LEXIS 224687, at *7 (D. Del. Nov. 22, 2021). Here, the Settlement provides valuable benefits to PureCycle and its stockholders while eliminating numerous risks, costs, and burdens of litigation for all concerned, including the Company. Balanced against the delays, costs, and particularly the risks of attempting to secure additional benefits through further litigation and trial, the valuable benefits conferred upon PureCycle and its stockholders render the Settlement fair, reasonable, and adequate. Katz Decl. ¶43; *see also In re Pfizer Inc. S'holder Derivative Litig.*, 780 F. Supp. 2d 336, 340 (S.D.N.Y. 2011). While Plaintiff believes that the claims alleged in the Federal Action are meritorious, continued litigation would be complex, costly, and of substantial duration, and significant risks would remain. Katz Decl. ¶43; Ayers Decl. ¶¶8, 11.

Plaintiff would have faced a motion to dismiss by Defendants challenging the sufficiency of the allegations, as well as whether Plaintiff should have made a demand on the Board before initiating litigation–a daunting task for any derivative plaintiff.[9] *See United Food and Com. Workers Union v.*

---

[9] The Delaware Chancery Action and Demanding Stockholders proceeded on a different theory than Plaintiff in the Federal Action by making a demand upon the PureCycle Board and, in the case of the Delaware Chancery Action, asserting that the demand was wrongfully refused.

*Zuckerberg*, 262 A.3d 1034, 1048-1049. (Del. Sept. 23, 2021); *In re Chemed Corp., S'holder Derivative Litig.*, 2019 U.S. Dist. LEXIS 36168, at *22 (D. Del. Feb. 26, 2019) (successfully alleging that demand is excused is a "difficult feat under Delaware law"). If that motion was defeated, further litigation would still be long, complex and costly. Katz Decl. ¶44. Document discovery would need to be conducted, depositions would need to be taken, experts would need to be designated, and expert discovery would need to be conducted. *Id.* The Settling Defendants' expected motions for summary judgment would have to be briefed and argued and a trial would have to be held. Even if liability were established, Plaintiff would still have to prove damages, which is no easy feat. *In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 537 (3d Cir. 2004) ("[a]fter evaluating several possible bars to plaintiffs' success at trial, the District Court concluded that on balance, the [risks of establishing liability and damages] favored settlement.").

Moreover, a victory at trial is no guarantee that the judgment would ultimately be sustained on appeal or by the trial court. *See, e.g.*, *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408 (7th Cir. 2015) (vacating in part $2.46 billion judgment against securities fraud defendants and remanding for a new trial on limited issues – after 13 years of litigation); *Kahn v. Lynch Commc'n Sys., Inc.*, 669 A.2d 79 (Del. 1995) (dismissal of all plaintiffs' derivative claims on appeal). In addition, the appeals that inevitably follow would likely take several years, with an entirely uncertain outcome. *See Unite Nat'l Ret. Fund*, 2005 U.S. Dist. LEXIS 26246, at *10-11 ("[S]hould this litigation have ensued, the parties would have engaged in a significant amount of discovery, pre-trial motions, an extensive trial followed by post-trial motions and an appeal, all of which would be at great expense…these circumstances could extend the litigation many months or years.").

The Settlement eliminates these and other risks of continued litigation, including the very real risk of no recovery after years of litigation, while providing the Company and its stockholders substantial benefits. Accordingly, these factors support final approval of the Settlement.

### 2.    The Reaction of PureCycle's Stockholders

The reaction of the Company's stockholders to the Settlement also supports final approval. On February 18, 2025, the Court ordered that Notice be provided to PureCycle stockholders, which PureCycle provided in the prescribed manner on February 28, 2025, and which Settling Stockholders' Counsel posted on their respective websites. *See* Katz Decl. ¶40; Ex. 1. The Court observed that this notice "fully satisfies Rule 23.1 of the Federal Rules of Civil Procedure and the requirements of due process, complies with the rules of this Court, and is the best notice practicable under the circumstances[.]" (D.I. 52).

While the deadline for objections has not yet passed, since Notice was disseminated, Plaintiff's Counsel has not yet received any objections or heard from any stockholder that they are dissatisfied with the Settlement. *See* Katz Decl. ¶41. This is significant, especially because PureCycle is held by thousands of stockholders, including numerous sophisticated institutions. *See In re Wilmington Tr. Sec. Litig.*, 2018 U.S. LEXIS 196644, at *16 (D. Del. Nov. 19, 2018) (noting that lack of objections was "particularly remarkable" given large percentage of stock owned by "institutional investors who have the knowledge and resources to properly evaluate a settlement and to object if necessary"). Even considering the unmeritorious objection that the Court has already rejected,[10] the reaction of PureCycle stockholders augurs in favor of final approval of the Settlement. *See Impinj*, 2021 U.S. Dist. LEXIS 224687 at *7 ("As a general rule, a small number of objectors weighs in favor of approval."); *see also Intel*,  2010 U.S. Dist. LEXIS

---

[10] Two days after Plaintiff filed the Motion for Preliminary Approval of the Settlement (D.I. 31), and prior to the dissemination of Notice, one objection was filed by a stockholder (D.I. 35) who, despite acknowledging that the Settlement provided valuable benefits to PureCycle and its stockholders (D.I. 43 at 1), claimed the Notice was unclear as to the Settlement's effect on derivative claims related to a securities class action, *Southgate v. PureCycle Technologies, Inc. et al.*, No. 1:23-cv-08605 (S.D.N.Y.) (an action which was thereafter dismissed with prejudice). *Id.*  The Court rejected the objection, holding that the Notice adequately "advise[d] of the breadth of the release" and, therefore, did "not order any change to any of the documents submitted in connection with the motion for preliminary approval of settlement." (D.I. 50 at 2).

74661, at *4 ("find[ing], with respect to shareholder reactions, that it is very significant that only a few shareholders have objected to the settlement.").

### 3.    The Stage of Proceedings and Discovery Completed

The Third Circuit has recognized that "[i]n some cases, informal discovery will be enough" for counsel to assess the value of the claims and "negotiate a settlement that provides fair compensation." *In re Nat'l Football League Players Concussion Inj. Litig.*, 821 F.3d 410, 436-37 (3d Cir. 2016) (recognizing "significant informal discovery" by counsel as probative of the "strengths and weaknesses of their case"). "Even settlements reached at a very early stage and prior to formal discovery are appropriate where there is no evidence of collusion and the settlement represents substantial concessions by both parties." *In re Johnson & Johnson Derivative Litig.*, 900 F. Supp. 2d 467, 482 (D.N.J. 2012).

Here, "despite the absence of formal discovery," the Settling Parties "fully appreciated the merits of this case." *Unite Nat'l Ret. Fund v. Watts*, 2005 U.S. Dist. LEXIS 26246, at *13 (approving settlement of derivative litigation that was "still in the pre-trial stage" where plaintiffs "undertook extensive investigation" of the underlying claims). Here, Settling Stockholders' Counsel conducted a thorough investigation of the facts and legal sufficiency of the claims, delving deeply into the relevant facts and law, reviewing books and records produced pursuant to 8 *Del. C.* §220, and engaging in frank discussions with Defendants' Counsel in the course of the mediation and settlement process. *See* D.I. 32 at 14-15; Stip. §I(C); Katz Decl. ¶43;[11] Melnick Decl. ¶¶5, 18; *see also In re Processed Egg Prod. Antitrust Litig.*, 284 F.R.D. 249, 267 (E.D. Pa. 2012) ("[A]lthough no formal discovery was conducted[,]…Co-Lead Counsel conducted informal discovery, including, *inter alia*, independently investigating the merits prior to filing

---

[11] *See also* revised counsel declarations: Ex. 6, ¶¶3, 11, 12; Ex. 7, ¶¶3, 11; Ex. 8, ¶¶4–8; Ex. 9, ¶¶4–8.

the complaint (with additional investigation prior to filing amended complaints) and exercising opportunities to review records").

The Settling Parties further stress-tested the underlying merits of and defenses to the Derivative Matters during the extensive mediation process. Global settlement efforts began at the end of February 2024 with a dual-track mediation session for the Securities Action and the Derivative Matters scheduled for February 26, 2024. *See* Melnick Decl. ¶6; Katz Decl. ¶44. The Settling Parties subsequently participated in a full day mediation session on March 5, 2024.  Melnick Decl.  at ¶7; Katz Decl. ¶44. Although the mediation session ended without a negotiated resolution, the process left the Settling Parties better informed regarding each other's assessment of the strengths and weaknesses of their respective claims and defenses. *See* Melnick Decl. ¶7; D.I. 32, at 7-8; Katz Decl. ¶44; Stip. at 5-6. The Settling Parties then engaged in two more formal mediation sessions, on March 13, 2024, and April 2, 2024, during which they continued to engage in frank discussions regarding the strengths and weaknesses of the claims and defenses at issue. *See* Melnick Decl. ¶8; D.I. 32, at 7-8; Stip. at 5-6; Katz Decl. ¶44; *see also In re Wilmington Tr. Sec. Litig.*, 2018 U.S. Dist. LEXIS 114132, at *14 (D. Del. July 10, 2018) ("consider[ing] whether the settlement negotiations occurred at arm's length" and "whether there was significant investigation of Plaintiff's claims"). Accordingly, this factor supports final approval of the Settlement.

### 4.    The Ability of Defendants to Withstand a Greater Judgment

This factor "'is concerned with whether the defendants could withstand a judgment for an amount significantly greater than the settlement.'" *Unite Nat'l Ret. Fund*, 2005 U.S. Dist. LEXIS 26246, at *15 (quoting *Cendant*, 264 F.3d at 240). In a derivative suit like this, the seventh *Girsh* factor "is complicated by the fact that the Individual Defendants are entitled to indemnification from the Company." *Impinj*, 2021 U.S. Dist. LEXIS 224687, at *12. Further litigation could deplete any available insurance, at which point,

"the Company that is supposed to benefit will be spending its own money in providing discovery, indemnifying the Individual Defendants, and funding their own obligations as a Nominal Defendant." *Id.*

Even when defendants "are capable of withstanding a larger judgment," courts in this Circuit have held that this factor "does not weigh heavily for or against the settlement." *Wilmington Tr.*, 2018 U.S. LEXIS 196644, at *20 ("Even if the Court were to presume that the defendants' resources far exceeded the settlement amount, in light of the balance of the other factors considered which indicate the fairness, reasonableness, and adequacy of the settlement, the ability of the defendants to pay more, does not weigh against approval of the settlement.").

The Settlement provides for a $3 million cash payment to the Company, representing a recovery of approximately 30% of the Company's financial damages incurred in defending and resolving the Securities Action, and substantial internal governance and control Reforms. Settling Stockholders and their Counsel determined not to risk this valuable, highly beneficial recovery for the vanishingly small possibility of achieving a better result at trial, and through the appeals that would certainly follow.  Katz Decl. ¶47; Ayers Decl. ¶¶8, 11.

### 5. The Range of Reasonableness of the Settlement in Light of the Best Possible Recovery and Litigation Risks

The eighth and ninth *Girsh* factors analyze how "the present value of the damages the plaintiffs would likely recover if successful, appropriately discounted for the risks of not prevailing…compare[] with the amount of the proposed settlement." *In re Lucent Techs., Inc. Sec. Litig.*, 307 F. Supp. 2d 633, 647 (D.N.J. 2004). However, "[t]he best possible recovery, while arguably more than the settlement, is tempered by the risks of further litigation." *Unite Nat'l Ret. Fund*, 2005 U.S. Dist. LEXIS 26246, at *15. The Settlement provides "immediate and substantial benefits" of a $3 million Monetary Component, as well as the implementation of the Reforms, both of which provide a substantial benefit to PureCycle "and

represents a better option than little or no recovery at all." *Id*. Even if Plaintiff won a judgment after trial, the Reforms could not have been secured absent this Settlement.

Plaintiff ultimately agreed to the Settlement after considering, *inter alia*, (i) the relative strength of Plaintiff's allegations and Settling Defendants' potential defenses thereto, (ii) the considerable amount of fact and expert discovery as well as motion practice necessary to litigate the Federal Action through trial and final judgment, and (iii) the time, expense, and uncertainty of litigating the Federal Action through trial and final judgment as compared to the benefit of certainty in the form of both a monetary recovery and improved corporate governance reforms for the Company. Katz Decl. ¶49; Ayers Decl. ¶8. The Settlement is fair, adequate and reasonable as demonstrated by application of the *Girsch* factors, and, as such, it is respectfully submitted and should be approved by the Court in its entirety.

## IV.    CONCLUSION

For the reasons set forth herein, Plaintiff respectfully requests that the Court enter the proposed Judgment attached as Exhibit D  to the Stipulation granting final approval of the proposed Settlement and granting such other and further relief as the Court deems just and proper.

Dated:  April 10, 2025

**WEISS LAW**
David C. Katz
Joshua M. Rubin
Mark D. Smilow
305 Broadway, 7th Floor
New York, NY 10007
(212) 682-3025
dkatz@weisslawllp.com
jrubin@weisslawllp.com
msmilow@weisslawllp.com

*Lead Counsel for Plaintiff*

**LEVI & KORSINSKY, LLP**
Gregory M. Nespole
Correy A. Suk
33 Whitehall Street, 17th Floor
New York, NY 10004
(212) 363-7500
gnespole@zlk.com
csuk@zlk.com

*Additional Counsel for Plaintiff*

Respectfully submitted,

**COOCH AND TAYLOR, P.A.**

By:  _/s/ Blake A. Bennett_
Blake A. Bennett (#5133)
The Brandywine Building
1000 N. West Street, Suite 1500
Wilmington, DE 19801
(302) 984-3800
bbennett@coochtaylor.com

*Liaison Counsel for Plaintiff*

21